John Morrison
Robert Farris-Olsen
Morrison, Sherwood,
Wilson, & Deola, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
ph. (406) 442-3261
fax (406) 443-7294
john@mswdlaw.com
rfolsen@mswdlaw.com
*Attorneys for Plaintiff Tanya Gersh*

Morris Dees*
J. Richard Cohen*
David C. Dinielli*
James M. Knoepp*
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
ph. (334) 956-8200
fax (334) 956-8481
morris.dees@splcenter.org
richard.cohen@splcenter.org
david.dinielli@splcenter.org
jim.knoepp@splcenter.org
*Attorneys for Plaintiff Tanya Gersh*
*Admitted *Pro Hac Vice*

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
MISSOULA DIVISION

TANYA GERSH,

Plaintiff,

vs.

ANDREW ANGLIN, publisher of
the *Daily Stormer*,

Defendant.

Case No.:  9:17-cv-00050-DLC-JCL

PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

I.   PLAINTIFF HAS COMPLETED SERVICE OF PROCESS
     AND THIS COURT HAS SUBJECT MATTER
     JURISDICTION .................................................................................. 5

     A.   Facts Related to Service of Process and Subject Matter
          Jurisdiction ................................................................................ 5

     B.   This Court Has Subject Matter Jurisdiction ............................. 11

     C.   Plaintiff Sufficiently Served Process on Defendant ................ 14

          1.   Plaintiff's Use of Ohio Law To Serve Process
               Complied with Due Process ............................................ 14

          2.   Plaintiff Complied with Ohio Law To Effect
               Service of Process ........................................................... 15

          3.   Plaintiff Diligently and Timely Served Process ............. 18

II.  DEFENDANT IS LIABLE IN TORT ................................................. 19

     A.   The First Amendment Does Not Protect Against
          Defendant's Liability in Tort .................................................... 19

          1.   Tortious Speech Is Not Protected ................................... 19

          2.   Defendant Can Be Liable for the Harm Inflicted by
               the Troll Storm Messages ............................................... 20

          3.   Defendant Made Plaintiff a "Captive Audience,"
               Which Further Undermines Any Claim to First
               Amendment Protection .................................................... 21

          4.   Defendant's Troll Storm Would Not Be Protected
               Even If It Could Be Said To Relate to a Matter of
               Public Concern or Be Directed at a Public Figure ......... 25

          5.   In Any Event, the Allegations Do Not Support the
               Assertion That Defendant's Troll Storm Related to
               a Matter of Public Concern or That Plaintiff Is a
               Public Figure ................................................................... 26

        a.    Allegations Show That the "Speech" Does Not Relate to a Matter of Public Concern ............ 26

        b.    Allegations Show That Plaintiff Was Not a Public Figure ...................................................... 28

             i.    Even if Plaintiff Were a Public Figure, She Need Not Allege a False Statement Made with Actual Malice ......... 29

             ii.    In Any Event, Plaintiff Alleges False Statements Made with Actual Malice ........ 30

    B.    Defendant's Other Arguments About the Privacy Claim Are Irrelevant .............................................................. 31

    C.    Plaintiff Adequately Alleges that Her Emotional Distress Was a Foreseeable Consequence ............................... 32

III.    DEFENDANT IS LIABLE UNDER THE MONTANA ANTI-INTIMIDATION ACT ............................................................ 33

    A.    The Act Is Not Unconstitutionally Overbroad ......................... 33

    B.    Plaintiff's Allegations State a Claim for Violation of the Act ......................................................................... 36

CONCLUSION ................................................................................. 37

EXHIBIT INDEX ............................................................................. 39

CERTIFICATE OF COMPLIANCE ...................................................... 40

CERTIFICATE OF SERVICE ............................................................. 41

# TABLE OF AUTHORITIES

## CASES

*520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1,*
  760 F.3d 708 (7th Cir. 2014) ...............................................................23
*AM Trust v. UBS AG,*
  681 F. App'x 587 (9th Cir. 2017) ......................................................15
*Americans." F.C.C. v. Pacifica Found.,*
  438 U.S. 726 (1978).............................................................................23
*Berger v. City of Seattle,*
  569 F.3d 1029 (9th Cir. 2009) ..........................................................22
*Bland v. Fessler,*
  88 F.3d 729 (9th Cir. 1996) ...............................................................24
*Borough of Buryea v. Guarnieri,*
  564 U.S. 379 (2011)..............................................................................28
*Brimm v. Genao-Gomez,*
  No. CV 14-197, 2014 WL 5471969 (D. Mont. Oct. 28, 2014) ..........12
*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973)..............................................................................34
*Chan v. Soc'y Expeditions, Inc.,*
  39 F.3d 1398 (9th Cir. 1994) .............................................................14
*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010)..............................................................................27
*City of Ontario v. Quon,*
  560 U.S. 746 (2010)..............................................................................24
*Cohen v. California,*
  403 U.S. 15 (1971)................................................................................22
*Collin v. Smith,*
  578 F.2d 1197 (7th Cir. 1978) ..........................................................37
*Dodds v. Am. Broad. Co.,*
  145 F.3d 1053 (9th Cir. 1998) ..........................................................30
*Erznoznik v. Jacksonville,*
  422 U.S. 205 (1975)..............................................................................22
*First Amendment. United States v. Alvarez,*
  567 U.S. 709 (2012)..............................................................................19
*Free Speech Coal., Inc. v. Shurtleff,*
  No. 2:05CV949, 2007 WL 922247 (D. Utah Mar. 23, 2007) ............24
*Frisby v. Schultz,*
  487 U.S. 474 (1988)..............................................................................22

*Gitlow v. New York*,
    268 U.S. 652 (1925)..............................................................................19

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..............................................................................30

*Hill v. Colorado*,
    530 U.S. 703 (2000)..............................................................................22

*Housh v. Perth*,
    133 N.E.2d 340 (Ohio 1956).................................................................31

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)..............................................................................15

*Johnson v. Johnson*,
    615 F. App'x 430 (9th Cir. 2015) .........................................................11

*Kovacs v. Cooper*,
    336 U.S. 77 (1949)................................................................................23

*Lehman v. City of Shaker Heights*,
    418 U.S. 298 (1974)....................................................................... 22, 23

*LLC Smallwood v. Collins*,
    No. 2:08-CV-679, 2008 WL 5111170 (S.D. Ohio Dec. 2, 2008).......................18

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)..............................................................................23

*Meyer v. Grant*,
    486 U.S. 414 (1988)..............................................................................27

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)..............................................................................15

*N.A.A.C.P. v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)....................................................................... 19, 21

*Nat'l Coal. of Prayer, Inc. v. Carter*,
    455 F.3d 783 (7th Cir. 2006) ................................................................23

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*,
    484 U.S. 97 (1987)................................................................................15

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017)..........................................................................24

*Pest Comm. v. Miller*,
    626 F.3d 1097 (9th Cir. 2010) ..............................................................27

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life
    Activists*,
    290 F.3d 1058 (9th Cir. 2002) ....................................................... 34, 37

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)..............................................................................35

