IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TANYA GERSH,<br><br>             Plaintiff,<br><br>vs.<br><br>ANDREW ANGLIN,<br><br>             Defendant. | CV 17-50-M-DLC-JCL<br><br>ORDER AND<br>FINDINGS &<br>RECOMMENDATION |

Plaintiff Tanya Gersh brings this action against Defendant Andrew Anglin, the publisher of a website who she claims initiated an online anti-Semitic harassment and intimidation campaign against her and her family. Anglin has moved to dismiss Gersh's Complaint under Federal Rule of Civil Procedure 12(b) for lack of diversity subject matter jurisdiction, for lack of personal jurisdiction based on insufficient service of process, and for failure to state a claim upon which relief can be granted. For the reasons set forth below, Anglin's motion should be

1

denied to the extent it seeks dismissal for lack of subject matter jurisdiction

pursuant to Rule 12(b)(1) and for lack of personal jurisdiction based on insufficient

service of process pursuant to Rule 12(b)(5).

To the extent Anglin moves to the dismiss pursuant to Rule 12(b)(6) for

failure to state a claim upon which relief can be granted, the Court will address the

motion in a separate Findings and Recommendation after holding oral argument.

## I.   **Background**[1]

Gersh lives in Whitefish, Montana, and has a real estate practice there. She

and her husband are Jewish, and have raised their two children in the Jewish faith.

In late 2016, Gersh became involved in a real estate dispute with Sherry Spencer

("Spencer"), the owner of a mixed-used property in downtown Whitefish.

Spencer's son, Richard Spencer, is a white nationalist member of the far right who

gained notoriety when a video of him stating "Hail Trump! Hail our people! Hail

victory" during a gathering of white nationalists soon after President Donald

Trump's election went viral. Following the video's release, some members of the

Whitefish community who believed that Spencer had not disavowed her son's

racist views considered protesting in front of her mixed-use property.

---

[1] The following background facts are taken from the Complaint and accepted as true for present purposes only.

When Gersh learned about the possible protests, she contacted the building's commercial tenants to warn them and spoke with Spencer about the situation. Spencer essentially asked Gersh what she should do, and Gersh said that if she were in Spencer's situation she might sell the building, donate the profits, and make a public statement denouncing her son's views. Spencer apparently liked that idea at first, and asked Gersh if she would be the realtor and help her sell the property. Spencer subsequently changed her mind about having Gersh list the property, however, and on December 15, 2016, she published a post on a blog website accusing Gersh of threatening and harassing her into agreeing to sell the property.

The day after Spencer's blog post, Anglin posted the first in a series of thirty articles related to Gersh on his website, *The Daily Stormer.* The December 16, 2016, article republished Spencer's allegations against Gersh and was titled "Jews Targeting Richard Spencer's Mother for Harassment and Extortion – TAKE ACTION!" Anglin called for a "troll storm" against Gersh, and included contact information for her, her husband, and her twelve-year old son. Anglin encouraged readers to contact Gersh and members of her family to "tell them you are sickened by their Jew agenda" and make their opinions of her behavior known. (Doc. 1, at 18).

3

As soon as Anglin's December 16, 2016, article went live, Gersh and her family began receiving hundreds of threatening and harassing communications, including phone calls, voicemails, text message, emails, letters, and social media comments. For approximately the next two months, Anglin continued publishing articles about Gersh on his website, and the troll storm against Gersh and her family continued. All told, Gersh and her family received more than 700 threatening and harassing communications during this period.

Gersh filed this action against Anglin on April 18, 2017, invoking the Court's diversity subject matter jurisdiction under 28 U.S.C. § 1332. Gersh asserts state law claims against Anglin for invasion of privacy, intentional infliction of emotional distress, violations of Montana's Anti-Intimidation Act, and punitive damages. Gersh sought and obtained two extensions of time to effect service, and on November 14, 2017, defense counsel entered an appearance on Anglin's behalf. Approximately two weeks later, Anglin filed the pending motion to dismiss the Complaint for lack of diversity subject matter jurisdiction under Rule 12(b)(1), for lack of personal jurisdiction based on insufficient service of process under Rule 12(b)(5),[2] and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

_____

2 Anglin also cites Rule 12(b)(2), which provides for dismissal based on lack of

4

## II.   **Legal Standards**

### A.   **Rule 12(b)(1)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)

challenges the court's subject matter jurisdiction over the claims asserted.   "Once

challenged, the party asserting subject matter jurisdiction has the burden of proving

its existence." *Rattlesnake Coalition v. United States Environmental Protection*

*Agency*, 509 F.3d 1095, 1102 n. 1 (9th Cir. 2007).

