JULIE M. LAKE
Registered Diplomate Reporter
Certified Realtime Reporter
Martin-Lake & Associates, Inc.
P.O. Box 7765
Missoula, Montana 59807-7765
406/543-6447 office
jml@martin-lake.com

United States Contract Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| TANYA GERSH, | |
|---|---|
| Plaintiff, | No. CR-17-50-M-DLC-JCL |
| vs. | |
| ANDREW ANGLIN, | Defendant's Motion to Dismiss |
| Defendant. | |

**BEFORE THE HONORABLE JEREMIAH C. LYNCH**
**UNITED STATES MAGISTRATE JUDGE**
**FOR THE DISTRICT OF MONTANA**

Russell Smith Federal Courthouse
201 East Broadway
Missoula, Montana 59802

Tuesday, April 3, 2018
1:39 p.m. to 2:57 p.m.

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription.

1                            APPEARANCES

2     For the Plaintiff:

3     DAVID DINIELLI (*pro hac vice*)
      Deputy Legal Director
4     Southern Poverty Law Center
      400 Washington Avenue
5     Montgomery, Alabama 36104
      david.dinielli@splcenter.org
6
      JOHN MORRISON
7     Attorney at Law
      Morrison Sherwood Wilson & Deola, PLLP
8     401 N. Last Chance Gulch
      Helena, Montana 59601
9     john@mswdlaw.com

10    For the Defendant:

11    MARC J. RANDAZZA (*pro hac vice*)
      Attorney at Law
12    Randazza Legal Group, PLLC
      4035 S. El Capitan Way
13    Las Vegas, Nevada 89147
      mjr@randazza.com
14
      MATHEW M. STEVENSON
15    Attorney at Law
      Stevenson Law Office
16    1120 Kensington Avenue, Suite B
      Missoula, Montana 59801
17    matstevenson@bigskylegal.com

18

19                            CONTENTS

20       Proceedings.......................................    3
         Legal Argument by Mr. Randazza.. ..................    4
21       Legal Argument by Mr. Dinielli....................   24
         Legal Argument by Mr. Morrison....................   39
22       Legal Argument by Mr. Randazza....................   47

23       Reporter's Certificate............................   59

24

25

TUESDAY, APRIL 3, 2018

1

2      Whereupon, the following proceedings were had and entered

3 of record in open court, with counsel present:

4          THE COURT:  Good afternoon, please be seated.

01:39:31  5      This is the time set for argument in *Gersh versus

6 *Anglin*, Civil Cause 17-50, Missoula.

7      We're here today to address the defendant Anglin's

8 Rule 12(b)(6) motion seeking dismissal of plaintiff Gersh's

9 Complaint for failure to state a claim upon which relief can

01:39:54 10 be granted.

11      I'll begin by asking counsel for Ms. Gersh to identify

12 themselves for the benefit of the court reporter.

13          MR. DINIELLI:  Good afternoon, Your Honor.  David

14 Dinielli of the Southern Poverty Law Center, for the

01:40:05 15 plaintiff.

16          MR. MORRISON:  John Morrison, Morrison Sherwood

17 Wilson Deola, for the plaintiff as well.

18          THE COURT:  Good afternoon.

19          MR. RANDAZZA:  Good afternoon, Your Honor.  Marc

01:40:14 20 Randazza on behalf of the defense.

21          THE COURT:  Good afternoon.

22          MR. STEVENSON:  Good afternoon, Your Honor.  Mat

23 Stevenson on behalf of the defendant.

24          THE COURT:  All right, good afternoon to all of you.

01:40:21 25 I intend here to give each side 30 minutes of argument.  If

the defendant as the movant wishes to reserve some time for
a rebuttal, advise me of that.  Do you wish to do that?

MR. RANDAZZA:  Yes, Your Honor, we would like to
reserve 15 minutes for rebuttal.

01:40:41  THE COURT:  All right.  That being said, then I will
hear from--I take it, Mr. Randazza, you will be arguing
today?

MR. RANDAZZA:  Yes, thank you, Your Honor.

THE COURT:  All right, I'll hear from you first.

01:40:56  MR. RANDAZZA:  Your Honor, today I'm not here on
behalf of the principle that I like what my client has to
say.  I do not.  I abhor what my client has to say.  But I
am here defending the principle that he has the right to say
it without intervention by the government or without tort
01:41:40  liability.

Justice Roberts said in *Snyder v. Phelps*, "Speech is
powerful.  It can stir people to action, move them to tears
of both joy and sorrow, and--as it did here--inflict great
pain.  But we cannot react to that pain by punishing the
01:42:00  speaker because we as a nation have chosen a different
course--to protect even hurtful speech on public issues to
ensure that we do not stifle public debate."

THE COURT:  Let me interrupt for a moment.  Forgive
me.  But when you make that statement you are talking about,
01:42:19  obviously, Mr. Anglin, because we have this difference

between the people who actually directly contacted

Ms. Gersh--

       MR. RANDAZZA:  Yes.

       THE COURT:  --and/or her family versus Mr. Anglin,

01:42:32  what he put on his website.  And you are referring in this

instance to Mr. Anglin, correct?

       MR. RANDAZZA:  I am, Your Honor.  I do not represent

those parties.  However, since Your Honor asked, I might

even say that were I hypothetically here defending those

01:42:50  parties, even their speech I believe would be protected.

    However when it comes to my client, there is this

attenuation.  My client did publish articles.  My client

published exhortations to action.  My client did express

himself on this matter of public concern and then these

01:43:12  other people reacted negatively.

    Now, we have a sample throughout the Complaint which, as

I read it, I am filled with emotional sympathy for

Ms. Gersh.  I would not wish to suffer what she suffered.  I

empathize with her.  However, even that, how can my client

01:43:33  be held responsible for what his readers might read and how

they might react?  There were, by their count, I

believe--and forgive me if I'm wrong, correct me if I'm

wrong--hundreds of messages.

       THE COURT:  700, I'm told.

01:43:49         MR. RANDAZZA:  Yes.  And we have a sample of the

worst of the worst, none of which I find to be emotionally

or psychologically defensible, but I find them to be legally

so.  Some of them may be extremely cruel, but none of them

rise to the level of a true threat.  There is no threat to

01:44:08   violence in a way that the speaker would control the means

of that violence or harm.

But then if I step back from those words that I do not

stand here today to defend, I don't stand here to defend

those speakers, but if we step back to what Mr. Anglin did,

01:44:27   it is really most--the case that I found to be most

analogous was the *Claiborne Hardware* case, where in that

case, and as I read it, it was--you know, if I were--if you

were to hire me as your clerk, I would probably just start

with that and start replacing names and nouns, because in

01:44:48   that case we had an impassioned plea for a change of social

circumstances.

THE COURT:  Tell me how, in your view, how

*Claiborne*, we're going to be talking about that, ties in

with the captive audience doctrine.

01:45:08   And the reason I ask that is this:  We all know the

court identified three ways in which an individual such as,

in that case Mr. Evers but in this case Mr. Anglin,

hypothetically could be held liable for the tortious acts of

the people who followed his speech, we'll say.

01:45:25   MR. RANDAZZA:  Correct.

THE COURT:  And the first one that the court identified and seems important here is the one that--the question before the Court in *Claiborne* was Mr. Evers authorized, directed or ratified specific tortious activity. Okay?

MR. RANDAZZA:  Yes, Your Honor.

THE COURT:  When you tell me about the captive audience in *Claiborne*, I want you to tell me--I understand that there were numerous articles written by Mr. Anglin.  I think some of the messages, if I'll call them that, to Ms. Gersh and/or her family occurred after the first article, first or second article written, but that he continued to write articles with the same theme.

Those subsequent articles, do they constitute a ratification, authorization, direction?

MR. RANDAZZA:  I don't believe so, Your Honor.

THE COURT:  All right, tell me why.

MR. RANDAZZA:  Because if he had--he could continue to extoll the virtues of his beliefs, the beliefs and the tenets of national socialism.  He can continue to extoll his beliefs of racism, his anti-Semitic views.  Just because somebody reacted negatively to that, I don't believe that that creates any obligation on his part to stop.  No legal obligation.

THE COURT:  But didn't he--the tenor of his articles

suggest at the very least that they direct these--their opinions, as I think he used the term opinions, directly into Ms. Gersh's life, so to speak?  Maybe not necessarily her home.  The plaintiff takes the position that is to be considered part of her home, her e-mail accounts or text messaging, et cetera?

01:47:08

MR. RANDAZZA:  The plaintiff does take that position.  I respectfully disagree, Your Honor.

We look at the captive audience cases.  One of the most key captive audience cases that we might look to would be *Snyder v. Phelps.*  And I can't think of anybody more captive than a father at his son's funeral.  However, even in that case the Westboro Baptist Church was not found to be addressing a captive audience.

01:47:23

THE COURT:  Well, that occurred on public property, did it not?

