IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TANYA GERSH, | CV 17-50-M-DLC-JCL |
| Plaintiff, | |
| vs. | FINDINGS & RECOMMENDATION |
| ANDREW ANGLIN, | |
| Defendant. | |

This matter comes before the Court following oral argument on Defendant Andrew Anglin's motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, Anglin's Rule 12(b)(6) motion to dismiss should be denied.

## I.    **Background**[1]

Gersh lives in Whitefish, Montana, and has a real estate practice there. She and her husband are Jewish, and have raised their two children in the Jewish faith.

---

1 The following facts are taken from the Complaint and accepted as true for present purposes only.

In late 2016, Gersh became involved in a real estate dispute with Sherry Spencer, the owner of a mixed-used property in downtown Whitefish. Sherry Spencer's son, Richard Spencer, is a white nationalist member of the far right who gained notoriety when a video of him stating "Hail Trump! Hail our people! Hail victory" during a gathering of white nationalists soon after President Donald Trump's election went viral.

Richard Spencer's racist views and his family connection to Sherry Spencer were common knowledge in Whitefish, which has become home to several vocal white nationalists in recent years. In response to growing concerns about the increased presence of white nationalists in the region, the Whitefish community has repeatedly and publicly reinforced its commitment to treating all residents with dignity and respect. For example, the Whitefish City Council approved an anti-hate resolution in December 2014, and community organizations began to distance themselves from the Spencers.

As Richard Spencer's profile expanded to the national stage after the election of President Trump, the Whitefish community's discontent with the Spencers grew. Following the release of Richard Spencer's viral video, approximately seventy residents of Whitefish gathered for a meeting and someone proposed boycotting the businesses located in Sherry Spencer's building. Although

the proposal was rejected, talk of a boycott or protest persisted in the Whitefish community.

When Gersh learned about the possible protests, she tried to warn several of her friends who rented spaced as commercial tenants in Sherry Spencer's building. One of those tenants told Gersh that Sherry Spencer wanted to talk to her, and Gersh reluctantly agreed to consider accepting a call from Sherry Spencer. A few minutes later, Sherry Spencer called Gersh and essentially asked Gersh what she should do. Gersh said that if she were in Sherry Spencer's situation she might sell the building, donate the profits, and make a public statement denouncing her son's views. Sherry Spencer apparently liked that idea at first, and asked Gersh if she would be the realtor and help her sell the property. Sherry Spencer subsequently changed her mind about having Gersh list the property, however, and on December 15, 2016, she published a post on a blog website accusing Gersh of threatening and harassing her into agreeing to sell the property.

The day after Sherry Spencer's blog post, Anglin posted the first in a series of thirty articles related to Gersh on his website, *The Daily Stormer*. The December 16, 2016, article republished Sherry Spencer's allegations against Gersh and was titled "Jews Targeting Richard Spencer's Mother for Harassment and Extortion – TAKE ACTION!" Anglin called for a "troll storm" against Gersh, and included

3

publicly available contact information for her, her husband, and her twelve-year old son. Anglin encouraged readers to contact Gersh and members of her family to "tell them you are sickened by their Jew agenda" and make their opinions of her behavior known. (Doc. 1, at 18).

As soon as Anglin's December 16, 2016, article went live, Gersh, her husband, and her 12-year-old son began receiving hundreds of threatening and harassing anti-Semitic communications, including phone calls, voicemails, text message, emails, letters, and social media comments. For approximately the next two months, Anglin continued publishing articles about Gersh on his website, and the troll storm against Gersh and her family continued. All told, Gersh and her family received more than 700 threatening and harassing communications during this period.

Gersh filed this action against Anglin on April 18, 2017, invoking the Court's diversity subject matter jurisdiction under 28 U.S.C. § 1332. Gersh asserts state law claims against Anglin for invasion of privacy, intentional infliction of emotional distress, violations of Montana's Anti-Intimidation Act, and punitive damages. Gersh sought and obtained two extensions of time to effect service, and on November 14, 2017, defense counsel entered an appearance on Anglin's behalf. Approximately two weeks later, Anglin moved to dismiss the Complaint for lack

of diversity subject matter jurisdiction under Rule 12(b)(1), for lack of personal

jurisdiction based on insufficient service of process under Rule 12(b)(5), and for

failure to state a claim upon which relief can be granted under Rule 12(b)(6).