*Rowan v. Post Office Dep't,*
   397 U.S. 728 (1970)................................................................ 22, 23
*Spence v. Washington,*
   418 U.S. 405 (1974)..................................................................22
*State Bd. of Dentistry v. Kandarian,*
   886 P.2d 954 (Mont. 1994).......................................................31
*State ex rel. Hadley v. Pike,*
   No. 14 CO 14, 2014 WL 3744717 (Ohio Ct. App. July 25, 2014)....................16
*Taylor Made Golf Co., Inc. v. Eagle Golf Prods., Inc.,*
   176 F.R.D. 537 (N.D. Ohio 1997) ...........................................18
*U.S. Commodity Futures Trading Comm'n v. Majestic Enters. Collision
   Repair, Inc.,*
   2011 WL 767890 (N.D. Ohio Feb. 28, 2011).....................................16
*United States v. Mendelsohn,*
   896 F.2d 1183 (9th Cir. 1990) ...............................................21
*United States v. Wurzbach,*
   280 U.S. 396 (1930)................................................................34
*United States." Lew v. Moss,*
   797 F.2d 747 (9th Cir. 1986) ................................................ 11, 12
*Vasic v. Patent Health, L.L.C.,*
   2013 WL 4716341 (S.D. Cal. Sept. 3, 2013)...................................17
*Virginia v. Black,*
   538 U.S. 343 (2003)............................................................. 35, 37

## STATUTORY AUTHORITIES

52 U.S.C. § 20310(5)(B)–(C) ..............................................................6
Mont. Code Ann. § 27-1-1503(2) ................................................... 34, 35

## RULES AND REGULATIONS

Fed. R. Civ. P. 4(e)(1) ........................................... 8, 14, 17, 18, 19
Franklin Cty. Ct. Com. Pl. R. 91.01................................................16
Ohio Gov. Bar R. VII § 2(A)(1)(f) ................................................17
Ohio R. Civ. P. 4.1 ...........................................................................8
Ohio R. Civ. P. 4.4 ................................................................. 10, 19
Ohio R. Civ. P. 4.6 ...........................................................................9
Ohio R. Prof'l Conduct 5.5(c)(2)..................................................17

# ADDITIONAL AUTHORITIES

*Ohio Dep't Transp.*
   http://www.dot.state.oh.us/maps/CountyImages/Franklin.jpg  (last visited
   Dec. 7, 2017) ......................................................................................................6

## INTRODUCTION AND SUMMARY OF ARGUMENT

This lawsuit is about a massive, vicious harassment and intimidation campaign launched against a woman and her twelve-year-old son that was designed to inflict the maximum possible disruption and psychological harm on Plaintiff. Despite Defendant's efforts, no selective quotes of high-soaring rhetoric from the Supreme Court's First Amendment jurisprudence can possibly immunize such grotesque conduct. Nor can Defendant get away with any further efforts to evade service of process or the power of this Court.

Plaintiff filed her Complaint in April, alleging in detail the coordinated campaign that Defendant launched, encouraged and directed. The words that Defendant and his followers used in their frightening campaign—a campaign that even included threatening messages and Holocaust images directed at Plaintiff's twelve year-old son's private social media accounts—demonstrate beyond any doubt that Defendant and his followers intended to punish Plaintiff, disrupt her life, and cause her excruciating mental anguish.

What has Defendant done since Plaintiff filed this lawsuit? He's played a childish game of hide-and-seek. Defendant's own statements on the *Daily Stormer* make clear that he had near instant notice of this lawsuit. He mocked the lawsuit, created and posted new violent memes directed at Plaintiff in retribution, and used his site to raise money to defend himself against Plaintiff's claims. When he finally

hired counsel, months ago, his counsel joined in the games, repeatedly mocking Plaintiff's counsel to press based on counsel's inability to effect personal service on Defendant, and falsely denying that Plaintiff's counsel had reached out to him to determine whether Defendant's counsel was authorized to accept service.

Plaintiff was forced to undertake months of unnecessary effort to effect service by certified mail, then regular mail, and finally by publication in Ohio, all while Defendant and his counsel spent these same months playing games and teasing the press with lies and indirection about Defendant's whereabouts. Counsel for Defendant now finally has entered an appearance—albeit a special appearance to permit Defendant to challenge service of process and subject matter jurisdiction.

But the games continue. Defendant's first move out of the box has been to move to dismiss on the purported basis that Plaintiff's service efforts were ineffective and that he purportedly is "stateless," thereby depriving the Court of subject matter jurisdiction. The arguments are baseless, and suggest that Defendant thinks that he can forever evade both the consequences of his actions and the power of this Court. He cannot.

Defendant's argument regarding service of process, for example, is based largely on a wholly unfounded accusation that it is *Plaintiff's* counsel who purportedly has behaved in an unethical manner by invoking Ohio procedures for serving process. This, the Defendant asserts, constitutes the "unauthorized practice

2

of law." Of course, the relevant Ohio ethics rule, which Defendant addresses literally nowhere in his motion, makes clear that temporary work in Ohio relating to a matter pending in another jurisdiction or tribunal in which the attorney is admitted does not constitute unauthorized practice. The accusation therefore is wrong, and, as shown below, irrelevant. Plaintiff's counsel has painstakingly followed every detailed requirement of Ohio law regarding service of process, and that service is now complete.

Defendant's argument that this Court lacks subject matter jurisdiction because he purportedly is "stateless" is similarly flawed. The law makes clear that Defendant is "domiciled" in one place (in this case, Ohio) until he establishes a domicile somewhere else. The law makes equally clear that the inquiry into domicility depends on objective *facts*, such as Defendant's vote in the last Presidential election in Franklin County, Ohio, and an encounter a process server employed by Plaintiff had in Franklin County eleven days ago with a man he believes to be Andrew Anglin. Despite this law, Defendant offers literally *no facts at all* to suggest that he has established a domicile outside Ohio, not even a declaration. The only thing offered to the Court is the unsworn assertion of his lawyer (who stated in open Court that he does not know where his client is) to the effect that his client is "stateless," an assertion that cannot be squared with the statement that his client's whereabouts are unknown. This is just more

gamesmanship and delay. With this brief, Plaintiff submits actual evidence of objective facts demonstrating that Defendant remained domiciled in Ohio on the day Plaintiff filed her Complaint. On the current record, it is plain that this Court therefore has subject matter jurisdiction. Defendant can only hide for so long.

Finally, Defendant seeks the protection of the First Amendment. But the First Amendment offers protection to none of his conduct, nor to any of the hundreds of messages his followers directed at Plaintiff and her family.

Defendant's grand invocation of the First Amendment simply finds no doctrinal footing. As shown below, the First Amendment does not protect a coordinated, online attack that is effectuated through hundreds of private messages directed at a particular individual, that is designed to cause substantial emotional harm to the chosen victim, and that harms the victim in precisely the manner the defendant intends.

The naked intent to harm Plaintiff (as opposed to, for example, a desire to contribute to a public debate) is clear from the words and imagery Defendant used to encourage the troll storm, and from the nature of the messages themselves. One call to Plaintiff's cell phone, for example, consisted of nothing but the sound of gun shots. Most tellingly, Defendant even urged his followers to target Plaintiff's son—an action plainly designed to frighten and terrorize the boy's mother.

Targeting a child in order to punish a mother is not "political speech," and it cannot possibly be immunized as somehow related to a matter of "public concern."

There are no First Amendment "catch words" and there is no doctrinal analysis that could insulate this conduct from traditional tort liability. To the contrary, and as shown below, the law makes clear that the First Amendment does *not* allow Defendant to make Plaintiff a captive to his troll storm against her will by laying siege to her private channels of communication with the intent to terrorize and punish her and inflict mental anguish. Any other constitutional rule would be unimaginable and intolerable.