A defendant may pursue a Rule 12(b)(1) motion to dismiss for lack of

jurisdiction either as a facial challenge to the allegations of a pleading, or as a

substantive challenge to the facts underlying the allegations. *Savage v. Glendale*

*Union High School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n.2 (9th

Cir. 2003). A facial challenge to the jurisdictional allegations is one which

contends that the allegations "are insufficient on their face to invoke federal

jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

The success of a facial challenge to jurisdiction depends on the allegations in the

---

personal jurisdiction. Rule 12(b)(2) and (5) are different in that the former applies
where a defendant challenges the basis for jurisdiction over his person, and the
latter applies where a defendant challenges the method by which jurisdiction was
obtained through service of process. Because Anglin is seeking dismissal based on
insufficient service of process, his motion is properly considered under Rule
12(b)(5).

complaint, and does not involve the resolution of a factual dispute. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). In a facial challenge the court must assume the allegations in the complaint are true and it must "draw all reasonable inferences in [plaintiff's] favor." *Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. In resolving such a factual attack, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039. If the moving party has "converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039 (*quoting Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003)). In looking to matters outside the pleadings, the Court must "resolve all disputes of fact in favor of the non-movant...similar to the summary judgment standard." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996). As with a motion for summary judgment, the party moving to dismiss for lack of subject matter jurisdiction "should prevail only if the material

6

jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

### B.      Rule 12(b)(5)

A federal court cannot exercise personal jurisdiction over a defendant without proper service of process. *Omni Capital Int'l v. Rudolf Wolff & co.*, 484 U.S. 97, 104 (1987). Under Rule 12(b)(5), dismissal is the proper remedy for insufficient service of process. Once the sufficiency of service has been challenged, the plaintiff bears the burden of establishing that service was valid under Rule 4 of the Federal Rules of Civil Procedure. *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004). "The court may consider evidence outside the pleadings in resolving a Rule 12(b)(5) motion." *Fairbank v. Underwood*, 986 F.Supp.2d 1222, 1228 (D. Ore. 2013).

## III.    Discussion

### A.      Subject Matter Jurisdiction

For the Court to have subject matter jurisdiction based on diversity, all plaintiffs must be of different citizenship than all defendants, and the amount in controversy must exceed $75,000. See 28 U.S.C. § 1332. Anglin does not dispute that the amount in controversy exceeds $75,000, but contends Gersh has not met

her burden of demonstrating that she and Anglin were of diverse citizenship at the time the Complaint was filed in April 2017.

The Complaint claims "diversity of citizenship" and alleges that Gersh is a citizen of Whitefish, Montana while Anglin is a citizen of Ohio."[3] Anglin does not dispute that these allegations are facially sufficient to invoke the Court's diversity jurisdiction, but instead makes a factual challenge to the truth of the allegations. According to Anglin, he was domiciled abroad when the Complaint was filed, and so was not a citizen of Ohio or any other state for purposes of establishing diversity.

"To demonstrate citizenship for diversity purposes a party must (a) be a citizen of the United States, and (b) be domiciled in a state of the United States." *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir. 1986). An individual who is a citizen of the United States but has no domicile in any state is considered "stateless" for purposes of diversity jurisdiction. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490

---

[3] As originally filed, the Complaint alleged residency instead of citizenship. (Doc. 1, ¶¶ 32, 36, 39). At the preliminary pretrial conference, counsel for plaintiff affirmatively asserted that Gersh is a citizen of Montana and Anglin is a citizen of Ohio. (Doc. 45, at 12-14). Defense counsel stated that he did not object to allowing Gersh to amend the Complaint to allege citizenship. Accordingly, the Court ordered that the Complaint was effectively amended to reflect that Gersh had alleged the state of citizenship of the respective parties. (Doc. 45, at 14; Doc. 41, at 1).