01:47:42

MR. RANDAZZA:  Yes, Your Honor.  And had this--had these protests, for example, been directed to occur outside of her home, there I'm citing the *Frisby v. Schultz* would say that the government may prohibit picketing at her residence.

01:47:59

There are cases that say that if there were phone calls coming into her house on a constant basis, that might be something in a commercial speech context which the government could intervene in.

01:48:14

01:48:35

1       However, I think this is different because this is not
2   commercial mailers coming to a house.  For example, there is
3   a good case that they cite called *520 South Michigan Avenue*
4   *Associates, Limited v. Unite Here Local*, a 7th Circuit case.
5   And it's cited specifically for this line:
6       "The freedom of an unwilling listener to avert one's
7   eyes or ears is considerably lessened when she is required,"
8   and then there is an ellipsis, "to check her phone
9   messages."  However, the omitted word in this quote is "to
10  be on the job and check her phone messages."  So this is
11  different.
12      I also think that technology has changed the fact of
13  back when some of these captive audience cases with respect
14  to phone calls were written, we didn't have the ability to
15  simply block a number.  We don't have to turn your phone off
16  completely now in order to avoid unwanted phone calls.  I
17  get them constantly.  Block the number and we're done.
18  E-mails--
19          THE COURT:  Isn't the--if there's 700 calls coming,
20  for instance, and you have to block 700 calls, wouldn't or
21  couldn't someone find that to be intolerable within the
22  purview of the captive audience doctrine?
23          MR. RANDAZZA:  I believe if my client were manning a
24  phone bank or directing people to make these direct calls to
25  them again and again, it might be.  However, Your Honor, I

1   don't think so, because Ms. Gersh herself has been quoted as

2   saying that she enjoyed the calls of support that she got.

3       So what we're doing here is we're going to make a

4   determination that the calls of support which she received,

01:49:58   5   which outnumbered the calls of criticism.  And that makes me

6   happy to hear that the mail that she got supporting her

7   outnumbered the hate mail.

8       Are we going to say that the bad phone calls and the bad

9   speech, we're going to find that to be tortious but we're

01:50:17   10   not going to find the mail that is in support to be

11   tortious?  That, of course, is a viewpoint discrimination

12   determination.

13       So I do not believe, Your Honor, that even getting a lot

14   of phone calls when you are involved in a matter of public

01:50:31   15   concern is going to be something that you can be held

16   liable--that you can hold another person liable for, and

17   most certainly not the person who simply wrote an editorial,

18   or even 30 editorials, calling for action and calling for

19   someone to share their opinion.

01:50:47   20       THE COURT:  Well, when you use the term public

21   concern, you are not suggesting to me that Ms. Gersh would

22   be considered a public figure?

23       MR. RANDAZZA:  I would, Your Honor.

24       THE COURT:  Okay.

01:50:56   25       MR. RANDAZZA:  It is our position--

1          THE COURT:  On what basis?

2          MR. RANDAZZA:  Well, Ms. Gersh did interject herself

3    into a public controversy.  The issue of Richard Spencer's

4    mother living in Whitefish is a matter of public concern.

01:51:08    5          THE COURT:  But didn't Ms. Spencer contact Ms. Gersh

6    in the first instance to act as her realtor?

7          MR. RANDAZZA:  That is a matter of factual dispute,

8    Your Honor.

9          THE COURT:  Okay.

01:51:19    10          MR. RANDAZZA:  I look at the--whether or not that

11    happened, though, I don't think is legally relevant to

12    determining whether or not Ms. Gersh interjected herself

13    into a matter of public concern either voluntarily or

14    involuntarily.

01:51:32    15          THE COURT:  And when you tell me she injected

16    herself, that's based upon your conclusion that by

17    suggesting to Ms. Spencer that she sell her building and

18    transfer the proceeds to an entity of some kind, that that's

19    interjecting herself and, thus, she becomes a public figure,

01:51:56    20    because the Spencer potential march--by her son, the

21    potential march was a matter of public concern?

22          MR. RANDAZZA:  Well, I think even before that, Your

23    Honor, if I'm recalling the allegations of the Complaint

24    with total recall.

01:52:11    25      The issue of Ms. Spencer living there even before there

was a planned march has been a matter of controversy.
Ms. Gersh even alleges that she's been part of a movement
to--I believe it's called "Hate Does Not Live Here."  Even
that--I'm not saying she did something bad by joining that
01:52:30    group.  In fact, that's a wonderful thing and that's her
First Amendment right.  But I would say that given that this
is a public controversy, she is a limited purpose public
figure.  I don't think she's a public figure for all
purposes, of course.  She's not reached that level of
01:52:46    notoriety.  But with respect to this issue, this debate, she
has joined a side of the debate and, thus, voluntarily
interjected herself into a larger public debate.

        I can appreciate the fact that somebody new to the arena
of public debate might not appreciate just how far that
01:53:07    might go and just how far that swirl of public attention
could expand.  But expand it did, and that is not something
that my client did.

        You know, there is a--in some of your questions, Your
Honor, there is this thread where, you know, I could see as
01:53:27    my client starts writing about her and that is the thing
that brings her into the public debate, we may not have that
shelter.  You can't make someone a public figure and then
claim now they are a public figure, so I should have a lower
level of proof.  But this was prior to my client's writing
01:53:44    that she did step into that arena.

```
 1            THE COURT:  Well, what did she do to publish her
 2    opinion, so to speak, in the public arena?
 3            MR. RANDAZZA:  Your Honor, I think that that's--
 4    that's not--that's not the inquiry that I think gets to the
 5    heart of the issue.
 6        I think that the heart of the issue is when you do have
 7    a person who is drawing controversy, Ms. Spencer, and you--
 8    even if--let's accept the state of the facts as they present
 9    it--Ms. Spencer called her, not vice versa.  Even then, if I
10    got a call from--well, heck, when I got a call from
11    Mr. Anglin, I understood that if I took that call and I
12    became involved with him in any way, that might lead me to
13    be a limited purpose public figure.
14            THE COURT:  So it's your position that by Ms. Gersh
15    having a conversation, arguably a private conversation with
16    Ms. Spencer about the sale of her building, and then
17    Ms. Spencer, to my understanding, conveyed that to her son
18    which led to this--Mr. Anglin doing whatever he did on his
19    website, that that makes Ms. Gersh a public figure?
20            MR. RANDAZZA:  A limited purpose public figure, yes.
21            THE COURT:  Well, limited purpose, but the point
22    being, a public figure.
23            MR. RANDAZZA:  Yes, Your Honor.  And additionally
24    let's not forget it was not just a phone call to a realtor.
25    This was a phone call to a realtor who was an activist in
```

01:54:01

01:54:22

01:54:41

01:55:03

01:55:15

1    this organization.  And it was also--part of that

2    conversation was a request that Ms. Spencer publicly

3    denounce her son.  Now, she chose not to do that.  But I

4    think if I were to call the "Daily Stormer" and ask them to

01:55:35  5    publish an editorial denouncing Hermann Göring's history,

6    then they decided to publish something instead about me for

7    not being sufficiently sympathetic to their views, yes, I

8    would have interjected myself.

9         THE COURT:  Was the suggestion to publicly denounce

01:55:54  10   Mr. Spencer, her son, was that professional advice in order

11   to allow her to maintain her building at acceptable rental

12   levels?  We know what the background is.

13        MR. RANDAZZA:  Right.  That is not in the Complaint,

14   Your Honor.  And if it is, then I missed that detail.

01:56:15  15       But if it were a--if it was saying that you should

16   denounce your son so I could sell this place better--

17        THE COURT:  Wasn't the issue it was a concern she

18   couldn't maintain her rental levels because if the march

19   occurs, that puts a bad light on her and her building?  Like

01:56:33  20   it or not, that could happen?

21        MR. RANDAZZA:  Perhaps.

22        THE COURT:  So it's your position Ms. Gersh didn't

23   make that suggestion to her for purposes of assisting her as

24   her real estate agent, but for purposes of advancing the

01:56:49  25   other group she was involved with?

1          MR. RANDAZZA:  This is how I see it in the

2     Complaint, but let's look at the alternate view.

3          Even if it were simply to make this a more palatable

4     sale or rental, it's still a big matter of public

01:57:04   5     controversy.  In fact, by definition if we look at that

6     scenario and accept that as the true state of affairs, if

7     I'm acting as a real estate agent and I say you need to make

8     this public statement because your building's going to be

9     hard to rent or sell absent that public statement, doesn't

01:57:22   10     that presuppose that there is already a public controversy?

11     It accepts the fact that there is already a public

12     controversy.  So we're already in the public controversy

13     arena no matter which way we go on that factual note, Your

14     Honor.

01:57:37   15          THE COURT:  All right.  I probably had you digress

16     from your argument.  Get back if you would, please, to the

17     captive audience, how that applies here, if it does.