On March 21, 2018, the undersigned entered a Findings and

Recommendation recommending that Anglin's motion to dismiss be denied to the

extent it seeks dismissal for lack of subject matter and personal jurisdiction, and

scheduling oral argument on the Rule 12(b)(6) aspect of his motion. (Doc. 75).

That Findings and Recommendation is awaiting review by presiding Judge Dana

L. Christensen. In the meantime, the undersigned held oral argument on the Rule

12(b)(6) aspect of Anglin's motion and issues the following Findings and

Recommendation.

## II.   <u>Legal Standards</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a

complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under

Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal

theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

*Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint will survive a motion to dismiss if it alleges facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," then dismissal under Rule 12(b)(6) is appropriate. *Mendiondo*, 521 F.3d at 1104.

In determining whether this standard is satisfied, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1055 (9th Cir. 2008). Assessing a claim's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

## III.   <u>Discussion</u>

Gersh's Complaint pleads claims under Montana law for invasion of

privacy, intentional infliction of emotional distress, and violations of Montana's Anti-Intimidation Act.[2] Anglin makes several arguments in support of his motion to dismiss. First, he argues that the entire Complaint is subject to dismissal because Gersh's claims are premised on speech protected by the First Amendment to the United States Constitution. Second, Anglin argues that even if the speech his online readers engaged in is not protected, he cannot be held liable for their tortious conduct. Even assuming his first two arguments fail, Anglin maintains Gersh has not alleged facts sufficient to support the elements of her claims for invasion of privacy, intentional infliction of emotional distress, and violations of the Montana Anti-Intimidation Act. Anglin also challenges the constitutionality of Montana's Anti-Intimidation Act, both facially and as applied.

## A.    First Amendment

Anglin first argues the Complaint should be dismissed in its entirety because Gersh's claims are all premised on speech protected by the First Amendment. Because Gersh is seeking to hold Anglin liable in tort for the impact of his speech and that of his readers, Anglin likens her claims to content-based restrictions on

---

2 Gersh also brings a claim for "malice," by which she seeks punitive damages under Mont. Code Ann. § 27-1-221. Because a claim for punitive damages is not an independent cause of action, whether it survives Anglin's motion to dismiss depends on whether Gersh's substantive tort claims survive.

speech. See *United States v. Cassel*, 408 F.3d 622, 626 (9ᵗʰ Cir. 2005) (recognizing that "when the definition of a crime or tort embraces any conduct that causes or might cause a certain harm, and the law is applied to speech whose communicative impact causes the relevant harm, we treat the law as content-based.")

As a general rule, content-based restrictions on speech are permitted only when confined to a "few historic and traditional categories" of unprotected speech, including incitement, "obscenity, defamation, speech integral to criminal conduct, so-called fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to present." (internal quotations and citations omitted). *United States v. Alvarez*, 567 U.S. 709, 717 (2012). For speech to be characterized as "fighting words," there must be "a likelihood that the person addressed would make an immediate violent response." *United States v. Poocha*, 259 F.3d 1077, 1080-81 (9th Cir. 2001) (quoting *Gooding v. Wilson*, 405 U.S. 518, 528 (1972)). "True threats" are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "Incitement" is advocacy that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *United States v. Dahlstrom*, 713 F.2d

8

1243, 1428 (9th Cir. 1983).

Gersh's tort claims are based on Anglin's own speech in the articles he posted online, as well as on the speech of readers as expressed in the hundreds of troll storm messages they sent to Gersh and her family. In his opening brief, Anglin anticipates that Gersh might attempt to characterize these articles and messages as fighting words, true threats, or incitement. Anglin contends that even taking the allegations in the Complaint as true, however, none of the speech at issue falls within any of these historically recognized categories and the First Amendment thus bars Gersh's claims as a matter of law.