The motion should be denied in its entirety.

## I.   PLAINTIFF HAS COMPLETED SERVICE OF PROCESS AND THIS COURT HAS SUBJECT MATTER JURISDICTION

### A.   Facts Related to Service of Process and Subject Matter Jurisdiction

Plaintiff offers the following objective facts regarding service of process and subject matter jurisdiction.

Defendant's hometown is Columbus, Ohio. *See Daily Stormer* Article, Ex. A. Public records suggest that Defendant has resided at a number of Franklin

County, Ohio, locations. *See* Accurint Reports, Ex. B.[1] Franklin County, Ohio addresses were attributed to Defendant in a civil judgment filed in Virginia in 2010 and four criminal charges filed in Ohio in 2006. *See id.* Defendant also posted on the *Daily Stormer* a photo of himself holding his Ohio temporary instruction permit identification card, which was issued on January 1, 2013, and expired on January 17, 2014, and which he redacted to hide his address and license number. *See Daily Stormer* Article 7–8, Ex. C.

Defendant also registered to vote in Ohio on October 11, 2016, and remains a registered voter in Franklin County, Ohio. *See* Registration Information, Ex. D. He voted in the 2016 general election in Franklin County by absentee ballot. *Id.* "[O]verseas voter[s]" are qualified to vote "in the last place in which the person was domiciled before leaving the United States." 52 U.S.C. § 20310(5)(B)–(C).

Defendant's family members live in Franklin County, Ohio, as well. Defendant's father, Gregory Anglin, owns several properties in Franklin County, Ohio. *See* Auditor Records, Ex. F. His business operates out of a building in Franklin County, Ohio. *See* Corporation Details, Ex. G. Defendant's siblings also live in Franklin County, Ohio. *See* Accurint Reports, Ex. B.

---

[1] *See, e.g.*, *Ohio Dep't Transp.*, http://www.dot.state.oh.us/maps/CountyImages/Franklin.jpg (last visited Dec. 7, 2017) (map of Franklin County showing the location of Columbus, Dublin, Pickerington, and Worthington).

Defendant also has business ties to Ohio using Franklin County, Ohio addresses—primarily a single address for a suite in Worthington, Ohio. On September 2, 2016, Defendant registered Moonbase Holdings, LLC, with the Ohio Secretary of State as a domestic limited liability company under his name as agent, using a Franklin County, Ohio, mailing address. Corporation Details, Ex. H. The address remains his "active" contact address. *Id*. Three months later, Defendant authorized his father to register "Daily Stormer" as a trade name with the Ohio Secretary of State, under Defendant's name as registrant, with a business address in Franklin County, Ohio. Corporation Details, Ex. I. This also remains his "active" contact address. *Id*. On January 5, 2017, Defendant's father, on behalf of Moonbase Holdings, LLC, registered "Andrew Anglin" as a trade name with the Ohio Secretary of State, with Moonbase Holdings, LLC, serving as registrant and using a Franklin County, Ohio, address. Corporation Details, Ex. J. A Franklin County, Ohio, address was also used to register the *Dailystormer.com* domain name. Whois Record, Ex. K.

Defendant also used Franklin County, Ohio, addresses for fundraising, including purportedly to hire counsel to defend him in this lawsuit. He solicited donations on the *Daily Stormer* in 2015 using his father's office address in Franklin County, Ohio. *See Daily Stormer* Article at 3, Ex. L. In April 2017, he twice published a Franklin County, Ohio, Post Office Box address to receive

donations. Exs. C & D to Mot. for Extension of Time to Effect Service, ECF 13-3, 13-4. The United States Postal Service indicated in response to a request by Plaintiff's process server that the boxholder's street address was also in Franklin County, Ohio. Ex. B to Mot. for Extension of Time to Effect Service 5, ECF 13-2.

Plaintiff relied on this objective evidence of Defendant's domicile to attempt service under Ohio state law pursuant to Federal Rule of Civil Procedure 4(e)(1). In addition to personal service, which was unsuccessful, Ohio law provides that the clerk of court can effect service via United States certified mail. Ohio R. Civ. P. 4.1. The Rule instructs the clerk to deliver a copy of the process and complaint to the United States Postal Service, Ohio R. Civ. P. 4.1(A)(1)(a), and "docket the fact of delivery" and the return receipts, Ohio R. Civ. P. 4.1(2). In order to comply with these requirements, the Franklin County Clerk of Court *sua sponte* created a miscellaneous administrative matter and assigned a case number. The clerk then docketed several requests, proofs, and returns of service in the administrative matter. *See* Docket Report, Ex. M. The clerk's certified mailings were returned undeliverable. *Id.* Plaintiff therefore requested that the clerk attempt service by ordinary mail pursuant to Ohio Rule of Civil Procedure 4.6(D). The clerk docketed the requests, proofs, and returns of ordinary mail service in the administrative matter. *See* Docket Report, Ex. M.

The Ohio Rules of Civil Procedure consider service complete when the fact of mailing is entered on the record, "provided that the ordinary mail envelope is not returned by the postal authorities with an endorsement showing failure of delivery." Ohio R. Civ. P. 4.6(D). Several of the clerk's ordinary mail service attempts were returned undeliverable between July 26 and August 21, 2017. *See* Docket Report, Ex. M. Accordingly, on August 25, 2017, Plaintiff requested that the Clerk initiate service by publication under Ohio Rule of Civil Procedure 4.4. Plaintiff's counsel submitted to the clerk an affidavit in compliance with the rule averring that Defendant's residence is unknown and detailing the efforts made to ascertain Defendant's residence.

Public Notice began to run in the *Daily Reporter*, a newspaper of general circulation in Franklin County, Ohio, on September 13, 2017. *See Daily Reporter* at 15, Ex. N. Two errors were printed in the initial publication: the name of the Court was listed as Franklin County Common Pleas Court and the time to answer the complaint was given as twenty-eight days after the last day of publication. The errors were corrected, and the Public Notice filed as Exhibit A to Plaintiff's Notice Regarding Service of Process, ECF 19-1, ran weekly between September 20, 2017, and October 18, 2017. Plaintiff placed a second, identical public notice in the *Daily Reporter* that ran weekly between October 5, 2017, and November 9, 2017. *See* Proof of Publication, Ex. O. Publications ran on the following schedule:

9

| Week of: | Mon. | Tue. | Wed. | Thu. | Fri. |
|----------|------|------|------|------|------|
| Sept. 10 | | | Notice[2] | | |
| Sept. 17 | | | Notice | | |
| Sept. 24 | | | Notice | | |
| Oct. 1 | | | Notice | Notice | |
| Oct. 8 | | | Notice | Notice | |
| Oct. 15 | | | Notice | Notice | |
| Oct. 22 | | | | Notice | |
| Oct. 29 | | | | Notice | |
| Nov. 5 | | | | Notice | |

The publication contained the name and address of this Court, the federal case number, the names of the parties, a summary statement of the object of the complaint and demand for relief, and notified the Defendant of the deadline to answer the complaint. *Id.*; *see also* Ohio R. Civ. P. 4.4(A)(1) (listing necessary elements of publication). It ran "at least once a week for six successive weeks." Ohio R. Civ. P. 4.4(A)(1). The sixth public notice ran on October 26, 2017, and the final publication was November 9, 2017.