U.S. 826, 828 (1989). Thus, a United States citizen who is domiciled abroad cannot be sued in federal court based on diversity jurisdiction. See *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995); *Freidrich v. Davis*, 767 F.3d 374, 378 (3rd Cir. 2014).

The party asserting diversity jurisdiction bears the burden of establishing the opponent's domicile, which is to be determined at the time the lawsuit is filed. *Lew*, 797 F.2d at 794. Once established, a person's "domicile is not lost until a new one is acquired." *Lew*, 797 F.2d at 750. A change in domicile requires two things: "physical presence at a new location" and "an intention to remain there indefinitely." *Lew*, 797 F.2d at 750. A person's "mere absence" from an established domicile, "however long continued, cannot work the change."*Mintzis v. Scott*, 2014 WL 3818104 *5 (C.D. Cal. July 30, 2014) (quoting *Mitchell v. United States*, 88 U.S. 350, 353 (1874)).

If domicile is established as being in one location, the burden of production shifts to the opposing party to present substantial evidence of a change in domicile. *Lew*, 797 F.2d at 751-52. The "party with the burden of proving citizenship may rely on the presumption of continuing domicile, which provides that once established, a person's state of domicile continues unless rebutted with sufficient evidence of change." *Mondragon v. Capital One Auto Finance*, 736 F.3d 880, 885

(9th Cir. 2013).

"[A] person is 'domiciled' in a location where he or she has established a 'fixed habitation or abode in a particular place, and [intends] to remain there permanently or indefinitely.'" *Lew*, 797 F.2d at 749-50 (quoting *Owens v. Huntling*, 115 F.2d 160, 162 (9th Cir. 1940)). Domicile is determined based on a number of objective factors, no single one of which is controlling, including: "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes." *Lew*, 797 F.2d at 750. Courts are to evaluate domicile based on "objective facts," and "statements of intent are entitled to little weight when in conflict with facts." *Lew*, 797 F.2d at 750.

Here, the *Lew* factors weigh in favor of finding that Anglin was domiciled in Ohio at the time the Complaint was filed in April 2017. Public records produced by Gersh identify three Franklin County, Ohio residential addresses associated with Anglin between 2003 and 2010. (Doc. 50-2). Records cited by Gersh reflect that Anglin registered to vote in Ohio on October 11, 2016, and voted in the 2016 general election in Franklin County, Ohio by absentee ballot. (Doc. 50-4). The

10

Court also notes that Anglin has longstanding family ties in Ohio. Gersh points to evidence showing that Anglin's father and siblings live in Franklin County, Ohio, and his father owns several properties and operates a business there. (Docs. 50-2; 50-6; 50-7).

Most importantly, Gersh has presented evidence that Anglin maintains significant business ties to Ohio. Both of Anglin's businesses -- Moonbase Holdings, LLC and Daily Stormer – are registered with the Ohio Secretary of State and are active. (Docs. 50-8; 50-9). There is evidence that Anglin has maintained and used various mailing addresses in Franklin County, Ohio for business and other purposes. The active contact address for both of Anglin's businesses is located in Franklin County, Ohio. (Docs. 50-8, at 2; 50-9, at 2). And as recently as April 2017, Anglin published an Ohio post office box address to solicit donations for his legal defense in this lawsuit. (Docs. 13-3, at 2; 13-4, at 5).