18          MR. RANDAZZA:  Yes.  Your Honor, I do not believe

19     that it does.  If we look at other captive audience cases,

01:57:53   20     for example, *Bland v. Fessler* is the Ninth Circuit one that

21     I alluded to earlier.  Now, that cited--a 1996 case is cited

22     for the proposition that turning off ringers forces people

23     into isolation.  Screening would clutter the machines of

24     those who can afford them.  Hanging up does not always allow

01:58:13   25     the called party to tell the caller not to call again.

1      But here in that case it involved a California law that

2  required commercial auto dialers to use a live operator to

3  obtain the called party's consent to listen to the

4  pre-recorded messages.  That's different than simply saying

01:58:32     5  phone calls make you a captive audience.

6      The omitted language that poor people cannot afford

7  answering machines, which was omitted probably because of

8  the fact that the technology is very different, there are

9  many ways in 2017 to reduce the number of unwanted calls

01:58:49    10  using caller ID, blocking certain numbers.

11      I understand that that is inconvenient, but we lose--as

12  we step into the public light, we step into matters of

13  public dispute, we lose many conveniences that those people

14  who are--have the privilege of living an anonymous

01:59:08    15  lifestyle, they have many privileges that you, yourself,

16  Your Honor, have lost the day you took your commission.

17          THE COURT:  True, but let me have you set aside for

18  a moment, because the plaintiff doesn't agree with you and I

19  may not necessarily agree with you, that she's a public

01:59:23    20  figure, Ms. Gersh.

21          MR. RANDAZZA:  Yes, Your Honor.

22          THE COURT:  Limited public figure.  And then talk to

23  me about the captive audience and how it applies if we make

24  that assumption.

01:59:33    25          MR. RANDAZZA:  Even if she's not a public figure,

this is still a matter of public concern.  So the matter and the person, each one of those can lift us to the fact that this is a matter of public debate.

So even if you decide she's not a public figure or wasn't a public figure at the time, this is still a matter of public concern.  The person at the center of the matter of public concern is going to necessarily be subject to certain verbal and slings and arrows and invasions of privacy that the rest of us would prefer not to enjoy.

THE COURT:  Well, what I was hoping you would talk about a bit is, you make the statement in your brief that social media, e-mail, telephone messages are directed to a distant cloud, computer servers, to which the individual must affirmatively reach out to acquire.

That's an alternative argument, I take it, to your position that the captive audience doctrine does not apply here.  Explain that to me.

MR. RANDAZZA:  Well, Your Honor, if we were to say that getting an outrageous amount of physical mail, if this case were taking place in the '80s and somebody was just getting thousands of postcards a day, perhaps distributed by my client who said, here, fill these out and send them in; or, here's a stack of letters, take them and sign them, they are pre-addressed, that might be another story if she was simply inundated with packages that she would have to then

1    sift through and figure out what's the electric bill and

2    what is this letter criticizing her.

3        But when you open up your e-mail box, you do have to

4    open that e-mail.  You see a subject line.  I don't think

02:01:22    5    that there is any--I don't think you can analogously say

6    that this is a captive audience simply because they get a

7    lot of e-mails.

8            THE COURT:  Well, the Supreme Court has said you are

9    a captive audience if there's people picketing outside your

02:01:38   10    home, correct?

11            MR. RANDAZZA:  Yes, Your Honor.  Or you can be.

12            THE COURT:  You can be.  And it's based upon the

13    right of privacy of the homeowner, correct, in that case?

14            MR. RANDAZZA:  Yes, Your Honor.

02:01:49   15            THE COURT:  And a right of privacy in today's

16    digital world is quite different than it was when that case

17    was decided, correct?

18            MR. RANDAZZA:  Unfortunately, greatly diminished,

19    Your Honor.

02:02:00   20            THE COURT:  Well, true, and I know where you are

21    going with that.  But we do have an expectation of privacy,

22    I believe, at least in many instances, to our e-mail

23    accounts.  Would you agree with that?  If I don't publish

24    them to the world.

02:02:13   25            MR. RANDAZZA:  Yes, if my client were hacking into

her e-mail account and--

THE COURT:  Well, I'm talking about Ms. Gersh.  Or anybody.  Let's set Ms. Gersh aside.

If they have an e-mail account that they don't publish to the world but to a select few people, that person has an expectation of privacy in that e-mail account.  Would you agree with that?

MR. RANDAZZA:  I'm not sure I would, Your Honor.

THE COURT:  And why is that?

MR. RANDAZZA:  Because the mere fact of your e-mail address itself, I don't know that that would be a private matter if we're looking at the invasion of privacy tort that they seem to indicate here.  However, it's my understanding that this e-mail address was previously published.  Accordingly--if she had a secret e-mail address that nobody knew except--

THE COURT:  Well, that's where my question is headed.

MR. RANDAZZA:  I have a secret e-mail address that only my closest family members know because that way I know when that one's lit up, I want to look at that.  Perhaps if somebody discovered what that secret e-mail was that I've only given to four people and they publish that, that might be the case.  But that's not the case here.

THE COURT:  Okay.  Then answer me this question,

1  too.  These--it's doxing, as I guess the term is now, where

2  the cell phone numbers, or landlines if anybody has those,

3  e-mails and so forth are put on a website.  That's what

4  Mr. Anglin did, correct?

02:03:44  5          MR. RANDAZZA:  Yes.

6          THE COURT:  And Twitter accounts, including the

7  Twitter account of Ms. Gersh's son?

8          MR. RANDAZZA:  Yes, Your Honor.

9          THE COURT:  Was all of that material--all of those

02:03:53  10  modes of communication, I should say, were they all public?

11          MR. RANDAZZA:  They were public, Your Honor.

12          THE COURT:  So there was not--nobody had to go

13  surreptitiously, I'll use that term, to find any of those

14  communication media?

02:04:07  15          MR. RANDAZZA:  That is neither alleged or alluded

16  to.

17          THE COURT:  I'm asking what your understanding is.

18          MR. RANDAZZA:  That is my understanding, that no.

19  Therefore, she has a public address listed on her real

02:04:18  20  estate broker's website.  Even her son's Twitter account.

21  And it's personally offensive to me that somebody would say,

22  here's a minor's Twitter account, direct your attention

23  toward it.  But it was not a private matter.  It's not

24  something that's hidden.  And, therefore, while we may all

02:04:38  25  sit here and perhaps--I would imagine nobody in this

1    courtroom disagrees with me that as a matter of poor taste,

2    that is not the test under our constitution.

3         THE COURT:  All right.  You've used not all of your

4    time but I just want you to wrap up answering this question.

02:04:57  5    It goes back to the direct, authorize or ratify question I

6    asked you earlier.

7         What in your mind does it take for a person who

8    establishes a website that ends up in a troll storm to an

9    individual, what would it take in your mind to say that

02:05:14  10   person directed, authorized or ratified?  What is the Court

11   to look to in terms of making that determination?

12        MR. RANDAZZA:  A couple of factors, Your Honor.

13   One, what is it that they are inciting?  So when we look at,

14   for example, the *NAACP v. Claiborne Hardware* case, in that

02:05:34  15   case even the speech itself, when the gentleman from the

16   NAACP made the speech, he actually said people are going to

17   get their skulls cracked if they cross the line.  I'm

18   paraphrasing, but there was an actual exhortation to

19   violence, but not imminent violence.

02:05:50  20        And I think what we need to look to is, it needs to be

21   incitement to imminent lawless action.

22        THE COURT:  Well, I'm going to ask the plaintiff's

23   counsel, and I believe this is their position, that a person

24   can be held regardless of whether it's incitement.  In other

02:06:10  25   words, they are taking the position that the substance of

1   the communication doesn't necessarily have to be incitement

2   or be inciteful, in other words.  But you are trying to

3   limit it to that.  Is that your position that it has to be a

4   call to incitement?

5   02:06:27        MR. RANDAZZA:  It has to be a call to something

6   tortious.  Otherwise, if I were to--if I were not involved

7   in this case, I might exhort people to send her letters of

8   support.  So you are looking at the content of what he had

9   to say.  And so if we look at it in these--you know, these

10  02:06:43  charged terms like troll storm, well, what does troll storm

11  really mean?

12        THE COURT:  Would sheer volume be sufficient?

13        MR. RANDAZZA:  I don't think so, Your Honor.

14        THE COURT:  But you understand that to be the

15  02:06:54  plaintiff's argument?

16        MR. RANDAZZA:  I do.  But, however, I would say that

17  if you even receive one image like what they put in their

18  Complaint, that would itself still be just as alarming, just

19  as much.

20  02:07:10     My client--I think it's important to say that my client

21  even made sure to tell everybody no threats of violence,

22  nothing illegal of any kind.  The reason being, he even gave

23  his reason, but that gives them some kind of moral

24  authority.

25  02:07:26        Same thing as was in the *NAACP v. Claiborne Hardware*

case, in that speech, the discussion that we're going to

burn this down, we're going to crack people's skulls.

Now, rhetorical hyperbole?  Probably.  That's how the

court looked at it.  But even then that's not a ratification

02:07:44  of the fact that there actually was physical violence in

that case.