Gersh does not do as Anglin anticipates, however, and does not take the position that the speech giving rise to her claims constitutes fighting words, true threats, or incitement. According to Gersh, it does not matter whether Anglin's articles and his readers' messages fall squarely within any of the historically recognized categories of speech. What matters, Gersh contended at oral argument, is whether after balancing the competing interests at stake and considering the record as a whole, the speech at issue is entitled to First Amendment protection. Gersh is correct.

Anglin's argument to the contrary is based on the mistaken premise that unless speech falls squarely within a recognized category of unprotected speech,

the First Amendment necessarily operates as a complete bar to tort liability. The Ninth Circuit has rejected this approach, finding instead that the "court has an obligation to make an independent examination of the whole record" to determine whether speech is protected or whether it "may be lawfully restricted under the First Amendment." *Shoemaker v. Taylor*, 730 F.3d 778, 788 (9th Cir. 2013).

Certainly, the First Amendment "can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). See also *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988). But the protections afforded under the First Amendment are not absolute, and the government may regulate speech consistent with the Constitution. *Virginia v. Black*, 538 U.S. 343, 348 (2003). Where, as here, tort liability is challenged on First Amendment grounds, courts must balance the personal interests protected by state tort law with the competing First Amendment interest in protecting speech. See e.g. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Snyder*, 562 U.S. at 451-452.

    1.   <u>Speech as a Matter of Public or Private Concern</u>

Under this balancing approach, whether the First Amendment prohibits holding a defendant liable for speech-based tort claims depends in large part on "whether that speech is of public or private concern, as determined by all of the

circumstances of the case." *Snyder*, 562 U.S. at 451. Speech on matters of public

concern "occupies the highest rung of the hierarchy of First Amendment values,

and is entitled to special protection." *Snyder*, 562 U.S. at 452. "Not all speech is of

equal First Amendment importance," however, "and where matters of purely

private significance are at issue, First Amendment protections are often less

rigorous." *Snyder*, 562 U.S. at 452. "Speech deals with matters of public concern

when it can 'be fairly considered as relating to any matter of political, social, or

other concern to the community." *Snyder,* 562 U.S. at 453 (quoting *Connick v.*

*Myers*, 461 U.S. 138, 146 (1983)). Deciding whether speech is of public or private

concern requires the court "to examine the 'content, form, and context' of that

speech 'as revealed by the whole record.'" *Snyder*, 562 U.S. at 453 (quoting *Dun*

*& Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)).

Anglin argues that taking the facts as alleged in the Complaint as true, the

speech giving rise to Gersh's tort claims was of public concern because he and his

readers were simply expressing their political views about Gersh and her

participation in the collective community actions against Spencer, including the

planned protest and boycott. But Gersh has alleged facts showing that much of

what Anglin wrote in his articles and many of the communications from his readers

had nothing to do with Gersh's involvement in a collective community action

against Spencer.

Gersh alleges that Anglin published several articles filled with anti-Semitic rhetoric and imagery specifically about her and her family, and called on his readers to carry out a "troll storm" and "tell them you are sickened by their Jew agenda." (Doc. 1, ¶7). Gersh claims Anglin's readers then answered his call to action, and targeted her and her family with hundreds of personally hateful, threatening, and harassing anti-Semitic text messages, phone calls, emails, letters, and social media comments. As alleged by Gersh, the troll storm consisted primarily of direct private communications with Gersh and her family, and was effectuated almost exclusively through personal channels of private communication.

The Court cannot say based on these allegations as to content, form and context, that this speech addressed matters of public concern. Whether the speech giving rise to Gersh's claims addressed public or private matters for First Amendment purposes is properly addressed on a fully developed factual record. For now, it is enough that Gersh has alleged facts upon which it could be found that Anglin's speech and that of his readers addressed matters of private concern in light of its content, form, and context.