On December 10, 2017, a process server employed by Plaintiff had an encounter with a man at a grocery store in Franklin County, Ohio. *See* Decl. of Cremeans. Based on the process server's previous study of photographs, the process server recognized the man to be Defendant Andrew Anglin. *Id.*

---

[2] This first notice dated September 13 contained two errors, as described above.

## B.   This Court Has Subject Matter Jurisdiction

This Court has subject matter jurisdiction because there was complete diversity when Plaintiff filed this action: she was a citizen of Montana and Defendant was a citizen of Ohio. All objective facts reasonably available then and now support this conclusion. Yet Defendant seems to suggest that he can sufficiently prove otherwise by his attorney's unsworn assertions that Defendant is not *now* a citizen of Ohio or any other state. This Court's jurisdiction cannot be avoided so easily.

"To demonstrate citizenship for diversity purposes a party must (a) be a citizen of the United States, and (b) be domiciled in a state of the United States." *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir. 1986). Defendant's domicile is evaluated using objective facts such as "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes." *Id.* at 750 (citing cases). This Court must give "little weight" to Defendant's "statements of intent . . . when in conflict with facts." *Id.*; *accord Johnson v. Johnson*, 615 F. App'x 430, 431 (9th Cir. 2015) (rejecting defendant's "statement that he is 'an American citizen nonresident of any state'").

Numerous objective facts concerning Defendant's residence, voting registration and voting practices, location of family, place of business, and driver's license and automobile registration support a finding that Defendant was domiciled in Franklin County, Ohio, when Plaintiff filed this action on April 18, 2017. *See supra* Part I.A. And the fact that he was seen and confronted by a process service in Franklin County on December 10, 2017, undermines the suggestion that he is currently abroad. *See* Decl. of Cremeans.

Defendant has not presented any evidence to support his contention that he is not or was not domiciled in any state. Defendant's domicile "is not lost until a new one is acquired." *Lew*, 797 F.2d at 750. If objective facts demonstrate domicile in one place, the burden of production shifts to Defendant to "present substantial evidence to support his contention that his domicile had changed." *Id.* at 751. Even then, only two domiciles would destroy diversity in this action: Montana (where Plaintiff is a citizen) or a foreign country. *See, e.g.*, *Brimm v. Genao-Gomez*, No. CV 14-197, 2014 WL 5471969, at *1 (D. Mont. Oct. 28, 2014) (Christensen, J.). But Defendant does not even assert that he was domiciled in Montana or a particular foreign country when Plaintiff filed this action. Thus far, all Defendant has presented to rebut a presumption of domicile in Ohio are his attorney's unsworn assertion that he "is not a citizen of Ohio," Br. In Supp. of Mot.

12

to Dismiss ("Br.") 16, ECF 32, and that he "is not a citizen of any State," *id.* at 17. These assertions warrant no weight.

Defendant seems to suggest that he is not domiciled *anywhere*. He denies citizenship in any state but does not assert that he was domiciled in a specific foreign country when Plaintiff filed. In fact, Defendant's denials are couched in present terms; he does not specifically deny that he was domiciled in Ohio the day Plaintiff filed. He points only to his post-filing assertion to the press that he now lives abroad. *See* Br. 17 (quoting Ex. 27 to Mot., ECF 32-27 (July 10, 2017 CNN article about this lawsuit)). Yet Defendant notoriously conceals and obfuscates his whereabouts to evade detection. *See, e.g.*, *LA Times* Article, Ex. P (reporting Defendant refused to say where he was or even admit he was in the United States). Thus, his suspect claims to living in Nigeria amount to nothing more than trolling. *Compare, e.g.*, July 12, 2017 *Daily Stormer* Article at 2, Ex. Q (Defendant's article sarcastically claiming to be in Nigeria), *and* July 14, 2017 *Daily Stormer* Article, Ex. R (Defendant's article claiming that he was living in Nigeria), *with Reveal* Article, Ex. S (casting doubt on Defendant's claim that he now lives in Nigeria). This Court must hold Defendant to his burden of producing "substantial" evidence that his domicile changed to a foreign country by the time Plaintiff filed.

### C.      Plaintiff Sufficiently Served Process on Defendant

After multiple attempts to personally serve process, *see* Mot. for Extension of Time To Effect Service 3, ECF 13, Plaintiff served Defendant by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state . . . where service is made"—Ohio—pursuant to Federal Rule of Civil Procedure 4(e)(1).

"Rule 4 is a flexible rule that should be liberally construed to uphold service so long as a party receives sufficient notice of the complaint," and "[t]echnical defects in a summons do not justify dismissal unless a party is able to demonstrate actual prejudice." *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404 (9th Cir. 1994).

None of Defendant's arguments about service of process holds water. Ohio's service-of-process laws afforded Defendant due process, Plaintiff and her counsel complied with Ohio law, and Plaintiff diligently and timely served process.

### 1.      Plaintiff's Use of Ohio Law To Serve Process Complied with Due Process

Plaintiff's use of Ohio's service-of-process laws was reasonably calculated, under all the circumstances, to apprise Defendant of this action and afford him an opportunity to present his objections. That is all due process required. Defendant incorrectly argues that for this Court to have personal jurisdiction over him, Ohio's courts of general jurisdiction must have personal jurisdiction over him too. This

argument confuses the relationship between personal jurisdiction and service of process.

"Service of process and personal jurisdiction are two different things." *AM Trust v. UBS AG*, 681 F. App'x 587, 589 (9th Cir. 2017). The Due Process Clause requires that a court have personal jurisdiction over a defendant before it can subject him to a judgment. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Service of process is simply a necessary condition for personal jurisdiction in the Court in which the action is pending. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). The due process question is not whether Ohio may exercise personal jurisdiction over Defendant, but whether Plaintiff complied with Ohio's service-of-process laws and whether those laws are reasonably calculated to give Defendant notice. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

### 2.   Plaintiff Complied with Ohio Law To Effect Service of Process

Plaintiff's counsel was not required to seek admission pro hac vice to serve process using Ohio's service-of-process laws. Defendant bases his erroneous argument on Ohio's rule that service by publication requires the filing of an affidavit that a judge purportedly must deem sufficient. *See* Br. 15. But no Ohio judge needed to review or actually reviewed the sufficiency of counsel's affidavit.

That issue is before this Court only. It is this Court, not the Franklin County Court of Common Pleas, that determines whether Plaintiff served process under Ohio law because it is this Court's jurisdiction, not that of the Franklin County court, that Plaintiff invokes. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Majestic Enters. Collision Repair, Inc.*, No. 4:10 CV 2287, 2011 WL 767890, at *1–2 (N.D. Ohio Feb. 28, 2011) (holding sufficient plaintiff's affidavit for service of process under Ohio's rule).

Nor did any Ohio rule require admission pro hac vice. Rules of the Franklin County Court of Common Pleas require an attorney to seek admission pro hac vice in order to "be permitted to represent parties in any litigation pending or to be filed in" the Franklin County Court of Common Pleas. Franklin Cty. Ct. Com. Pl. R. 91.01, Ex. T. Plaintiff is not a "part[y] in any litigation pending or to be filed in" the Franklin County Court of Common Pleas. Whether the lack of admission pro hac vice by Plaintiff's counsel would have stripped the Franklin County court of its jurisdiction over a complaint filed in that court is therefore entirely beside the point. *See, e.g.*, *State ex rel. Hadley v. Pike*, No. 14 CO 14, 2014 WL 3744717, at *4 (Ohio Ct. App. July 25, 2014) (holding failure by plaintiff's attorney to timely seek admission pro hac vice stripped court of subject matter jurisdiction to consider defendant's motion to dismiss).