Considered collectively, these objective facts are sufficient to establish that Anglin was domiciled in Ohio before Gersh filed her Complaint in April 2017. In fact, Anglin does not dispute that he "used to live in Ohio" (doc. 59, at 15) and was previously domiciled there, which explains why he voted in the 2016 general election by absentee ballot in Franklin County, Ohio. (Doc. 64-1, ¶ 20); see 52 U.S.C. § 2310(5)(B)-(C) (stating that an "overseas voter" is qualified to vote "in

the last place in which the person was domiciled before leaving the United

States."). But according to Anglin, he "changed his domicile from Ohio" (doc. 59,

at 17) and moved abroad permanently long before Anglin initiated this action in

April 2017. Anglin claims he changed his domicile to the Philippines sometime

before 2010, then to Greece in 2013, and finally to Cambodia on April 14, 2017 –

just four days before Gersh filed her Complaint in this case. If the Court finds that

he has not established a Cambodian domicile, Anglin asks the Court to find based

on the presumption of continuing domicile that his last domicile in Greece was the

operative domicile at the time the Complaint was filed in April 2017.

Anglin admits that he does not have much to document his alleged domiciles

abroad (doc.70, at 2), but has filed a supporting declaration to substantiate his

claim that he is no longer domiciled in Ohio. Anglin begins by addressing the

remaining *Lew* factors, and stating that he does not own any real property in Ohio

or maintain any residence there, does not own a motor vehicle registered in Ohio,

does not hold any professional license issued by the State of Ohio, and does not

pay income or other taxes to the State of Ohio. (Doc. 64-1, at 3). Significantly,

however, Anglin does not claim to have done any of these things in the

Philippines, Greece, Cambodia, or anywhere else for that matter. Because there is

no evidence that Anglin engaged in any of these activities in Ohio or elsewhere,

12

these *Lew* factors are essentially neutral and say nothing about Anglin's domicile. Even assuming Anglin's statements are true, they are not sufficient to demonstrate that he lost his Ohio domicile by acquiring a new one abroad.

For the most part, the rest of Anglin's declaration is a series of subjective statements regarding his intent to change domicile. Anglin states he left Ohio permanently and established a new domicile in the Philippines sometime before 2010, but has not produced any objective evidence showing such a change in domicile. Anglin simply states in his declaration that sometime before 2010, he "took up residency in the Philippines, with the intent to live there permanently." (Doc. 64-1, ¶ 21). Anglin explains that he does not have any documentation of his travel to the Philippines, however, because he obtained a new passport in 2013. (Doc. 64-1, ¶ 21). The Court gives Anglin's statement of intent little weight because it is not corroborated by any objective facts and is in conflict with evidentiary materials provided by Gersh. As discussed above, Gersh has produced evidence showing that Anglin maintained significant business, civic, and family ties in Ohio long after he claims to have taken up residency in the Philippines. Anglin's declaration is not sufficient to demonstrate that he changed his domicile from Ohio to the Philippines before 2010.

Anglin's attempt to show that he established his domicile in Greece in 2013

13

fares no better. Anglin states that he "moved to Greece, with the intent to live there permanently" in 2013 and considered the country his permanent home. (Doc. 64-1, at ¶ 22). Anglin explains that before he moved to Greece, he visited the Consulate General of Greece in Chicago and was advised to enroll in an academic program once he entered Greece in order to obtain the most useful visa. Instead of following that advice, however, Anglin states that he "obtained employment as a tour guide" for a youth hostel in Athens. (Doc. 64-1). Notably, however, Anglin has not come forward with any records documenting either the fact or duration of his alleged employment in Greece. Nor has he provided any other evidence to corroborate his claim of a Greek domicile, such as residential rental agreements or bank account records. And while Anglin states that he has attached photocopied excerpts from his passport evidencing his travels to Greece, the pages he has provided do not contain any entry and exit tourist visa stamps from Greece. (Doc. 64-1, at 6-12). Although it is not dispositive, the Court also finds the fact that Anglin does not even claim to have had a visa that would have permitted him to remain in Greece indefinitely further undermines claim that he established a domiciled there. See *Jee Solar Co., Ltd. v. Matinee Energy, Inc.*, 2015 WL 10939972 *10 (D. Ariz. Mar. 30, 2015). As with his alleged domicile in the Philippines, the Court views Anglin's self-serving statements regarding his alleged domicile in Greece with skepticism

14

because they are in conflict with the objective facts showing that he maintained significant ties to Ohio. Anglin has not met his burden of producing sufficient evidence to support his claim that he changed his domicile to Greece in 2013.