THE COURT:  Well, my point is there doesn't have to

be physical violence, does there?

MR. RANDAZZA:  There has to be at least something

02:07:56  tortious, Your Honor.  If it were simply my client

endorsing--

THE COURT:  The breach of the receiver's, in this

case Ms. Gersh, peace of mind by getting bombarded with the

sheer volume of these e-mails, texts, whatever.

02:08:08  MR. RANDAZZA:  If we were to--if this were to be the

case where that--that rule of law was designed and invented,

I think we would have a very deep chilling effect on

political activism and speech.

You know, it's very easy for, I think, all of us to

02:08:34  think that it's just awful when there is this sheer volume

of Nazi-inspired speech.  But let's just change it to the

next activist, just because none of us want to see--I

presume nobody in this courtroom wants to see this activism

be successful.  I would like to see my client's activism

02:08:55  defeated in the marketplace of ideas.

1    But if we think about communities in Pennsylvania where

2  everybody says let's send letters to the CEO of this company

3  that's engaged in fracking in our community; or, heck, if we

4  even have politicians who are too tolerant of bigotry or

02:09:12    5  racism, each--whatever the rule you lay down for the Nazi

6  here, you also lay down for the civil rights activist.

7         THE COURT:  Oh, I understand completely.

8         MR. RANDAZZA:  And I would be--I would find it far

9  more chilling than my walk off the airplane into Missoula

02:09:32   10  last night, and that was quite a shock for a guy from the

11  hot desert.

12         THE COURT:  All right, thank you.  I'm going to

13  reserve some time for you.

14         MR. RANDAZZA:  Thank you, Your Honor.

02:09:46   15         THE COURT:  For the plaintiff, Mr. Dinielli.

16         MR. DINIELLI:  Thank you, Your Honor.

17    With the Court's indulgence I'll be addressing the First

18  Amendment issues generally and the torts.  I would like to

19  allow my co-counsel, Mr. Morrison, to address the questions

02:10:19   20  relating to the Montana Anti-Intimidation Act.

21         THE COURT:  All right.  In fairness to you folks,

22  we're focused on the First Amendment questions we're dealing

23  with.

24         MR. DINIELLI:  That's fine.

02:10:30   25    Your Honor, the defense here is asking for a First

Amendment right to launch an online targeted vicious attack

directed at an individual, designed to make her life hell,

effectuated essentially through private communications that

contribute nothing to the marketplace of ideas.  This intent

02:10:52   is laid bare by the fact that the troll storm was directed

even at her own son, 13 years old.

I would like to set the stage a little bit for what I

think we're doing today here, Your Honor.  We need to

remember that we're here on a 12(b)(6), a motion to dismiss.

02:11:08   Although we did not discuss this at length in our brief, the

same rules apply when someone raises a First Amendment

defense on 12(b)(6) as any other kind of defense or any

other kind of argument.  First Amendment defense is an

affirmative defense.  Many, many district courts have

02:11:25   delayed final decisions on First Amendment defenses until

the record is developed.

The colloquy, for example, relating to whether Ms. Gersh

is a limited public figure, whether any of the speech

addressed a public concern, I think essentially demonstrates

02:11:43   why that might be an appropriate approach here.

In order for the Court to grant the defense's motion

they would have to conclude that the allegations leave no

doubt but that the claims are barred.

The colloquy revealed that there are already potential

02:12:00   factual disputes relating to underlying facts that might

1   inform a discussion of, for example, whether she's a limited

2   public figure.  So, for example, we heard Mr. Randazza say

3   that my client was affiliated with a group that is correctly

4   called "Love Lives Here".  There are no such allegations.

02:12:20   5   There is an allegation that she heard a rumor about a

6   meeting that she did not attend.  There is no allegation

7   that she was acting on their behalf, that she was a member,

8   or that she had any role in planning or being even able to

9   withhold the possibility of any kind of public march.

02:12:36   10   So to the extent that it matters, and we can get into

11   whether or not it does or not, whether she was a public

12   figure, the allegations are what matter, not Mr. Randazza's

13   argument and not--

14   THE COURT:  I understand completely.

02:12:48   15   MR. DINIELLI:  Thank you.

16   The second thing is that Mr. Randazza's argument appears

17   to begin with the premise that unless the Supreme Court has

18   already defined a, quote, exception to the First Amendment,

19   that any cause of action, tort or statutory, that is based

02:13:05   20   on words, is presumptively barred.

21   Again, that's not the proper approach.  And the Ninth

22   Circuit in a 2013 case expressly rejected this approach and

23   confirmed that it's the duty of the court to look at the

24   record as a whole.

02:13:20   25   So what we're not doing here today, or on this motion,

1    is determining whether what Mr. Anglin and his followers did

2    fits within just the particular exceptions that Mr. Randazza

3    has cited.  It doesn't matter if it was a true threat, for

4    example.  It doesn't matter if it's incitement.  What

02:13:39    5    matters is, looking at the record, whether there is a reason

6    to confer First Amendment protection to the language that

7    was used and we would obviously submit that it's not.  But

8    even more important--

9              THE COURT:  Well, focus upon--there's that jump, if

02:13:51    10    you will, to hold Mr. Anglin responsible versus the people

11    who communicated the statements, threats, et cetera, to

12    Ms. Gersh.  Right?  It's your position that he is

13    responsible.

14              MR. DINIELLI:  Absolutely, Your Honor.

02:14:07    15              THE COURT:  And it's your position that he is

16    responsible under the statements made, I take it, in the

17    *Claiborne* case?

18              MR. DINIELLI:  That's exactly correct, Your Honor.

19              THE COURT:  So tell me--

02:14:17    20              MR. DINIELLI:  Two observations about that, if I

21    may.

22              THE COURT:  Sure.

23              MR. DINIELLI:  One is that we think that the

24    language that the court has addressed in the *Claiborne* case

02:14:25    25    describing the three ways in which that speech could have

1   given rise to liability, is the Supreme Court's confirmation

2   that specific direction of tortious activity is not

3   protected and can be the basis of liability.

4       In addition, Your Honor, we are relying on the

02:14:42   5   common-law principle that substantial assistance to the

6   commission of a tort makes the person liable in tort.

7       THE COURT:  Even in the First Amendment context?

8       MR. DINIELLI:  Absolutely, Your Honor.

9       THE COURT:  Any authority for that?

02:14:54   10      MR. DINIELLI:  Well, not specifically saying in the

11   First Amendment context.

12      THE COURT:  I didn't think so.

13      MR. DINIELLI:  But in Montana cases addressing both

14   invasion of privacy under the guise of intrusion into

02:15:09   15   seclusion and with respect to intentional infliction of

16   emotional distress.

17      THE COURT:  I have no problem with that.  But what

18   you are suggesting to me is that principle should apply in

19   the First Amendment context to hold Mr. Anglin responsible.

02:15:19   20      MR. DINIELLI:  Well, there is no reason why it

21   should not, Your Honor.  A tort is a tort unless there is a

22   First Amendment defense.  If there is a First Amendment

23   defense to the tort which we say is the launching of a troll

24   storm which resulted in and was intended to cause harm, then

02:15:32   25   there is a First Amendment defense.  I don't understand why

there would be a different result simply because someone is
alleged to have provided assistance under the common-law.

THE COURT:  Well, isn't--in *Claiborne* itself, didn't
the court say even the suggestion of undertaking unlawful
activity, even violent activity, is in fact protected?

MR. DINIELLI:  The court did describe the subject
speech at issue in that way.  That is not what we are
alleging here.  We are not alleging that Mr. Anglin
advocated for violence.  We are alleging that he
specifically directed people to take specific actions, which
they did, and he knew what they would do.

THE COURT:  Understood.  But it's your position, if
I understand it correctly, going back to the terminology
"sheer volume," that the sheer volume of calls that may have
been made, some 700 according to the allegations, that is,
quote, intolerable within the meaning of the Supreme Court's
discussion of captive audience to state a claim.  Am I right
on that?

MR. DINIELLI:  Well, I don't think we need the
captive audience argument in order to get where we want to
go.  It is helpful.  We do contend that Ms. Gersh was
essentially a captive audience.

THE COURT:  Okay.  Say you lose on the captive
audience.  That the doctrine--the Court decides not to apply
that doctrine which is in fact, as you know, applied very

1    sparingly.  Correct?

2          MR. DINIELLI:  That's right, Your Honor.

3          THE COURT:  So let's assume captive audience doesn't

4    work for you.  What is your theory of liability?

5          MR. DINIELLI:  Well, it still is the theory that we

6    allege under the intrusion into seclusion tort, Your Honor.

7    That doesn't necessarily require the application of the

8    captive audience doctrine.

9          And, in fact, the lead case that we cite and that was

02:17:18   10    discussed earlier, the *Rowan* against *United States Post*

11    *Office Department* case, which is the case about the mail

12    going into the home, was about things going into the home.