2.  <u>Gersh's Status as a Private or Public Figure</u>

Whether the First Amendment prohibits holding a defendant liable for speech-based tort claims also depends in part on the plaintiff's status as a general public figure, limited purpose public figure, or private individual. A general public figure is an individual who has achieved "such pervasive fame or notoriety" that he becomes a public figure for all purposes and in all contexts" *Gert v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). A limited purpose public figure is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 351-52. An individual who is "dragged unwilling" into a public controversy is not made into a limited purpose public figure. *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 156, 166-67 (1979). A plaintiff who is a general or limited-purpose public figure may be held to a higher standard of proof, and be required to allege false statements made with actual malice. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).

Anglin touched on this issue in his opening brief, suggesting that Gersh should be considered a limited purpose public figure because she "voluntarily injected herself into national politics." (Doc. 32, at 33). Anglin elaborated on this point at oral argument, taking the position that Gersh is a limited-purpose public figure who must allege and prove actual malice in order to prevail on her speech-

13

based tort claims. He argued the allegations in the Complaint establish that Gersh became a limited purpose public figure by voluntarily injecting herself into the public controversy between Sherry Spencer and the Whitefish community activists who were planning a boycott or protest at her property. Anglin maintained that taking the allegations in the Complaint as true, Gersh voluntarily injected herself into this controversy by joining the Love Lives Here anti-hate group, and contacting Sherry Spencer to suggest that she sell her building, donate the profits, and make a public statement denouncing her son.

But Anglin's position is not supported by the allegations in the Complaint, which say nothing about Gersh having affiliated herself with the Love Lives Here group. Gersh claims only that she "heard the rumors of a possible boycott or protest" at Sherry Spencer's property and "grew concerned that a protest would actually take place," at which point she "tried to warn several of her friends who rented space as commercial tenants in Ms. Spencer's building." (Doc. 1, ¶¶ 57-58). And while Anglin maintains that Gersh initiated the conversation with Spencer, the Complaint alleges it was Spencer who called Gersh and asked for her advice, and that Gersh "reluctantly agreed" to accept the call. (Doc. 1, ¶¶ 60-61). The Complaint further alleges that Spencer then published a false account of their conversation, and Anglin essentially republished that account in his articles calling

14

for a troll storm against Gersh and her family.

Accepting the allegations in the Complaint as true, Gersh has alleged facts upon which it could be found that she was a private individual who was dragged into any public controversy that might be found to exist, and did not voluntarily inject herself into a public controversy simply by accepting a call from Sherry Spencer and having a private conversation with her. The fact that those allegations are disputed by Anglin serves only to illustrate that his First Amendment defense, and the question of whether Gersh was a private individual or limited purpose public figure, should be addressed as necessary later in the litigation on a complete evidentiary record.

### 3.   Captive Audience Doctrine

Gersh also invokes the captive audience doctrine in response to Anglin's motion to dismiss on First Amendment grounds. The captive audience doctrine recognizes that the government may restrict speech that is otherwise protected by the First Amendment if it invades the listener's substantial privacy interests "in an essentially intolerable manner." *Snyder*, 562 U.S. at 459 (quoting *Cohen v. California,* 403 U.S. 1, 21 (1971)).

The United States Supreme Court has applied the doctrine "only sparingly to protect unwilling listeners from protected speech." *Snyder*, 562 U.S. at 459. In

most situations, "the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." Rather, "the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Snyder*, 562 U.S. at 459 (quoting *Erznoznik v. Jacksonville*, 422 U.S 205, 210-11 (1975)). But when members of a "captive audience cannot avoid the objectionable speech," the First Amendment allows "the government to prohibit offensive speech as intrusive." *Frisby v. Schultz*, 487 U.S. 474, 487 (1988). The United States Supreme Court has "repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom." *Frisby*, 487 U.S. at 487.

Gersh contends she and her family were a captive audience to the several hundred cell phone calls, voicemails, text messages, emails, letters, and social media comments they received from Anglin's readers, and asks the Court to hold that Anglin did not have a First Amendment right to force that offensive speech into her home. Gersh argues the traditional concept of "home" has expanded with the proliferation of cell phones, texting, emails, social media messages and other forms of electronic communication. She claims several courts have recognized as much, with one putting it this way: "[T]he substantial right of residents to find

16

sanctuary in their homes, free from unwanted speech, is just as – if not more – vital today, where intrusions via the mail, the telephone and, now, email and the internet are ubiquitous." *National Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783, 795 (7th Cir. 2006) (Williams, J., concurring). Relying on this expansive view of home and Montana's traditional and time honored respect for residential privacy, Gersh argues the troll storm messages invaded her privacy interests in an essentially intolerable manner.