Nor did Plaintiff's counsel violate any rule of ethics by relying on the Franklin County Clerk to assist with service. A lawyer does not practice law in Ohio without authorization when he "is admitted in another United States jurisdiction, is in good standing in th[at] jurisdiction . . . , and regularly practices law," and when the "legal services" he provides in Ohio "are reasonably related to a pending . . . proceeding before a tribunal in . . . another jurisdiction . . . ." Ohio R. Prof'l Conduct 5.5(c)(2); *see also* Ohio Gov. Bar R. VII § 2(A)(1)(f) (providing exception to definition of unauthorized practice of law when lawyer "[r]ender[s] legal services in accordance with Rule 5.5 of the Ohio Rules of Professional Conduct"). To the extent that Plaintiff's counsel provided any "legal services" in Ohio within the meaning of Rule 5.5, those services fit squarely within this exception to the prohibition against unauthorized practice.

In any event, Rule 4(e)(1) did not require Plaintiff to strictly comply with "unnecessary technicalit[ies]" in Ohio's service-of-process rules. *United States v. Jerkovich*, No. 1:17-CV-01144, 2017 WL 6371465, at *1 (E.D. Cal. Nov. 8, 2017). Even then, Plaintiff went above and beyond what Rule 4(e)(1) required by requesting that the Franklin County clerk attempt service by certified and ordinary mail and publication rather than effecting those mailings and publications herself or requesting that the clerk of this Court do so. *See, e.g.*, *Vasic v. Patent Health, L.L.C.*, No. 13cv849, 2013 WL 4716341, at *5 (S.D. Cal. Sept. 3, 2013) (holding

17

that, except for an unrelated reason, plaintiff served process under Ohio law by personally mailing summons by certified mail); *LLC Smallwood v. Collins*, No. 2:08-CV-679, 2008 WL 5111170, at *1 (S.D. Ohio Dec. 2, 2008) (holding plaintiff could have complied with Ohio's service-of-process laws by requesting that clerk of *federal* court serve process by certified mail); *Taylor Made Golf Co., Inc. v. Eagle Golf Prods., Inc.*, 176 F.R.D. 537, 538–39 (N.D. Ohio 1997) (holding plaintiff who mailed summons to defendant served process under Ohio's service-of-process laws). What matters then is not necessarily *who* mailed or arranged for publication of the summons—Plaintiff's counsel himself, the clerk of this Court, or the clerk of the Franklin County court pursuant to a request by Plaintiff's counsel—but rather that it was attempted at all.

### 3.     Plaintiff Diligently and Timely Served Process

Service of process was diligently and timely effected. This Court twice found good cause to grant Plaintiff extensions to serve process. *See* Order, ECF 14; Order, ECF 17. The Court ordered Plaintiff to effect service on or before October 27, 2017. Order 1, ECF 17. Plaintiff completed service on October 26, 2017, by publishing a corrected Public Notice in Franklin County, Ohio, for six consecutive weeks beginning September 20, 2017, and ending October 26, 2017. *See* Ohio R. Civ. P. 4.4(A)(1); *see also* Pl.'s Notice Regarding Service of Process 2, ECF 19; *supra* Part I.A. That the Public Notice ran for an additional two weeks suggests

18

only that Plaintiff went above and beyond the requirements of Rule 4(e)(1) and can

hardly be used by Defendant to deem service insufficient.

## II.     DEFENDANT IS LIABLE IN TORT

### A.     The First Amendment Does Not Protect Against Defendant's Liability in Tort

#### 1.     Tortious Speech Is Not Protected

"It is a fundamental principle, long established, that the freedom of speech . .

. secured by the Constitution[] does not confer an absolute right to speak or

publish, without responsibility, whatever one may choose, or an unrestricted and

unbridled license that gives immunity for every possible use of language and

prevents the punishment of those who abuse this freedom." *Gitlow v. New York*,

268 U.S. 652, 666 (1925). States may restrict categories of speech historically and

traditionally restricted despite the First Amendment. *United States v. Alvarez*, 567

U.S. 709, 717 (2012). Nor does the First Amendment provide any protection to

speech that authorizes, directs, or ratifies others' torts. *N.A.A.C.P. v. Claiborne*

*Hardware Co.*, 458 U.S. 886, 927 (1982).

The First Amendment did not entitle Defendant to force Plaintiff, as a

captive, to face the hundreds of hateful and threatening messages his followers

directed at her, nor did it entitle him to target Plaintiff's son to punish her or

bombard her private channels of communication with the intent to cause

psychological harm. This conduct constitutes the torts of invasion of privacy and

intentional infliction of emotional distress, as shown below, and Defendant cites no case that suggests that any of his conduct nor any of the messages his followers directed at Plaintiff should be immune from liability—not because any of the subject speech purportedly was political or addressed a matter of public concern, not because Plaintiff purportedly is a public figure, not because Plaintiff purportedly should be forced to allege actual malice (which she plainly did) and not for any other reason either.

### 2. Defendant Can Be Liable for the Harm Inflicted by the Troll Storm Messages

Defendant can indeed constitutionally be held liable for the tortious troll storm messages because he authorized, directed, and ratified them and because his directions were integral to those messages being sent to Plaintiff. He argues that he cannot be liable because he did not incite his followers, Br. 20, or employ them, *id.* at 24, but was merely associated with them, *id.* at 24–25. These arguments are flatly inconsistent with the allegations. Plaintiff alleges that Defendant, notorious for launching similar prior troll storms, unleashed his "fam" on Plaintiff to punish her, her son, and her husband. Compl. ¶¶ 3, 5. He provided contact information for all these people to make it easy for his "fam" to engage in the coordinated attack; he modeled the sort of vitriol he wanted them to use (such as Nazified images of Plaintiff and her son superimposed onto a photo of the gates of Auschwitz); and he

provided and participated in an online discussion group to cheer on the troll storm even after he launched it. *Id.* ¶¶ 5, 6, 9, 28. Defendant also stressed the importance of making Plaintiff and her family, friends, and colleagues "*feel* the kind of pressure they [were] making [him and his followers] feel," *id.* ¶ 7 (emphasis added).

These allegations demonstrate beyond a shadow of a doubt that Defendant "authorized, directed, or ratified specific tortious activity," which "justif[ies]holding him responsible for the consequences of that activity." *Claiborne Hardware Co.*, 458 U.S. at 927.  They also demonstrate that Defendant engaged in "more than mere advocacy" and that his conduct was integral to the trollers' unlawful acts. *United States v. Mendelsohn*, 896 F.2d 1183, 1186 (9th Cir. 1990). Defendant can be held liable on that basis as well. *See* Compl. ¶ 27 (alleging Defendant continued to urge his followers to harass Plaintiff as the troll storm progressed).

The First Amendment does not protect Defendant against liability for the injury caused by the troll storm he launched.

### 3. Defendant Made Plaintiff a "Captive Audience," Which Further Undermines Any Claim to First Amendment Protection

Whatever the value of Defendant's speech or the public position occupied by Plaintiff, the First Amendment did not entitle Defendant to make her captive to his

speech against her will by laying siege to her private channels of communication. The First Amendment does not prevent States from protecting those whose substantial privacy interests were invaded by another's speech in an essentially intolerable manner. *See Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)). A speaker intolerably invades a listener's substantial privacy interests when the listener wishes to but cannot avoid listening. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302 (1974).