Anglin next claims that he established a new domicile in Cambodia in April 2017 – just four days before Gersh filed her Complaint in this case. Anglin declares that on April 14, 2017, he "moved to the Kingdom of Cambodia, with the intent to live there permanently." (Doc. 64-1, ¶ 26). Anglin provides little in the way of supporting detail, however, stating only that while he was in Cambodia, he "lived at the Damnak Villa Boutique, located in the Old Market, Wat Damnak Village, in Siem Reap City" and purchased a motorcycle. (Doc. 64-1, ¶¶ 27-28). Anglin has not produced any corroborating evidence of his stay at the Damnak Villa Boutique hotel. But even assuming he did stay there, the temporary nature of such a housing arrangement is not indicative of intent to live in Cambodia indefinitely and does not support his claim that he was domiciled there. Anglin has also failed to produce any materials documenting his alleged motorcycle purchase, and has not submitted any evidence as to the remaining objective factors identified in *Lew*.

To support his claim of Cambodian domicile, Anglin relies instead on photocopied pages from his passport confirming that he did in fact enter the

country on April 14, 2017, on a one-month tourist visa. (Doc. 64-1, at 10).

Anglin's passport further shows that he exited Cambodia on May 3, 2017, and

reentered again on May 4, 2017, on another one-month visa. (Doc. 64-1, at 10-12).

On May 5, 2017, Anglin extended his Cambodian visa for another seven months,

but on August 19, 2017, he exited the country and has not returned since. (Doc. 64-

1, at 11-12). All told, Anglin spent just over four months in Cambodia, and had

only been in the country for four days when Gersh filed her Complaint on April 18,

2017. The fact that Anglin was only in Cambodia for a few months, and did not

even stay for the duration of his temporary visa, undercuts his statement that he

moved there in April 2017 with the intent to live there permanently.

According to Anglin, his absence from Cambodia is only temporary (doc.

64-1, ¶ 29) and he intends to return when he believes it is safe for him to do so.

Because he regularly receives "true threats of death and injury," Anglin has been

unwilling to "publicly disclose his current whereabouts" out of concern for his

personal safety. (Doc. 64-1, ¶ 32-33). To address those concerns, the Court issued

an order allowing Anglin to "submit whatever proof he deems necessary to

establish his current whereabouts for in camera review" to the extent such proof

might be relevant to the issue of domicile. (Doc. 31).

In response to that Order, Anglin made an in camera submission to the Court

for the purpose of rebutting evidence that he was seen in Ohio as recently as December 2017. (Doc. 71-1). Gersh has produced a declaration by Jeffrey Cremeans, the process server hired to serve Anglin with the Summons and Complaint. (Doc. 50-22). Cremeans states that on December 10, 2017, he saw and confronted Anglin in a grocery store in Columbus, Ohio. (Doc. 50-22). Gersh argues the fact that Anglin was seen in Ohio on December 10, 2017 is further evidence of his ongoing domiciliary ties to the state and undermines his claim that he is currently abroad.

To rebut that evidence, Anglin has submitted additional photocopied pages from his passport to document his travels since leaving Cambodia in August 2017. (Doc. 71-1). Anglin argues the exit and entry stamps on these passport pages show that he could not have been in Ohio in December 2017. But even assuming what Anglin says is true, and he was not in Ohio when Cremeans claims to have seen him in December 2017, Gersh has otherwise presented sufficient evidence to establish based on the *Lew* factors that Anglin established an Ohio domicile which is presumed to have continued until the Complaint was filed on April 18, 2017. As discussed above, Anglin has not produced substantial evidence to overcome that presumption. Anglin's in camera submission does not help him clear this evidentiary hurdle because it does not contain any evidence regarding his alleged

17

domiciliary ties to the Philippines, Greece, or Cambodia. Even assuming that
Anglin's in camera submission were sufficient to prove he is still traveling abroad
and has not returned to Ohio since leaving Cambodia, "mere absence" from a
previously established domicile is not enough to establish a change. See *Mintzis*,
2014 WL 3818104 *5 (quoting *Mitchell*,88 U.S. at 353).