13    But there are other cases in which the right to be let

14    alone, which is the right that the court discussed in that

02:17:33   15    case, has been applied outside the home in places where

16    someone is not necessarily a captive audience.

17          There was a Second Circuit case which we did not cite in

18    our brief, Your Honor.  It's called *Galella vs. Onassis*.

19    The cite is 487 F.2d 986.  It's 2nd Circuit, 1973.

02:17:54   20          That was a case in which the claims were IIED, an

21    invasion of privacy, and the facts were this:  There was a

22    paparazzo who was following Jackie Onassis' family and her

23    children.  Popping up out of bushes, scaring them, following

24    them in a motor boat.  Again, not in the home.  No

02:18:16   25    discussion of whether she was a captive audience.

1        What happened there was the court balanced the right to

2   be let alone, which I said is the right that the court

3   discusses in the *Rowan* case, and balanced it against the

4   right to communicate or the right to gather news.  Another

02:18:34   5   First Amendment right.

6        The Court said when we balance these things, we come out

7   in favor of the right to be let alone.  And of particular

8   importance, Your Honor, in that case is that the court said

9   specifically because of the fact that the paparazzo was

02:18:52   10  bothering, following, and scaring the children of

11  Ms. Onassis, that that balance came out in favor of the

12  right to be let alone.  We think that's highly instructive

13  here.  That's an examination or an explanation as to why I

14  don't think strict application of the captive audience

02:19:09   15  doctrine is necessary to win on the intrusion into seclusion

16  tort.

17        THE COURT:  And you are attempting to convince me

18  the intrusion into seclusion as discussed in that case, the

19  *Rowan* case, is applicable where we're talking about speech,

02:19:25   20  freedom of speech and association--

21        MR. DINIELLI:  That's correct, Your Honor.

22        THE COURT:  Any authority for that?

23        MR. DINIELLI:  The principal right of issue was a

24  right derived from the freedom of the press, not freedom of

02:19:39   25  the speech.  But it suggests that when First Amendment

1  concerns are at interest and the competing interest is the

2  right to be let alone, that there is a balancing to be done.

3         THE COURT:  Do you think there is a difference

4  between the freedom of press embodied in the First Amendment

02:19:53  5  and an individual's right to free speech and association?

6         MR. DINIELLI:  I can't come up with a reason why one

7  would be more important than the other, Your Honor.

8         THE COURT:  Okay.  But that's the only case you have

9  to cite me to sustain your position on this intrusion into

02:20:09  10  seclusion theory of liability?

11         MR. DINIELLI:  Well, no, Your Honor.  We cited cases

12  that stand for the proposition that, for example, telephone

13  calls into a person's home can constitute a violation, can

14  constitute that tort.

02:20:22  15      Our position is that--

16         THE COURT:  Doesn't the captive audience come into

17  play in that situation?  Isn't that what you've argued to

18  me?

19         MR. DINIELLI:  It could, Your Honor.  I don't think

02:20:31  20  it's a necessary element.  I'm not understanding why that

21  would be necessary to make that point.

22      However, I would say that Ms. Gersh is captive to her

23  devices.  She is a real estate agent.  She has to answer her

24  phone.  She has to answer messages.

02:20:47  25         THE COURT:  Were all of the media of communication

1    that I asked Mr. Randazza about, all of those were publicly

2    available?

3           MR. DINIELLI:  That's true, Your Honor; but the

4    disclosure of those is not necessarily the premise of the

02:21:03   5    tort in this case.

6           THE COURT:  I understand that.  I'm just asking you

7    a simple question, were they publicly available?

8           MR. DINIELLI:  To my knowledge, they were.

9           THE COURT:  All right.

02:21:11   10          MR. DINIELLI:  Your Honor, I think that what the

11   plaintiffs--or, I'm sorry, the defendants are left with is

12   trying to argue, as I said before, Ms. Gersh is a public

13   figure somehow, or that the speech at issue relates to a

14   matter of public concern and is, therefore, entitled to some

02:21:29   15   sort of special First Amendment solicitude.

16       I'll take the matter of public concern first because I

17   think there was kind of an aligning of any analysis of why

18   what happened here and the speech at issue is purportedly a

19   matter of public concern.

02:21:44   20       First of all, not anything that the public is interested

21   in is necessarily a matter of public concern.  Things are a

22   matter of public concern if they affect a large number of

23   people.

24       What's at issue here, and what started this troll storm

02:22:00   25   was not the larger issue of the views of Richard Spencer and

their heinousness or their righteousness.

     What started the issue here was the allegation that my client had put undue pressure on Sherry Spencer.  So are communications about that a matter of public concern?  I would suggest, Your Honor, that they are not.  And the *Snyder* case is the case to look at for this.  The *Snyder* case, as I recall, was the case about the picketing of the soldier's funeral.

     The Court there said--and I will say that that was a case in which there was an IIED claim and an intrusion into seclusion claim.

          THE COURT:  Why didn't the intrusion into seclusion claim prevail there if it should prevail here?

          MR. DINIELLI:  Well, in that case, Your Honor, the plaintiff had simply driven by the protest that was taking place in a public place.  He then went to the funeral.  The evidence was that he couldn't even hear the protestors when he was at the funeral and he didn't even see or read the signs.  The evidence was he could see the tops of the signs as he drove by.

     Now, what the court in that case did was it said that whether speech is on a matter of public concern depends upon the content, the form, and the context.  In other words, what the court said, and this is a quote, "What was said, where it was said, and how it was said."

1          Here, Your Honor, what was said?  Well, it is true that

2     Mr. Anglin justified his troll storm as based on the fact

3     that my client purportedly had extorted Sherry Spencer.  I

4     would submit that is not a matter of public concern.  But

02:23:52    5     certainly the messages that were sent as a result, and we

6     hold him responsible for that under the substantial

7     assistance theory, they did not in many cases even relate to

8     that.  They did not--

9          THE COURT:  Sorry to interrupt you.  But the

02:24:04   10     substantial assistance theory, where in the First Amendment

11     jurisprudence would I find that?

12          MR. DINIELLI:  Your Honor, I'm not certain if we

13     cited a case in which that was invoked in the context of a

14     tort in which there was a First Amendment defense.

02:24:21   15          I think the *Claiborne* case and the description of the

16     three exceptions to the decision that there would be no

17     liability for those--

18          THE COURT:  Well, let me interrupt again.  Because

19     if we're going to talk about the *Claiborne* case, we

02:24:34   20     certainly will talk about the language used by the Supreme

21     Court in the *Claiborne* case.  They did not use the term

22     "substantial assistance," correct?

23          MR. DINIELLI:  That's correct, Your Honor.

24          THE COURT:  Do you have any other First Amendment

02:24:46   25     jurisprudence that uses the term "substantial assistance"?

1          MR. DINIELLI:  No, I don't.

2          THE COURT:  I didn't think so.

3      So let's talk about the *Claiborne* case.  What in your

4   mind constitutes authorized, ratified or directly

02:24:59  5   threatened?  Does there have to be some sort of authority,

6   as in this case Mr. Anglin, over those individuals who may

7   engage in the speech that you consider to be tortious?

8          MR. DINIELLI:  Your Honor, I don't think there has

9   to be any kind of legal authority.  What we've alleged here

02:25:16  10   is that Mr. Anglin has built a website and a following in

11   which he's become notorious for launching these troll storms

12   in the past.

13          THE COURT:  Understood, understood.  It's just when

14   I read the terms authorized, ratified or directed, that

02:25:29  15   seems to conjure up some other legal principle such as

16   principal agency.  Some sort--employer/employee.  Some sort

17   of authority where the person is under my thumb.  If the

18   person does not engage in the activity I'm authorizing and

19   directing or ultimately they do and I ratify that.  Is there

02:25:48  20   any--

21          MR. DINIELLI:  Well, Your Honor, I will admit that I

22   have not read any case that interprets that language from

23   *Claiborne* in that way.

24          THE COURT:  Can you give me a case where any court

02:25:57  25   has interpreted that language?

1          MR. DINIELLI:  The language from *Claibourne*, Your

2     Honor?

3          THE COURT:  I'm talking about authorized, ratified

4     or directed.  Because I will confess to you I've looked.

02:26:08   5     I'm struggling with understanding in what context I'm to

6     read those terms, because that is in fact--I mean, you do

7     rely upon two--I think you do.  Your briefing wasn't

8     entirely clear.  But is the plaintiff relying both upon the

9     first exception, which is the incitement?

02:26:28  10          MR. DINIELLI:  No, we're not, Your Honor.

11          THE COURT:  I didn't think so because it wasn't

12     argued.  So you are relying on your theory of recovery on

13     authorized, ratified or directed, correct?

14          MR. DINIELLI:  Yes, Your Honor.  And our allegations

02:26:40  15     as to why he or how he authorized, ratified or directed

16     included, for example, the following, which is Exhibit 2 to

17     Mr. Anglin's moving papers, which is one of his first

18     articles.  I believe it's his first article.  And this is an

19     example of what we think constitutes directing the tortious

02:27:00  20     activity.