According to Anglin, however, this case is readily distinguishable from those applying the captive audience doctrine to speech targeted to private homes. He contends that, unlike mail delivery or picketing directly in front of someone's home, "social media, email, and telephone messages are directed to distant cloud computer servers to which the individual must affirmatively reach out to acquire." (Doc. 59, at 8). Anglin maintains the facts in this case are more analogous to those in *Synder v. Phelps*, 562 U.S. 443, 459-60 (2011), wherein the United States Supreme Court declined to extend the captive audience doctrine to an outdoor anti-homosexual demonstration near a service member's funeral. If a father attending his son's funeral is not considered a member of a captive audience, Anglin argues, Gersh and her family cannot have been a captive audience when they voluntarily checked their cell phone text and voice messages, email, and social media

accounts. Anglin takes the position that Gersh was not a captive audience to the troll storm communications because she and her family could have simply chosen not to reach out and check their electronic and telephone messages.

As the parties' respective arguments reflect, the question of whether to extend the captive audience doctrine under the circumstances presented here raises some novel and interesting issues. But because Gersh's Complaint survives Anglin's motion to dismiss on First Amendment grounds for the reasons set forth above, the Court need not answer that question now. Leaving this question unanswered for the moment is consistent with Gersh's position at oral argument, which was that she does not need to avail herself of the captive audience doctrine in order to overcome Anglin's First Amendment defense and state claims for invasion of privacy based on intrusion upon seclusion, intentional infliction of emotional distress, and violations of the Montana Anti-Intimidation Act.

## B.    Third Party Conduct

As noted above, Gersh's tort claims are based on Anglin's own speech in the articles he posted online, as well as on the speech of his readers as expressed in the hundreds of messages they sent to Gersh and her family. To the extent Gersh is seeking to hold Anglin liable for the conduct of his readers, Anglin argues her claims should be dismissed for two reasons. First, he contends Gersh has not

alleged facts upon which he can be held liable under Montana law for the conduct of his readers. Second, he argues that to hold him liable for his readers' speech would violate his First Amendment rights.

Anglin premises his first argument on Montana agency law, which holds that "[a] principal is not responsible for other wrongs committed by the principal's agent… unless the principal has authorized or ratified the acts, even though they are committed while he agent is engaged in the principal's service." Mont. Code Ann. § 28-10-602(2). An actual agent is statutorily defined as a person who is "really employed by the principal." *Butler v. Domin*, 15 P.3d 1189, 1194 (Mont. 2010). Because the Complaint does not allege that Anglin employed any of his readers, Anglin contends Gersh has not stated a basis for holding him liable as a principal for the actions of his readers.

Gersh does not rely on agency law, however, and instead claims that Anglin may be held liable for his readers' conduct on a "substantial assistance" theory. Under Montana law, an individual defendant can be held liable for the tortious conduct of another individual if the former "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Sloan v. Faque*, 784 P.2d 895, 896 (Mont. 1989) (quoting Restatement (Second) of Torts § 876).

The Complaint is replete with allegations that Anglin encouraged his readers to take action against Gersh, and caused them to inundate her and her family with hundreds of hateful and threatening anti-Semitic phone calls, text messages, emails, and other communications. Gersh claims that Anglin repeatedly published her and her family's personal contact information on his website (see e.g. Doc. 1, ¶¶ 128, 130) and modeled the sort of vitriol he wanted them to use with his inflammatory anti-Semitic rhetoric and Nazi imagery – including images of Gersh and her son superimposed on a Nazi propaganda poster and a photo of the gates of Auschwitz. (Doc. 1, ¶¶ 28, 135). In addition, the Complaint alleges that Anglin "encouraged" his readers to: (1) call Gersh "and tell her what you think. And hey – if you're in the area, maybe you should stop by and tell her in person what you think of her actions" (doc. 1, ¶ 84); (2) leave negative reviews of her business on line (doc. 1, ¶ 85); (3) take to Twitter and tell her 12 year old son "what you think of his whore mother's vicious attack on the community of Whitefish" (doc. 1, ¶ 88); (4) give Gersh's husband "a call or stop by his office and let him know what you think of his wife's behavior, advise him to get a leash on that hoe" (doc 1, ¶ 89); (5) contact businesses and organizations associated with Gersh (doc. 1, ¶ 145) and; (6) "keep putting pressure on these Jews." (Doc. 1, ¶ 130).