"The right to avoid unwelcome speech has special force in the privacy of the home and its immediate surroundings but can also be protected in confrontational settings." *Hill v. Colorado*, 530 U.S. 703, 717 (2000) (internal citations omitted). So, for example, public park-goers, *Berger v. City of Seattle*, 569 F.3d 1029, 1054 (9th Cir. 2009), and passersby of drive-in movie theaters, *Erznoznik v. Jacksonville*, 422 U.S. 205, 212 (1975), or of another's home, *Spence v. Washington*, 418 U.S. 405, 412 (1974), generally are not captive audiences because "public parks have been central to our constitutional heritage of open discourse," *Berger*, 569 F.3d at 1054, and passersby of drive-in movie theaters and others' homes "readily can avert [their] eyes," *Erznoznik*, 422 U.S. at 212; *Spence*, 418 U.S. at 412. But the First Amendment permits government to restrict the delivery of offensive mail to homes, *Rowan v. Post Office Dep't*, 397 U.S. 728, 736–38 (1970)), prohibit picketing at residences, *Frisby v. Schultz*, 487 U.S. 474,

484–85 (1988), ban the broadcast of loud and raucous noises on city streets, *Kovacs v. Cooper*, 336 U.S. 77, 86 (1949), regulate ads on public transportation, *Lehman*, 418 U.S. at 302–03, and create buffer zones around entrances to medical clinics, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 781 (1994), because such persons cannot reasonably be expected to avoid these circumstances and therefore would otherwise be held captive to speech against their will.

Plaintiff was an unwilling captive audience to Defendant's speech. "The ancient concept that 'a [wo]man's home is [her] castle' into which 'not even the king may enter,'" *Rowan*, 397 U.S. at 737, has expanded past the home's walls and curtilage with today's technologies—particularly email, social media, and smartphones. These new media for communication, just like broadcast media, "have established a uniquely pervasive presence in the lives of all Americans." *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 748 (1978). "[T]he substantial right of residents to find sanctuary in their homes, free from unwanted speech, is just as—if not more—vital today, where intrusions via the mail, the telephone and, now, email and the internet are ubiquitous." *Nat'l Coal. of Prayer, Inc. v. Carter*, 455 F.3d 783, 794 (7th Cir. 2006) (Williams, J., concurring).

"The freedom of an unwilling listener to avert one's eyes or ears is considerably lessened when she is required . . . to check her phone messages." *520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 724 (7th Cir.

23

2014). And "unsolicited . . . email unquestionably raises the captive-audience problem." *Free Speech Coal., Inc. v. Shurtleff*, No. 2:05CV949, 2007 WL 922247, at *14 (D. Utah Mar. 23, 2007).

Defendant's troll storm operated like automatic dialing and announcing devices, which "turn telephone users into a 'captive audience'" by placing automated calls that do not identify the caller or respond to the recipient, except instead of advertising a carpet cleaning service, they bombarded Plaintiff with hateful anti-Semitic messages. *See Bland v. Fessler*, 88 F.3d 729, 735 (9th Cir. 1996). "Turning off ringers forces people into isolation. Screening . . . would clutter the machines of those who can afford them. Hanging up does not allow the called party to tell the caller not to call again and does not always disconnect the call." *Id.* at 736.

The First Amendment does not require Plaintiff to give up an important means of communication merely because Defendant and his followers feel entitled to harass her through those same means. "Cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification." *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010). Social media "clear[ly]" is "the most important place[] (in a spatial sense) for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (holding

First Amendment prohibits States from prohibiting registered sex offenders' use of social media websites). Plaintiff's inability simply to avert her eyes was exacerbated by the need for her to engage with the public online in order to do business. In fact, one caller started off pretending to be a prospective client interested in "a medium sized resort town" but quickly told Plaintiff to "[g]o kill yourself you fucking Jewish kike." Compl. ¶ 100(i). The First Amendment does not require Plaintiff to go into hiding and cease all communications in order to preserve her right to recover in tort.

### 4. Defendant's Troll Storm Would Not Be Protected Even If It Could Be Said To Relate to a Matter of Public Concern or Be Directed at a Public Figure

Defendant makes a variety of arguments that he claims entitle him to First Amendment protection, including an argument that the "speech" at issue relates to a matter of political concern, Br. 28, and that his conduct is protected because Plaintiff purportedly is a "public figure" and that Plaintiff has failed to make certain allegations purportedly required in such circumstances. *Id*. at 29. Plaintiff addresses these arguments below, all of which fail on the facts and the law.

But the more important point is that no court has ever relied on these principles—regardless of whether the tort alleged is invasion of privacy or intentional infliction of emotional distress or anything else—to hold that a coordinated harassment campaign directed at an individual and effectuated largely

through channels of private communication deserve even the slightest bit of constitutional protection.

Indeed, the First Amendment could not possibly demand such a rule. Imagine, for example, if left-wing extremists decided to launch troll storms against Kellyanne Conway, Counselor to President Trump, and urged their followers to hound not only her but also her four children with hundreds of threats and vile messages of hate at all hours of the night that related in some way to their mother's service to the President. Could it possibly be the case that such conduct is literally immunized, simply because the troll storm in some way could be described as relating to a matter of political concern or to be targeted at a public figure?

The answer of course is no. No case holds or even suggests such a thing. Moreover, Plaintiff shows in the following sections that Defendant's invocation of First Amendment buzzwords fails in any event on both the facts and the law.

### 5. In Any Event, the Allegations Do Not Support the Assertion That Defendant's Troll Storm Related to a Matter of Public Concern or That Plaintiff Is a Public Figure

#### a. Allegations Show That the "Speech" Does Not Relate to a Matter of Public Concern

Although Defendant's harassment campaign is not entitled to First Amendment protection, Plaintiff nevertheless addresses Defendant's assertion that the "speech" at issue relates to a matter of political concern, and therefore cannot be punished. Br. 28. Defendant's argument appears to be that the troll storm

constitutes "political speech" because it purportedly commented on Plaintiff's alleged conduct as it relates to the mother of a non-party white nationalist who made a "political speech" after the election of President Trump. This description comes nowhere close to demonstrating that the troll storm is "political speech" of the sort courts have previously recognized. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *Meyer v. Grant*, 486 U.S. 414, 422 (1988) (circulation of petition seeking to induce political change was "core political speech"); *Pest Comm. v. Miller*, 626 F.3d 1097, 1105 (9th Cir. 2010) (commentary on candidate for office constitutes "political speech").

Further, the allegations demonstrate that the subject speech did not relate to *any* matter of public concern, political or otherwise. Whether speech addresses a matter of public concern depends on its content, form, and context based on the whole record—"what was said, where it was said, and how it was said." *Snyder*, .562 U.S. at 454. Defendant's troll storm—effectuated almost exclusively through personal channels of private communication—did not "sp[eak] to broader public issues." *Id.* Instead, the troll storm attacked an individual personally and privately with hundreds of frightening and threatening messages of expressed hatred for Plaintiff in particular. The messages reflected a bare desire to terrorize her. An email that merely repeated "Death to Tanya" thirty-three times cannot reasonably be said to relate to a matter of public concern. Compl. ¶ 95(a). Nor could a phone

call consisting of nothing other than the sound of gunshots. *Id.* ¶ 99. Nor could a message directed to Plaintiff's young son containing an image of an oven and taunting him to look inside for "a free Xbox One." *Id.* ¶ 122(f).[3]

### b.    Allegations Show That Plaintiff Was Not a Public Figure

Defendant asserts that Plaintiff became a limited-purpose public figure (which could require Plaintiff to allege actual malice), when she purportedly "voluntarily injected herself into national politics," Br. 24. Defendant's argument starts and stops there.