For the reasons set forth above, the Court finds based on the *Lew* factors and
the presumption that a person's domicile continues absent sufficient evidence of a
change, that Anglin was domiciled in Ohio when Gersh filed her Complaint in
April 2017. Because Gersh has thus met her burden of establishing diversity of
citizenship, Anglin's Rule 12(b)(1) motion to dismiss for lack of subject matter
jurisdiction should be denied.

### B.    Service of Process

Even assuming the Court has subject matter jurisdiction, Anglin argues this
action should be dismissed based on untimely and ineffective service of process,
and consequently, lack of personal jurisdiction.

Under Rule 4(e), a party may serve an individual by delivering a delivering a
copy of the summons and complaint to the individual personally, by leaving a copy
of each at the individual's dwelling or usual place of abode, or delivering a copy of
each to an authorized agent. Fed. R. Civ. P. 4(e)(2). Alternatively, a party may

serve an individual by "following state law for serving a summons in…the state where service is made." Fed. R. Civ. P. 4(e)(1). "If a defendant is not served within 90 days after the complaint is filed, the court…must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).

Gersh initially attempted to personally serve Anglin as allowed under Rule 4(e)(2), by hiring a registered process server who made several attempts to serve Anglin with a copy of the summons and complaint at each of the Ohio addresses he was found to have a connection with. When those attempts at service were unsuccessful, Gersh relied on the objective evidence of Anglin's Ohio domicile to attempt service under Ohio state law pursuant to Rule 4(e)(1).

The Ohio Rules of Civil Procedure provide that the clerk of court can effect service by certified mail. Ohio R. Civ. P. 4.1. If service by certified mail is returned and marked unclaimed, Ohio Rule 4.6(D) allows for service by ordinary mail upon a written request filed with the clerk. If the ordinary mail is not returned, service is considered complete. Ohio R. Civ. P. 4.6(D). Gersh attempted to serve Anglin by both of these methods, but the Franklin County Clerk of Court's certified and ordinary mail service attempts were returned undeliverable. (Doc. 50-13).

19

Accordingly, on August 25, 2017, Gersh requested that the Franklin County Ohio Clerk of Court initiate service by publication pursuant to Ohio Rule of Civil Procedure 4.4. Upon the filing of a proper affidavit, Rule 4.4 provides for service by publishing public notice in a newspaper of general circulation in the county in which the complaint is filed "at least once a week for six successive weeks". Ohio R. Civ. P. 4.4(A)(1). Gersh submitted an affidavit to the Franklin County Clerk of Court, and public notice in the *The Daily Reporter*, a newspaper of general circulation in Franklin County, Ohio, began to run on September 13, 2017. (Doc. 50-14). The initial public notice contained two errors, which were subsequently corrected.   The corrected public notice ran for five more weeks between September 20, 2017, and October 18, 2017. (Doc. 19-1). Gersh also placed a second, identical public notice which ran in the same paper for six consecutive weeks between October 5, 2017, and November 9, 2017. (Doc. 50-15).

On October 27, 2017, Gersh filed a Notice Regarding Service of Process stating that public notice had been published for at least six consecutive weeks in *The Daily Reporter* – a newspaper of general circulation in Franklin County, Ohio – as required by Ohio law." (Doc. 19). Approximately two weeks later, counsel entered an appearance on Anglin's behalf and by the end of November 2017 had filed the pending motion to dismiss.

Anglin first argues that service was untimely because it was not accomplished until after the extended deadline established by the Court. Gersh filed her Complaint on April 18, 2017, which meant that the 90-day period for service was set to expire on July 17, 2017. Due to her initial difficulties, however, Gersh sought and obtained two court ordered extensions of time giving her until October 27, 2017, to effect service. (Docs. 14 & 17). Anglin points out that the last public notice appeared in *The Daily Reporter* on November 9, 2017, and maintains Gersh thus failed to comply with the October 27, 2017, deadline.

As the materials submitted by Gersh reflect, however, she published the corrected public notice for six consecutive weeks beginning on September 20, 2017 and ending on October 26, 2017. Service was thus completed on October 26, 2017 – one day before the extended deadline. The fact that the public notice ran for an additional two weeks is immaterial.