21          If anyone wants to follow along, this is Page 8 of

22     Exhibit 2.  It's in Mr. Anglin's moving papers--or

23     opposition papers.

24          At the bottom.  "Her Twitter at Gersh Tanya doesn't

02:27:23  25     appear to be active but her son has active accounts.  You

1    can hit him up.  Tell him what you think of his whore

2    mother's vicious attack on the community of Whitefish."

3         And then it names the son and gives his Twitter handle.

4         We contend, and certainly we think this should be given

02:27:40   5    the benefit of the doubt at the motion to dismiss stage,

6    that this constitutes direction.

7         It is also the case that Mr. Anglin's website published

8    a total of 30 articles.  He also provided online discussion

9    forums.  We allege that because he was the publisher, it is

02:27:58  10    reasonable to presume he knew what was in those discussion

11    forums.  And there was discussion in those discussion forums

12    about what people were saying in their contacts to Ms. Gersh

13    and her family.

14         THE COURT:  Who ultimately makes the determination

02:28:13  15    of whether Mr. Anglin authorized, ratified or directed?

16         MR. DINIELLI:  Your Honor, I think that's a fact

17    question.

18         THE COURT:  So a finder of fact?

19         MR. DINIELLI:  That's correct.

02:28:23  20         THE COURT:  All right.  Any authority for that?

21         MR. DINIELLI:  No.

22         THE COURT:  It seems obvious to me, but I just

23    wanted to see --

24         MR. DINIELLI:  I wish I could, but I don't.

02:28:33  25         Your Honor, could I cede some of my time to my colleague

1    to talk about the Intimidation Act?

2              THE COURT:  You may.

3              MR. DINIELLI:  Thank you.

4              MR. MORRISON:  May it please the Court, John

02:28:53   5    Morrison, co-counsel for plaintiff Tanya Gersh.

6         There are three areas that I intend to discuss.  I

7    understand the Court has focused on the First Amendment

8    issues.  But the first is a notice issue.  The second is the

9    sufficiency of the pleading under the Anti-Harassment Act.

02:29:14  10    And then the third is the First Amendment issues that have

11    been raised.

12         First on the notice issue, if I may.  The Federal Rules

13    of Civil Procedure require a party challenging the

14    constitutionality of the state statute to give notice of the

02:29:29  15    constitutional question to the state attorney general of--

16              THE COURT:  True.

17              MR. MORRISON:  --5.1 under the Federal Rules of

18    Civil Procedure.  And this court, Judge Christensen, in

19    *Skogen versus Kosola*, just last October dismissed a claim

02:29:43  20    because that notice was not given.

21         We have not seen any proof by defendants that that

22    notice was given here, and so we believe that that is an

23    initial bar to the constitutional challenge of this state

24    statute.

02:29:59  25              THE COURT:  Okay.

1    MR. MORRISON:  The second point has to do with the
2    statute itself and the sufficiency of our pleading.
3        The anti-intimidation statute is 27-1-1503(2), and it
4    creates a civil cause of action for essentially the same
5    conduct that is described in very similar words in the
6    anti-stalking statute in the criminal code.  And it says
7    that, "An individual or organization who is attempting to
8    exercise a legally protected right and who is injured,
9    harassed, or aggrieved by a threat or intimidation has the
10   civil cause of action against the person engaging in that
11   behavior."
12       So in the first requirement the issue is whether Tanya
13   Gersh was attempting to engage in legally protected
14   activity.  And the legally protected activity in this case
15   is the use of her telephone, the use of her e-mail, the use
16   of her texting and her voice mail, going to work, earning a
17   living, living in her community, practicing Judaism and
18   simply the right to be left alone.  And so all of those
19   rights are at stake here.
20       And the next question becomes, was she injured, harassed
21   or aggrieved?  And I believe that the pleadings have,
22   without question, created at least a fact issue with respect
23   to the degree of injury and emotional distress and so forth.
24       The last piece has overlap with the First Amendment
25   questions.  And that is, was there a threat or intimidation?

And also overlapping into the First Amendment area is the

fact that the Montana Supreme Court has found with respect

to the anti-stalking statute that a communication can be

indirect.  It's not necessary for a defendant under that

02:32:00   anti-stalking criminal statute to actually make the

communication directly to the victim if there is an intended

relay of that communication or a--or if the person provoking

the communication knows what's going to happen in terms of

the third party passing it on.

02:32:21   We cited that *State versus McCarthy* case.  And in that

case I would submit to the Court that what allows Mr. Anglin

to be held responsible under the Anti-Intimidation Act for

the communications that came from the Internet trolls

directly to the Gershes is a very similar kind of standard

02:32:49   that would satisfy the authorize, ratify and direct

principle that the court was referring to with respect to

the First Amendment.  And what it really comes down to is a

kind of foreseeability.

THE COURT:  I'm not following.  I understand

02:33:05   foreseeability, but I'm not following your argument that

when this court is to interpret what the United States

Supreme Court said in *Claiborne* about authorize, ratify or

direct.  You are suggesting I look to Montana law to make

that determination?

02:33:17   MR. MORRISON:  Not at all, Your Honor.  But what I

am suggesting is that in order for us to prove our case

under the Anti-Intimidation Act, we will be introducing

proof that will satisfy the United States Supreme Court's

requirement of showing that Mr. Anglin did authorize, ratify

02:33:37    and direct this activity.

THE COURT:  Well, it's possible the evidence you

ultimately may be allowed to put on would satisfy the

Montana statute but not necessarily the Supreme Court's

statement.  Right?  Do you agree with that?

02:33:49    MR. MORRISON:  Yes, that's possible, but I think--

THE COURT:  Okay.

MR. MORRISON:  But I do believe that the evidence

that we're required to prove in order to satisfy that

Mr. Anglin is responsible for the 700-and-some

02:34:03    communications is very similar and goes a long way toward

establishing the authorize, ratify and direct.

As the Court pointed out, you know, 30 of these

communications that came from Mr. Anglin in his articles

were done after the first wave of attacks on Ms. Gersh, and

02:34:28    were along the lines of "Keep it up.  It's working.  Keep

after it.  Continue to try to wipe out the scourge" and that

sort of thing.  And we can quote those communications

directly.  But we are going to show in connection with the

Anti-Intimidation Act that Mr. Anglin did in fact know what

02:34:54    was going to happen.  He knew what was going to happen the

first time when he issued his commands and he knew--

certainly knew after the attacks had already started.

And essentially what he did was he launched an army or a

swarm of bees at the Gershes and exactly what he expected

02:35:19   happened.  The conduct of Mr. Anglin, the particular words

that he used that constituted his launching of that army or

the swarm of bees are quoted in the Complaint.  It's really

content neutral kind of language.  "Let's hit 'em up.  Ready

for an old-fashioned troll storm.  Call these people up.

02:35:41   Send them a quick message.  Make them feel the kind of

pressure that we feel.  Take action.  Stop by and tell her

in person what you think.  Leave a review of her business on

Google with a note that it's a front for an extortion

racket.  Call or stop by her husband's"--

02:35:59   THE COURT:  I've read all the comments, all right?

The reason I focused upon the First Amendment issue is

because I didn't put a lot of stock in the Rule 12(b)(6)

motion as it applies to the Montana claims.  But if you want

to talk yourself out of that, that's fine by me.

02:36:16   MR. MORRISON:  I understand, Your Honor, and I won't

belabor all of those particular communications.

THE COURT:  Good idea.

MR. MORRISON:  We've also in the Complaint

specifically alleged causation.  And I understand that the

02:36:30   Court is interested in this from the First Amendment

1    standpoint.  But I think that our allegations also satisfy
2    that authorize, ratify and direct standard when we have
3    alleged that Mr. Anglin intended this result.  He gave them
4    instruction and encouragement.  His conduct was a
02:36:52  5    substantial factor in bringing about the harm.  His comments
6    were designed to inflict distress on her.  That attacks were
7    substan--
8           THE COURT:  Are you arguing the First Amendment
9    point here?
02:37:04  10           MR. MORRISON:  Well--
11           THE COURT:  I understand--look, I understand what
12    the Montana statutes require.  I understand there's a
13    question of fact, in my view.  All right?  I understand
14    particularly there's a question of fact under the Montana
02:37:17  15    statute and common-law as to the issue of causation and so
16    forth.
17         The big issue, of course, it's facing right now is the
18    First Amendment issue.  And you are telling me that if you
19    satisfy the Montana common-law and/or the Montana statute,
02:37:31  20    you've therefore satisfied and defeated the First Amendment
21    defense.  Is that what you are telling me?
22           MR. MORRISON:  Not because that's true necessarily;
23    but in this particular case the elements are such that when
24    we prove them, I believe that we will have also satisfied
02:37:47  25    the First Amendment requirements.