In pleading her claim for invasion of privacy, Gersh essentially summarizes

20

her factual allegations and this theory of liability. She alleges that Anglin "gave his followers instruction and encouragement to harass [her] by exhorting them to contact [her] and by repeating false stories about [her] and Jews generally to stoke his followers' emotions." (Doc. 1, ¶ 215). Gersh's invasion of privacy claim further alleges that "Anglin gave his followers substantial assistance in harassing [her] by continually posting stories about, and posting contact information for, [her], her family members, and her colleagues." (Doc. 1, ¶ 214). Whether the facts as alleged will ultimately provide a basis for holding Anglin liable once the record is fully developed remains to be seen. But for present purposes, Gersh has sufficiently alleged facts in support of a cognizable legal theory by which Anglin could be held liable for the allegedly tortious conduct of his readers.

Turning again to his constitutional defense, Anglin next argues that to adjudge him liable for the acts of his readers would violate his First Amendment rights. For support, he relies on *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 919-20 (1982), which recognized that the First Amendment restricts the ability of a tort plaintiff to recover damages from "an individual solely because of his association with another." Under *Claiborne,* "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of

21

association alone it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne*, 458 U.S. at 920. Anglin maintains Gersh has not alleged facts showing that he belonged to a group with unlawful goals and that he specifically intended to further those goals, which means the First Amendment protects him from being found liable in tort merely by reason of his association with his readers.

As Gersh makes clear in response, however, she is pursuing a different theory of liability against Anglin. *Claiborne* identified three theories by which an individual may be held liable in tort for the unlawful conduct of others without running afoul of the First Amendment: (1) the individual "authorized, directed, or ratified specific tortious activity;" (2) the individual's public speech was "likely to incite lawless action" and the action "followed within a reasonable period" or (3) the individual's public speech "might be taken as evidence that [he] gave other specific instructions to carry out violent acts for threats." *Claiborne*, 458 U.S. at 927 (1982).

Gersh relies on the first *Claiborne* theory, and argues the facts as alleged in the Complaint show that Anglin authorized, directed, or ratified the tortious conduct of his readers.[3] This theory is not entirely different from the substantial

―――――――――――――――――――

3  It appeared from Gersh's response brief that she might also be relying on the

assistance theory recognized under Montana law, and many of the allegations

discussed above that support Gersh's state law theory of liability also support her

claim that Anglin authorized, directed, or ratified his readers' conduct. For

example, the fact that Anglin published the Twitter handle of Gersh's son and

wrote that "[y]ou can hit him up, tell them what you think of his whore mother's

vicious attack on the community of Whitefish" can be construed in Gersh's favor

as evidence that Anglin directed his readers to do just that.

In addition, Gersh has alleged facts supporting her theory that Anglin

ratified his readers' conduct in the many articles he published on his website

between December 2016 and February 2017. Gersh claims that "since launching

the troll storm," Anglin "stoked the fire continuously by publishing new articles on

the *Daily Stormer*," most of which "urge[d] his readers to continue their

harassment of Ms. Gersh and her family and associates." (Doc. 1, ¶ 27). By way of

example, Gersh cites the following excerpt from Anglin's second article: "There's

only one place this road ends. Keep Up the Pressure. Keep calling these people.