Again, there are no allegations that support the assertion. Plaintiff alleges that she merely "heard the rumors of a possible boycott or protest" of Ms. Spencer's building and "grew concerned that a protest would actually take place" and "tried to warn several of her friends who rented space as commercial tenants in Ms. Spencer's building." Compl. ¶¶ 57–58. She also reluctantly accepted a private phone call from Ms. Spencer. *Id.* ¶¶ 59–60. Plaintiff does not allege that she was involved in or voluntarily injected herself into any public protest or public controversy, or even that she had any power to cause or prevent any such protest.

---

[3] The fact that the troll storm consisted principally of direct and private (as opposed to public) communications with Plaintiff and her family further undermines Defendant's argument that the troll storm related to a matter of public concern. This is because the forum in which the speech is communicated is relevant to whether the speech relates to a matter of public concern. *See Borough of Buryea v. Guarnieri*, 564 U.S. 379, 398–99 (2011) (citing *Snyder*, 562 U.S. at 454–55) (holding internal employment grievance did not relate to public concern).

By contrast, limited-purpose public figures are those who affirmatively invite attention and comment. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). If public attention is thrust upon an otherwise private citizen—which is the most that could be said here—that is not enough. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 (1979) (holding plaintiff not made a limited-purpose public figure by being dragged into public controversy).

### i. Even if Plaintiff Were a Public Figure, She Need Not Allege a False Statement Made with Actual Malice

Defendant argues that *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), requires Plaintiff to allege a false statement of fact made with actual malice because she purportedly is a public figure. Br. 28–29. But *Hustler* addressed an ad parody about Jerry Falwell, a nationally known religious conservative that was published in a magazine with a national circulation. The case addressed the legal question "whether a public figure may recover damages for emotional harm caused by the publication of *an ad parody* offensive to him" and answered "that public figures and public officials may not recover for the tort of intentional infliction of emotional distress *by reason of publications such as the one here at issue* without showing in addition that the publication contains a false statement of fact which was made with 'actual malice.'" 485 U.S. at 50, 56 (emphasis added).

29

*Hustler*'s holding does not apply here. Plaintiff does not seek to recover for emotional harm caused by the publication of an offensive ad parody in a national publication; she seeks to recover for the emotional harm caused by Defendant's troll storm, which was directed specifically at Plaintiff, principally through channels of private communication that could not possibly have contributed to any public debate about any issue with which the First Amendment is concerned.

### ii.    In Any Event, Plaintiff Alleges False Statements Made with Actual Malice

Though she is not required to do so, Plaintiff has nonetheless alleged false statements, Compl. ¶¶ 86–88, 92, 125, 130–32, 134, 144, 148–49, 157, 166, 169, 172, 189, 193–94, 199, made with reckless disregard for the truth, *id.* ¶¶ 26, 92, 125, 130, 132, 144, 148, 157, 166, 169, 189, 193. "In a case such as this involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1061 (9th Cir. 1998) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). Plaintiff also alleges that Defendant published intentional falsehoods, Compl. ¶¶ 86–88, 92, 131, 134, 144, 148–49, 172, 194–95, 199, which his troll army then recklessly repeated in their coordinated attack. The actual malice standard, though inapplicable, has been met.

## B.      Defendant's Other Arguments About the Privacy Claim Are Irrelevant

Defendant argues that Plaintiff has not adequately alleged invasion of privacy because the contact information he published was already public. Br. 25–26. But Defendant conflates the tort of intrusion of solitude with the tort of public disclosure of private facts. Defendant's troll storm invaded Plaintiff's privacy by intruding on her solitude, which, as Defendant concedes, Br. 25, Montana expressly recognizes as a form of invasion of privacy. *See State Bd. of Dentistry v. Kandarian*, 886 P.2d 954, 957 (Mont. 1994) ("An invasion of privacy cause of action is defined as a wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.") (quotation omitted). One intrudes upon another's solitude when, for example, one "initiate[s] a systematic campaign of harassment of the plaintiff," involving "numerous telephone calls to the plaintiff herself every day for a period of three weeks, some of which were late at night," "calls to her superiors over the telephone," and calls to the plaintiff "in the public schools where she was employed three times within 15 minutes," resulting in threat of "loss of employment unless the telephone calls ceased," all "to harass and humiliate the plaintiff and cause her mental pain and anguish and cause her emotional disturbance." *Housh v. Perth*, 133 N.E.2d 340, 344 (Ohio 1956).

31

But Defendant seems to think, incorrectly, that the basis for the privacy claim is that he published Plaintiff's contact information. *See, e.g.*, Br. 26 ("All of the information Defendant allegedly published about Ms. Gersh was publicly available."). Here, Plaintiff does not allege that the mere publication of her contact information and that of her family injured her. Instead, she alleges that the she was injured when Defendant urged his followers to use that information to harass and torment her.

### C.   Plaintiff Adequately Alleges that Her Emotional Distress Was a Foreseeable Consequence

Plaintiff clearly alleges facts demonstrating that her emotional distress was the reasonably foreseeable consequence of Defendant's conduct—a necessary element of her claim for intentional infliction of emotional distress. Defendant's arguments to the contrary are difficult to take seriously. Being told in hundreds of emails and text and telephone messages that, for example, you should have died in the Holocaust, Compl. ¶ 98, and that you will be driven to suicide, *id.* ¶ 94(g), could obviously result in emotional distress. Even more obviously, targeting a mother's son with similar messages—one message included an image of an oven and urged the twelve-year-old son to look inside for an "Xbox One", *id.* ¶ 122(f); another asked the son whether his Rabbi had sucked his penis at the time he was circumcised, *id.* ¶ 122(d)—could obviously cause her severe emotional distress.

Plaintiff made specific additional specific factual allegations that also would support a finding of foreseeability, including that Defendant had become "notorious for terrorizing individuals through similar campaigns in the past," *id*. ¶ 3, that he stressed the importance of making Plaintiff and her family, friends, and colleagues "feel the kind of pressure they [were] making [him and his followers] feel," *id*. ¶ 7, and that he continued to urge his followers to harass Plaintiff as the troll storm progressed, *id*. ¶ 27. Severe emotional distress was not only the foreseeable consequence of Defendant's troll storm but its very end, and Defendant cannot wash his hands of it.

The odd notion that Defendant could not have foreseen that the troll storm would distress Plaintiff because she too purportedly supports collective action is really just an assertion that Plaintiff "got what was coming to her." The argument is legally irrelevant, unsupported by the allegations, and cannot defeat the claim for intention infliction of emotional distress.

## III. DEFENDANT IS LIABLE UNDER THE MONTANA ANTI-INTIMIDATION ACT

### A.     The Act Is Not Unconstitutionally Overbroad

Plaintiff's claim that Defendant violated the Montana Anti-Intimidation Act is based on the following provision of the Act:

> An individual or organization who is attempting to exercise a legally protected right and who is injured, harassed, or aggrieved by a threat or intimidation has a

33

> civil cause of action against the person engaging in the
> threatening or intimidating behavior.