Anglin next argues that service was ineffective for two reasons, both of which are without merit. First, he takes the position that service in Ohio was ineffective because he is not an Ohio resident, which means that he is not subject to the general personal jurisdiction of the Ohio courts. And because he is not alleged to have taken any action in the state of Ohio, he maintains the Ohio courts do not have specific personal jurisdiction over him under the Ohio long-arm

statute. Because the Ohio courts do not have personal jurisdiction over him, Anglin argues, service under Fed. R. Civ. P. 4(e)(1) was ineffective because that rule only allows service pursuant to state law if that state has personal jurisdiction over the defendant.

This argument is based on a misreading of Rule 4(e)(1) and conflates the sufficiency of service of process with the existence of personal jurisdiction. Rule 4(e)(1) simply states that an individual may be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state…where service is made." When applying Rule 4(e)(1), the question is not whether the state where service is made has personal jurisdiction over the defendant, but whether the plaintiff in the federal court action complied with that state's law for serving a summons. Thus, whether Ohio's courts of general jurisdiction have personal jurisdiction over Anglin has nothing to do with whether Gersh effectively served him under Ohio law. As discussed above, Gersh has established that Anglin was domiciled in Ohio at the time she filed the Complaint in April 2017, and as allowed by Rule 4(e)(2), she effectively served him by publication under Ohio law.

Second, Anglin contends that service by publication was unlawful because Gersh's counsel was not admitted to practice pro hac vice in Ohio. Under Ohio

Rule of Civil Procedure 4.4(A)(1), a party seeking to effect service by publication must file a supporting affidavit. Anglin argues that the drafting of such an affidavit is an act of advocacy that must be undertaken by an attorney licensed to practice in Ohio, and that the determination by a public official as to the sufficiency of such an affidavit is a judicial function rather than a ministerial one.

Anglin's arguments are unpersuasive. For one thing, Gersh is invoking the jurisdiction of this Court and not that of the Ohio courts, which means the sufficiency of the affidavit for service of process would be for this Court to adjudicate if it were challenged, which it is not. Furthermore, under Ohio rules of practice, an attorney need only seek pro hac vice admission in order to "be permitted to represent parties in any litigation pending or to be filed in" the Franklin County Court of Common Pleas. (Doc. 50-20). Gersh's counsel was not representing a party in litigation pending or to be filed in the Ohio court, but rather attempting to serve process on a party to litigation pending and filed in this Court. Under the Ohio rules of professional conduct, a lawyer does not engage in the unauthorized practice of law when he "is admitted in another United States jurisdiction, is in good standing in tha[at] jurisdiction…, and regularly practices law" and when the "legal services" he provides in Ohio "are reasonably related to a pending…proceeding before a tribunal in …another jurisdiction…." Ohio Rule of

23

Professional Conduct 5.5(c)(2). To the extent Gersh's counsel provided "legal services" in Ohio, his conduct falls squarely within this exception to the prohibition against the unauthorized practice of law. The Court therefore rejects Anglin's argument that Gersh's counsel engaged in the unauthorized practice of law by invoking Ohio procedure for serving process without first obtaining pro hac vice admission.

For the reasons set forth above, the Court concludes that Gersh effectively and timely served Anglin by publication under Ohio law as allowed by Fed. R. Civ. P. 4(e)(1). Anglin's motion to dismiss for lack of personal jurisdiction based on insufficient service of process should be denied accordingly.

## IV.   <u>Conclusion</u>

For the reasons set forth above,

**IT IS RECOMMENDED** that Anglin's Motion to Dismiss be DENIED to the extent it seeks dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and for lack of personal jurisdiction based on insufficient service of process pursuant to Rule 12(b)(5).

To the extent Anglin moves to the dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted,

24

**IT IS ORDERED** that oral argument on Anglin's motion is scheduled for **April 3, 2018, at 1:30 p.m.,** at the Russell Smith Courthouse, 201 E. Broadway, in Missoula, Montana.

DATED this 21st day of March, 2018.

Jeremiah C. Lynch
United States Magistrate Judge