THE COURT:  You are entitled to your belief.

MR. MORRISON:  And then with respect to the overbreadth issue that was raised by the defendant.

The application of this doctrine is, as the United States Supreme Court has said, manifestly strong medicine. It has been employed by the court sparingly and only as a last resort.  Facial overbreadth has not been invoked when limiting construction has been or could be placed on the statute.

What I would note is that the anti-intimidation statute has inherent within it certain limiting elements.  The plaintiff must be exercising a legally protected right.  The plaintiff must prove that she was injured, harassed or aggrieved.  And the defendant's conduct must amount to a threat or intimidation.

Also I would note with respect to that, that because this is a tort action the plaintiff has to prove that the plaintiff was damaged.  And in proving that she suffered damages and that she suffered an injury in fact, all of those requirements on the plaintiff go to inherently limiting the application of this law that prescribes this certain kind of conduct.

How am I doing time wise?

THE COURT:  You've got about two minutes.

MR. MORRISON:  I would just note that the Ninth

Circuit and other courts of appeal have recognized that a
host of the same kinds of activity that we're talking about
here may be proscribed consistent with the First Amendment.
In the Ninth Circuit's *Osinger* case, in 2014, finding the
defendant repeatedly calling, text messaging, sending social
media message to the victim was a course of conduct under
the anti-stalking statute and it was unprotected by the
First Amendment.

THE COURT:  No doubt about that.  It was a direct
communication.  If it was a direct communication by
Mr. Anglin to Ms. Gersh, I wouldn't have any quarrel with
that.  We're not talking about that here, are we?

MR. MORRISON:  Well, no, Your Honor; except in order
for us to satisfy the state requirement of Mr. Anglin
violating the Anti-Intimidation Act, we will be proving that
he was essentially directly culpable for the kinds of
communications that came in the swarm of bees that attacked
the Gershes.

THE COURT:  Understood.

MR. MORRISON:  And that's all I have at this time.
Thank you.

THE COURT:  All right, thank you.

Mr. Randazza, you might want to begin with the question
I meant to ask you--I appreciate Mr. Morrison bringing it
up--but your failure to satisfy Federal Rule of Civil

1    Procedure 5.1 by notifying the State of Montana via the

2    attorney general as to your constitutional challenge.

3         MR. RANDAZZA:  We failed to do so, Your Honor.

4         THE COURT:  All right.

02:40:56    5         MR. RANDAZZA:  Therefore at best today and as

6    applied challenge.  And I would say, if Your Honor wishes me

7    to jump to a different place.

8         THE COURT:  Yes, I do.

9         MR. RANDAZZA:  Where would you like me to--

02:41:07    10         THE COURT:  Oh, the reason being--I can't say you

11    can't bring it up in the future.  But that aspect of your

12    motion challenging the constitutionality, consistent with

13    Judge Christensen's decision and other decisions by this

14    court, it hasn't been satisfied.  Until it is, the Court

02:41:23    15    will not address that issue.  And then the question becomes,

16    have you waived that under Rule 12.

17         MR. RANDAZZA:  Yes, sir.  I have not researched

18    that, Your Honor.

19         THE COURT:  All right.

02:41:33    20         MR. RANDAZZA:  I will say, though, that it appears

21    as though we're still discussing whether this is a matter of

22    public concern.  I wish to address some of the comments that

23    my friend made.

24         You know, we were talking a bit about *Snyder v. Phelps*.

02:41:47    25    And in *Snyder versus Phelps*, just like here, we have a

sympathetic plaintiff but we have a greater, larger matter

of public concern that unfortunately sucks this sympathetic

plaintiff into the maelstrom of abusive language.  Abusive,

caustic and vehement language.

02:42:09      However, if we look at the Complaint when we want to

talk about this matter of public concern, Ms. Gersh, under

the allegations in this Complaint, and I believe they are

consistent with the actual facts, is that Ms. Gersh became a

public figure because of, at best, Ms. Spencer.  Perhaps

02:42:27  prior to that.  And I would say that prior to that her

involvement in various civic organizations and involvement

in the movement to move Ms. Spencer out of town would make

her a public figure.

      But let's just draw the line as brightly as we can.  And

02:42:42  at Paragraph 25 of the Complaint it discusses that Mrs.

Spencer published an article about her experience with

Ms. Gersh and everything in that statement may be false.

Ms. Spencer may be lying, then they should sue her for

defamation.  I don't represent her.

02:43:00      But they then allege the day after Anglin published his

views, Paragraph 26 of the Complaint.

      How all of this is a matter of public concern is

addressed at Paragraph 16 and forward, Paragraphs 51, 52 and

53 of the Complaint.  It discusses how the presence of

02:43:19  Ms. Spencer is a huge matter of concern for this community.

1      THE COURT:  So it's your position if I have a

2      conversation with someone and that someone publishes an

3      article in the local newspaper, even if totally false, and

4      then I become the subject of a troll storm, I'm a public

02:43:38   5      figure for purposes of First Amendment analysis?  That's

6      what you just told me, correct?

7           MR. RANDAZZA:  I find that a little confusing, so if

8      I could reiterate to make sure I've got you correct.

9           THE COURT:  Well, what you told me, if I understand,

02:43:51   10     is Ms. Gersh may have become a public figure, limited public

11     figure, because of what Ms. Spencer did.

12          MR. RANDAZZA:  Correct, yes.

13          THE COURT:  So my question seemed fairly

14     straightforward.  You are telling me or it is your position

02:44:05   15     that I could have a private communication with an

16     individual.  That individual could take the contents--the

17     supposed contents, even if the statements are false, of my

18     private conversation, publish that in a local newspaper and

19     then I can become the subject of a troll storm and those

02:44:20   20     people are protected by First Amendment.

21          MR. RANDAZZA:  No.  There is an intervening fact

22     that I want to throw in there.

23          THE COURT:  That's what I want to hear.

24          MR. RANDAZZA:  What I would say is in that scenario,

02:44:29   25     yes, you are not a United States District Judge in this

1    scenario.  You are a private figure.

2           THE COURT:  Oh, yeah, true, true.  Absolutely

3    private figure.  I shouldn't use me.  I'll use Ms. Puhrmann

4    here, if she will allow me.

02:44:42    5           MR. RANDAZZA:  You don't mind?  Yes, somebody can

6    publish completely defamatory, take out an ad in the local

7    newspaper or publish a website about her that is 100 percent

8    total lies.

9           THE COURT:  So I can unwittingly become--Ms. Puhrmann

02:44:58    10   could unwittingly become a public figure for purposes--

11   limited public figure for purposes of First Amendment

12   analysis?

13          MR. RANDAZZA:  Yes.  And then the next day somebody

14   else in another publication writes about those allegations.

02:45:11    15   They are false.  Now, they may have a defamation liability

16   at that point if they have failed to satisfy the actual

17   malice test, but she's already there.  She's already crossed

18   the line into public figure land when someone else made her

19   a public figure.

02:45:27    20       Same as Ms. Spencer.  At worst, for my argument in

21   Paragraph 25, that's when Ms. Gersh, at least, admits to

22   being a public figure.  Ms. Spencer is already a public

23   figure.

24       Remember in your hypothetical we don't define who the

02:45:43    25   person is who wrote that article, but let's say it's David

```
 1   Duke.  Let's say it's some other public figure.  Let's say
 2   it's Orlando Bloom.  Whoever it is, some public figure
 3   writes about you in an article, even in a completely
 4   defamatory way, yeah, you've unfortunately been dragged out
 5   of the shadows into the light of public figure land.
 6       So if Ms. Spencer falsely attributed those to Gersh,
 7   then that is--that is a matter between her and Ms. Spencer.
 8   Not a matter between her and the press.  Not a matter
 9   between her and my client's reporting on what happened
10   there.
11       Now, Your Honor had a question for me before, that I was
12   speaking from memory.  But I want to confirm that these
13   e-mails published were, at Paragraph 89, were e-mail or
14   phone number.  And I believe during their argument they also
15   admitted that these were already publicly available.
16       Now, I find the discussion of the *Onassis* case--it took
17   me a little by surprise, but I am somewhat familiar with
18   that case.  And the right to be let alone is not something
19   that you take in a complete vacuum.  While these people were
20   public figures they had a right to be left alone as far as
21   the examples that he gave:  The paparazzi popping out of the
22   bushes, being followed constantly.  Yeah, then the person
23   doing that could be held liable.  And then the person
24   authorizing or ratifying that--authorizing, ratifying or
25   directing that might be held liable.
```

02:46:01
02:46:23
02:46:39
02:46:59
02:47:20

1     So if I'm running a tabloid newspaper and I send out my

2    reporter and I say "hide in the bushes, use a--hide in their

3    backyard, wait next to their--in their boat to take pictures

4    of them," I do have that degree of agency control over them.