Keep emailing them. Make it known to them that the jig is officially up. We aren't

---

second *Claiborne* theory because she argued that Anglin engaged in "more than
mere advocacy," which is part of the standard for incitement. (Doc. 50, at 28). But
the Complaint does not allege incitement, and Gersh confirmed at oral argument
that she is not attempting to hold Anglin liable under an incitement theory.

playing this game anymore. The entire list of contact information is in my last post. Go do it." (Doc. 1, ¶ 128). As further alleged in the Complaint, Anglin published similar statements in subsequent articles, telling his readers: "So please, if you haven't contacted these people to let them know what you think of their deranged actions, do so" (doc. 1, ¶ 130) and "GET TO IT! If you are a true warrior for the cause, you will make time to contact all of these people. I'm serious. … Call and email all of these people. Do it right now." (Doc. 1, ¶ 139).

Gersh also claims that Anglin "provided his followers with online discussion forums where the followers could trade ideas and information for carrying out the harassment." (Doc. 1, ¶ 6). Taking these and all remaining allegations in the Complaint as true and construing them in the light most favorable to Gersh, Gersh has alleged sufficiently alleged that Anglin authorized, directed, or ratified the tortious conduct of his readers.

For the reasons set forth above, the Court rejects Anglin's argument that the Complaint should be dismissed on First Amendment grounds, and finds that Gersh has alleged sufficient facts to support a cognizable legal theory by which Anglin could be held liable for the conduct of his readers.

## C.     State Law Claims

Even assuming the Complaint is not subject to dismissal on First

Amendment grounds, Anglin argues Gersh has otherwise failed to state a claim under Montana law for invasion of privacy, intentional infliction of emotional distress, or violations of the Anti-Intimidation Act.

     1.    <u>Invasion of Privacy</u>

Count I of the Complaint alleges a common law claim against Anglin for invasion of privacy based on intrusion upon seclusion. Under Montana law, the common law cause of action for invasion of privacy "is defined as a wrongful intrusion into one's private activities in such a manner as to [cause] outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *State Board of Dentistry v. Kandarian*, 886 P.2d 954, 957 (Mont. 1994).

Anglin argues Gersh has not stated a claim for invasion of privacy because the only conduct he stands accused of was republishing publicly available contact information for Gersh and her family. Anglin argues Gersh had no reasonable expectation of privacy in such information, and so she cannot state a claim against him for invading her privacy.

As Gersh points out in response, however, her invasion of privacy claim is not based on the publication of her publicly available contact information. Rather, she alleges invasion of privacy based on Anglin's conduct in assisting and encouraging his followers to use that information to harass and torment her.

Gersh's invasion of privacy claim alleges that Anglin's conduct "and the conduct of his followers who acted at his urging amounts to a course of hounding" that became a "substantial burden" to her existence. Gersh claims that Anglin "acted in an extreme and outrageous manner by calling for a troll storm" against her, and that his conduct was a substantial factor in bringing about the harm that she experienced. (Doc. 1, ¶¶ 208-217). These allegations are sufficient to state a claim for invasion of privacy based on intrusion upon seclusion under Montana law.

### 2.      Intentional Infliction of Emotional Distress

Count II of the Complaint alleges a claim against Anglin for intentional infliction of emotional distress under Montana common law. Montana recognizes that "[a]n independent cause of action for infliction of emotional distress will arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent or intentional act or omission." *Sacco v. High Country Independent Press*, 896 P.2d 411, 429 (Mont. 1995). Anglin argues Gersh has not pled sufficient facts to support her allegation that he "could reasonably foresee the consequences of his conduct." (Doc. 1, ¶ 221). Anglin contends that because Gersh was involved with planning a boycott and protest of Sherry Spencer's business, she obviously condones collective action to express political opinions, so there would have been no reason

for him to foresee that the messages he called on his readers to send would have caused her any emotional distress. (Doc. 32, at 36-37).

Anglin's defensive argument notwithstanding, Gersh has alleged sufficient facts to support a finding of foreseeability. As discussed above, Gersh alleges that Anglin assisted, encouraged, and ratified, a vicious campaign of anti-Semitic harassment against her and her family. Regardless of Gersh's views on the propriety of collective action to express political views, she has adequately alleged that her emotional distress was a reasonably foreseeable consequence of Anglin's conduct.