Mont. Code Ann. § 27-1-1503(2). Defendant argues that the provision should be declared unconstitutionally overbroad because it purportedly could pin liability on "a pizza-delivery person . . . for 'threatening' a consumer that snow might delay dinner; [or] a professor . . . for 'threatening' a midterm." Br. 23. Application of the overbreadth doctrine, however, requires more than just wild hypotheses about how a statute could conceivably be applied in an unconstitutional manner. If there is any difficulty interpreting this statute under those contrived circumstances, "it will be time enough to consider it when raised by someone whom it concerns." *Broadrick v. Oklahoma*, 413 U.S. 601, 609 (1973) (quoting *United States v. Wurzbach*, 280 U.S. 396, 399 (1930)).

Application of the overbreadth doctrine is "strong medicine" that must be employed "sparingly and only as a last resort." *Id.* at 613. A law cannot be held facially overbroad "when a limiting construction has been or could be placed on the challenged statute." *Id.* Such a limiting construction is readily available here. The Ninth Circuit already has concluded that the words "threat" and "intimidation"—the words Defendant presumably believes to be overbroad— should be interpreted to incorporate constitutional limitations. *See Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1070-71 (9th Cir. 2002).

It is well-established that the First Amendment permits penalizing threats when someone "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). The person engaging in threatening behavior "need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and the disruption that fear engenders, as well as from the possibility that the threatened violence will occur." *Id.* at 344 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).

Courts also have defined what sorts of "intimidation" may be penalized without running afoul of the First Amendment. "Intimidation" is "a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360. The Ninth Circuit subsequently held that it is unnecessary to limit the sort of intimidation that may be constitutionally penalized to *bodily* harm. *See United States v. Cassel*, 408 F.3d 622, 636 (9th Cir. 2005).

The Montana Anti-Intimidation Act is not overbroad.[4]

---

[4] Defendant seeks to escape liability by asserting that Section 27-1-1503 provides a civil remedy to only public servants and jurors, Br. 30, but the statute's language clearly reads "individuals and organizations," Mont. Code Ann. § 27-1-1503(1)–(2).

**B.      Plaintiff's Allegations State a Claim for Violation of the Act**

Plaintiff alleges that Defendant launched a troll storm with the intent to threaten and intimidate her and to prevent her from exercising her rights to free speech and gainful employment. Moreover, the threats and intimidation detailed in the Complaint, including the words and images sent privately to Plaintiff, are precisely the sort for which the Constitution permits liability. Here is just a sampling:

- "We've had enough, Tanya. This is the goylash. You remember the last goylash, don't you Tanya? Yeah. You're gonna wanna dip out before this thing really gets started. Because I'll tell you want [sic], Tanya. This fire is already rising." Compl. ¶¶ 126–27.

- "We are going to ruin you, you Kike PoS. The same way you do anyone else. You mother-fuckers are going to taste your own medicine, as we harass you & yours in your public & professional lives. . . . You will be driven to the brink of suicide. & We will be there to take pleasure in your pain & eventual end." *Id.* ¶ 94(g).

- "We are going to have a field day with you scumbags… We are going to keep track of you for the rest of your life." *Id.* ¶ 94(h).

- "You are surprisingly easy to find on the internet. And in real life." *Id.* ¶ 100(f).

These words—and the countless other threats and intimidation detailed in the Complaint—make Defendant's bald assertion that he had no intention of furthering an unlawful goal simply implausible. When determining whether statements are threats, courts consider factual context, including the surrounding events and reaction of the listeners. *Planned Parenthood*, 290 F.3d at 1075 (holding public disclosure of names and addresses of abortion providers a true threat due to violent nature of some sectors of anti-abortion movement).

Here, the context of these messages reveals their intent. The intentional use of historical symbols of violence[5] shows that Defendant's sustained obsession with Plaintiff was an act of intimidation meant to place her in fear of harm. *Black*, 538 U.S. at 361. "An individual cannot be permitted to terrorize members of the public through threats, and then claim protection from prosecution under the First Amendment. Freedom of speech was never meant to be stretched to the point where more injury is done to society as a whole than good." *State v. Lance*, 721 P.2d 1258, 1267 (Mont. 1986).

## CONCLUSION

For the foregoing reasons, the motion should be denied.

---

[5] Defendant cites *Collin v. Smith*, 578 F.2d 1197, 1205–06 (7th Cir. 1978), for the proposition that Nazi expression is protected speech. The case holds that the First Amendment cannot countenance prior restraints of speech based on the possibility of future psychic harm. But the court specifically left open the possibility of a claim for recovery of damages "provably occasioned by the proposed march." *Id.* at 1206.

DATED December 21, 2017.

/s/ David C. Dinielli
_____
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff

/s/ John Morrison
_____
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff

## EXHIBIT INDEX

| Ex. | Description |
|---|---|
| A | Andrew Anglin, *Local Fake News Gives Anglin the Hitler Treatment*, Daily Stormer, February 17, 2017 |
| B | Accurint Reports dated December 23, 2016 and December 8, 2017 |
| C | Andrew Anglin, *Regarding Andrew Anglin's Height*, Daily Stormer, May 3, 2017 |
| D | Andrew Anglin Registration Information, Franklin County Board of Elections |
| E | Jessie Balmert, *Daily Stormer neo-Nazi website owner once registered to vote at fake address*, Cincinnati.com, August 31, 2017 |
| F | Franklin County Auditor Records for Greg Anglin |
| G | Morning Star Ministries USA, Inc. Corporation Details, Ohio Secretary of State |
| H | Moonbase Holdings, LLC Corporation Details, Ohio Secretary of State |
| I | Daily Stormer Corporation Details, Ohio Secretary of State |
| J | Andrew Anglin Corporation Details, Ohio Secretary of State |
| K | Dailystormer.com Whois Record |
| L | Andrew Anglin, *What is Happening Here With All of This?*, Daily Stormer, April 27, 2015 |
| M | Docket Report, Franklin County Court of Common Pleas Case No. 17-MS-343 |
| N | The Daily Reporter, September 13, 2017 |
| O | Proof of Publication dated November 9, 2017 |
| P | Matt Pearce, *What happens when a millennial goes facist? He starts up a neo-Nazi website*, LA Times, June 24, 2015 |
| Q | Andrew Anglin, *Fake News: CNN Uses Photoshopped Image of Andrew Anglin!*, Daily Stormer, July 12, 2017 |
| R | Andrew Anglin, *Nigerians Love Neo-Nazi White Supremacist Andrew Anglin*, Daily Stormer, July 14, 2017 |
| S | Aaron Sankin, *Where in the world is America's leading neo-Nazi troll?*, Reveal, July 27, 2017 |
| T | Franklin County Court of Common Pleas Rule of Practice 91 |

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Local Rule 7.1(d)(2). It contains 8,761 words, excluding the caption, certificates of service and compliance, tables of contents and authorities, and exhibit index.

/s/ David C. Dinielli
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing document was filed through the Court's CM/ECF filing system, and by virtue of this filing notice will be sent electronically to all counsel of record, including:

Mathew M. Stevenson
STEVENSON LAW OFFICE
1120 Kensington, Suite B
Missoula, Montana 59801
matstevenson@bigskylegal.com
*Attorney for Defendant Andrew Anglin*

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, Nevada 89147
mjr@randazza.com; ecf@randazza.com
*Attorney for Defendant Andrew Anglin*

Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
jmw@randazza.com; ecf@randazza.com
*Attorney for Defendant Andrew Anglin*

on this December 21, 2017.

/s/ David C. Dinielli
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff

41