02:47:37  5     But, on the other hand, let's say a paparazzo does such

6    a thing.  And then I am simply publishing a newspaper about

7    the Onassises or a newspaper article and I say, "Good job,

8    I'm really glad that these photos are there.  I hope to see

9    more of them."  There is no connection between me as that

02:47:59 10    tabloid publisher and my competition.  So I can't be the one

11    who's authorizing, ratifying or directing.  Those words

12    don't also legally mean encouraging, cheered, or applauded.

13    So we can be delighted about certain results without

14    being--without authorizing them or ratifying them.

02:48:19 15     THE COURT:  Let me interrupt you for a moment and

16    ask you.  Would you agree that there are some factual

17    questions here, such as whether Ms. Gersh is in fact a

18    limited public figure, just for openers, that counsels

19    against this matter being resolved on a Rule 12(b)(6) motion

02:48:37 20    to dismiss?

21     MR. RANDAZZA:  Not if I look at the Complaint, Your

22    Honor.  Because the Complaint does state, in fact at length,

23    about how this is this great public controversy surrounding

24    Ms. Spencer being in this town.  This is already a matter of

02:48:53 25    public concern when we look at Paragraph 16 and a few

1   following that.  But look at Paragraph 16, 51, 52, 53.  They

2   are already discussing--I'll pull it up here, Your Honor.

3        By way of background, Whitefish residents' discontent

4   with the Spencer family had been simmering for years and

02:49:17   5   reached a fever pitch when the "Hail Trump" video of Richard

6   Spencer went viral.  The video's viral release prompted

7   discussion among Whitefish residents.  The majority flatly

8   reject Richard Spencer's hateful ideology.  So this goes on

9   and on to discuss this great public controversy in Whitefish

02:49:37   10   that already takes place.

11        And then we jump to Paragraph 25 where Ms. Spencer--

12   about two weeks later, without any warning to Ms. Gersh,

13   Ms. Spencer published a blog post on the website "Medium"

14   and alleged in her post that Ms. Gersh tried to threaten and

02:49:54   15   extort her into selling her building.  The day after,

16   Mr. Anglin began posting articles in the "Daily Storm"

17   re-parroting Ms. Spencer's allegations.  So I don't see

18   where we have a factual dispute as to whether she's a

19   limited public figure.

02:50:10   20        THE COURT:  So cite me your best case supporting

21   your proposition that Annie Puhrmann here can unwittingly

22   become a limited public figure.

23        MR. RANDAZZA:  New York--I don't want to say it was

24   *New York Times*, but the party, and it was Butts, B-U-T-T-S.

02:50:32   25   There was a--I believe it was a football coach that was

1    drawn into a public controversy.  Any case where you cite a

2    vortex public figure or a limited purpose public figure or

3    involuntary public figure.  I'm sure if you--

4              THE COURT:  All right.  So ultimately I take it it's

02:50:55  5    your position with your opening comments that because we as

6    a society hold our First Amendment rights dearly,

7    particularly free speech and association, that we simply

8    have to deal, unfortunately, with acts of cowardice.  And

9    even though those acts of cowardice have happened in this

02:51:20  10   case, I'm not pointing to any particular individual, but

11   that, coupled with the anonymity of the Internet, that makes

12   this all the more real.

13             MR. RANDAZZA:  Your Honor, it's the price we pay for

14   living in a free society.  Yes, Your Honor.  You know, there

02:51:39  15   is--as much as we might look at this and, you know, I do

16   empathize with her.  But you could say that this was--this

17   group of cowards who did hide behind their anonymity and

18   attack her, they harassed her.  But *Rodriguez vs. Maricopa*

19   *County Community College District* says there is no

02:52:00  20   categorical harassment exception to the First Amendment free

21   speech clause.  Even those cowards we have to put up with,

22   yes.  And although we might have a regulation prohibiting

23   harassment and intimidation that might not be overbroad, it

24   has to be one that threatens or endangers the health or

02:52:20  25   safety of another.  Not simply one where people are sharing

1    their, admittedly, bigoted and objectionable views with

2    someone.  But even then if I were here representing that

3    group of cowards, I would still argue the same point of law.

4         But I think I am on more solid ground representing

02:52:40  5    Mr. Anglin, because Mr. Anglin's statements were simply not

6    part and parcel of his readers, followers, or these people

7    who simply followed like lemmings.  We don't know.

8         There is no allegation that any of these people had any

9    contact with Mr. Anglin beforehand.  We had no allegation

02:52:58  10    that Mr. Anglin knew what they were going to do.  Yes, I

11    would lose credibility here if I thought Mr. Anglin thought

12    he was just shouting into a void.

13         THE COURT:  Well, is there a factual question that a

14    light might be shed on through the discovery process

02:53:16  15    regarding what Mr. Anglin knew subsequent to his initial

16    publications, such as in the chat room, et cetera, that

17    would constitute directing, ratifying?

18         MR. RANDAZZA:  No, Your Honor.  And there is a very

19    clear reason for that.  You want to talk about the chat

02:53:35  20    rooms.  If people are talking in the chat rooms, first of

21    all, there is no allegation that Mr. Anglin monitored those

22    chat rooms.  Even if he did, I don't see it making a legal

23    or constitutional difference.  And he would not be liable

24    for anything in those chat rooms even if those chat rooms

02:53:54  25    are under his control.

1              THE COURT:  Didn't he provide the forum?

2              MR. RANDAZZA:  Yes, Your Honor, he provided the

3      forum.

4              THE COURT:  So if through the forum he is made aware

02:54:06    5      of the fact that there have been this bombardment, if you

6      will, or release of the bees as characterized by

7      Mr. Morrison, and some of those communications were

8      threatening, and yet he publishes similar articles with the

9      same directions with the information?  I won't say

02:54:22   10      directions.  Same comments.

11              MR. RANDAZZA:  Sure.  I don't think that that

12      constitutionally changes anything, Your Honor.

13              THE COURT:  Is it ratification?

14              MR. RANDAZZA:  It is not ratification, Your Honor.

02:54:32   15      Ratification, it implies that there is some kind of agency

16      control here.  It implies that, perhaps, if they worked for

17      him, perhaps if they were his agents--

18              THE COURT:  So maybe I asked you this before, but

19      bear with me.

02:54:47   20          Do you have any authority that helps me draw that

21      conclusion that there has to be some principal/agency

22      relationship, employment relationship, such that that

23      language utilized by the Supreme Court in *Claiborne*,

24      essential to saying the person authorized, ratified and

02:55:06   25      directed, that there has to be actual authority over the

1  individual to whom you--over the individual that made these

2  statements?

3      MR. RANDAZZA:  No greater authority than *Claiborne*

4  itself, Your Honor.  No, I do not.

02:55:19  5      THE COURT:  All right.

6      MR. RANDAZZA:  But I do have authority for--at least

7  to tie up this thread of this comment--this discussion

8  forum.  There is no allegation--this is a new argument that

9  they raised in their presentation, but I'm prepared to at

02:55:33  10  least partially address it.

11      47 U.S.C. Section 230 immunizes the operator of an

12  interactive computer service for any content thereupon.

13  This is part of the ironically named Communications Decency

14  Act.

02:55:53  15      THE COURT:  I'm familiar with it.

16      MR. RANDAZZA:  So, Your Honor, just if I may, just

17  to conclude.  I think that when somebody is advocating for

18  the free speech rights of somebody like this--and, truly,

19  somebody in your position, I think the 4th Circuit Judge

02:56:16  20  Robert King said it quite well in his opinion on *Snyder v.*

21  *Phelps*.  "The judges defending the constitution must

22  sometimes share their foxhole with scoundrels of every sort,

23  but to abandon the post because of the poor company is to

24  sell freedom cheaply.  And it's a fair summary of history to

02:56:36  25  say that the safeguards of liberty have often been forged in

controversies involving not very nice people."

    While that may be the case here, Your Honor, I think we--

        THE COURT:  I agree wholeheartedly with the statement.  My function here is to determine whether it fits into any of the Supreme Court decisions, most importantly *Claiborne,* which we're talking about.

        MR. RANDAZZA:  Thank you for your thoughtfulness and your questions, Your Honor.

        THE COURT:  Thanks to all of you.  I'll issue an opinion as soon as practical.  Court stands adjourned.

    (End of Proceedings at 2:57 p.m.)

<u>C E R T I F I C A T E</u>

STATE OF MONTANA      )
                      )  ss.
COUNTY OF MISSOULA    )

        I, Julie M. Lake, RDR, CRR, CSR, Freelance Court
Reporter for the State of Montana, residing in Missoula,
Montana, do hereby certify:

        That I was duly authorized to and did report the
proceedings in the above-entitled cause;

        I further certify that the foregoing pages of this
transcript represent a true and accurate transcription of my
stenotype notes.

        IN WITNESS WHEREOF, I have hereunto set my hand on
this the 20th day of April, 2018.



                    *Julie M Lake*
                    Julie M. Lake, RDR, CRR, CSR
                    Freelance Court Reporter
                    State of Montana, residing in
                    Missoula, Montana.