### 3.   Montana's Anti-Intimidation Act

Count III of the Complaint alleges a claim against Anglin under the following provision of the Montana Anti-Intimidation Act:

> An individual or organization who is attempting to exercise a legally protected right and who is injured, harassed, or aggrieved by a threat or intimidation has a civil cause of action against the person engaging in the threatening or intimidating behavior.

Mont. Code Ann. § 27-1-503(2).

Gersh alleges she "was attempting to exercise her legally protected rights, including her free speech rights," and was "injured, harassed, and aggrieved by the troll storm Mr. Anglin orchestrated against her." (Doc. 1, ¶¶ 226-27). Gersh asserts that "[m]any of the harassing communications constituted threats or intimidation

27

giving rise to a civil cause of action" under this statute. (Doc. 1, ¶ 228).

Anglin maintains Gersh fails to state a claim under this statute because her allegation that she was attempting to exercise her right to free speech relates to past conduct, and she has not alleged facts showing that she was attempting to exercise a legally protected right when Anglin allegedly harmed her. Contrary to Anglin's argument, Gersh has alleged facts showing that she was attempting to exercise her legally protected rights to privacy and to freely practice her religion at the time of Anglin's allegedly wrongful conduct.

Anglin next argues Gersh's Anti-Intimidation Act claim fails as a matter of law because the Mont. Code Ann. ¶ 27-1-503(2) is unconstitutional, both on its face and as applied, under the First Amendment. (Doc. 32, at 31). He contends the statute is facially overbroad because subsection (2) does not incorporate the definitions of "intimidation" or "threaten" set forth Montana's criminal statutes, and does not otherwise define those terms. And even if those criminal statutory definitions were incorporated, Anglin argues Gersh has not alleged an actionable threat or act of intimidation. Anglin also takes the position that the Anti-Intimidation statute is unconstitutional as applied, because the internet is a public forum and Montana does not have a compelling government interest in regulating what he might say on the internet in Ohio or anywhere else.

28

Anglin's constitutional arguments raise a threshold procedural issue. At the time of oral argument on April 3, 2018, Anglin had not complied with Federal Rule of Civil Procedure 5.1, which requires a party who raises an argument challenging the constitutionality of a state statute to provide notice to the state attorney general. Fed. R. Civ. P. 5.1(a). By the end of the day on April 3, 2018, Anglin had filed the requisite Notice of Constitutional Question in compliance with Rule 5.1. A party's failure to comply with Rule 5.1 may provide a basis for dismissing a claim challenging the constitutionality of a state statute. See *Skogen v. Kosola* 2017 WL 4516672 *5 (D. Mont. Oct. 10, 2017).

Here, however, Anglin has raised the constitutionality of Montana's Anti-Intimidation statute as a defense to Gersh's claim under the statute. Rule 5.1(d) states that "[a] party's failure to file and serve the notice…does not forfeit a constitutional…defense that is otherwise timely asserted. Anglin did not forfeit his constitutional defense by asserting it prior to having filed and served his Notice on the Montana Attorney General.

Under Rule 5.1(b), the Montana Attorney General has 60 days from the date the Notice was filed to intervene if he chooses to. Because that period has yet to run, and the record is not yet fully developed, it would be premature for the Court to address the constitutionality of Montana's Anti-Intimidation statute on Anglin's

29

motion to dismiss.

## IV.   <u>Conclusion</u>

In sum, the Court concludes: (1) it is not clear based on the allegations in the Complaint that Gersh's claims are barred as a matter of law by the First Amendment; (2) Gersh has alleged sufficient facts to support a cognizable legal theory by which Anglin could be held liable for the conduct of his readers; and (3) Gersh has adequately stated claims under Montana law for invasion of privacy, intentional infliction of emotional distress, and violations of the Anti-Intimidation Act.

Accordingly, IT IS RECOMMENDED that Anglin's Motion to Dismiss be DENIED to the extent it seeks dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

DATED this 3rd day of May, 2018.

Jeremiah C. Lynch
United States Magistrate Judge

30