Marc J. Randazza (*pro hac vice*)
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, Nevada 89147
Tel: (702) 420-2001
ecf@randazza.com

Jay M. Wolman (*pro hac vice*)
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Tel: (702) 420-2001
ecf@randazza.com

Mathew M. Stevenson, St. Bar # 6876
STEVENSON LAW OFFICE
1120 Kensington, Suite B
Missoula, MT 59801
Tel: (406) 721-7000
matstevenson@bigskylegal.com

*Attorneys for Defendant,*
*Andrew Anglin*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MONTANA**

**MISSOULA DIVISION**

| | | |
|---|---|---|
| TANYA GERSH, | ) | Case No. 9:17-cv-50-DLC-JCL |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S OBJECTIONS** |
| vs. | ) | **TO THE MAY 3, 2018, FINDINGS** |
| | ) | **AND RECOMMENDATION** |
| ANDREW ANGLIN, | ) | **(DKT. NO. 85)** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S OBJECTIONS TO THE MAY 3, 2018, FINDINGS AND RECOMMENDATION (DKT. NO. 85)

The Plaintiff brings claims that the First Amendment will not tolerate. Ms. Gersh was involved in a public controversy. She claims Defendant published a series of editorials critical of her involvement. The editorials were crude, even cruel. The Defendant's readers reacted with even more cruelty and crassness. However, the First Amendment does not require politeness or kindness. *See, e.g., R. A. V. v. St. Paul*, 505 U.S. 377, 391 (1992) ("The First Amendment does not permit … special prohibitions on those speakers who express views on disfavored subjects."). If the Recommendation is to stand, Montana would improperly "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules." *Id.* at 392.

The Report and Recommendation cannot stand if *R.A.V.* stands, nor can it stand if *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), *United States v. Stevens*, 559 U.S. 460 (2010), or *Brandenburg v. Ohio*, 395 U.S. 444 (1969) stand. The Defendant is a bona-fide neo-Nazi, and it may be alluring to side against the Nazi. However, the Constitution does not tolerate such viewpoint-based restrictions on speech – and the report and recommendation does just that.

Defendant, Andrew Anglin, pursuant to D. Mont. L.R. 72.3(a), objects to the May 3, 2018, Findings and Recommendation (Dkt. No. 85), wherein the Magistrate

recommended that the Motion to Dismiss (Dkt. No. 31) be denied to the extent it sought dismissal pursuant to Rule 12(b)(6).[1]

## 1.0   The Magistrate Judge's Recommendations, if Adopted, Would Violate the First Amendment

Defendant agrees that Ms. Gersh's claims are based solely on Defendant's alleged speech and the speech of his alleged readers.[2]  Dkt. No. 85 at 9.

### 1.1   The Speech does Not Fit Any Unprotected Category

Defendant agrees that Plaintiff does not contend 'the speech giving rise to her claims constitutes fighting words, true threats, or incitement" and the Magistrate Judge made no finding that the speech at issue met any of these "'few historic and traditional categories' of unprotected speech" permitting content-based restrictions on speech.  *Id.* at 8-9 quoting *United States v. Alvarez,* 567 U.S. 709, 717 (2012); see also, Motion to Dismiss, Dkt. No. 32 at 26-33 (explaining why the speech fits in

---

[1]   Defendant chose not to object to the prior Findings and Recommendation (Dkt. No. 75), as adopted May 7, 2018 (Dkt. No. 86) regarding that portion of his motion that challenged this Court's subject matter jurisdiction and the insufficiency of service.  Although Defendant contends that service was improper and he was domiciled in Cambodia when this suit was filed, he would prefer this Court, rather than a Cambodian court, weigh in on the important First Amendment rights to be vindicated.  Further, the motion has not yet been fully resolved, as the question of the constitutionality of the Anti-Intimidation Act is pending a response from the Montana Attorney General; Defendant reserves the right to argue that issue should the Magistrate Judge recommend further denial of the motion thereupon.

[2]   Although the Magistrate Judge addressed the captive audience doctrine at pp. 15-18 of the Findings and Recommendation, he came to no conclusion, stating the "Court need not answer that question now." Dkt. No. 85 at 18.  Thus, Defendant will not address that issue here, as there is nothing to object to, but reserves the right to further argue the matter as is appropriate to the circumstances.

no unprotected category and why no new category should be created).  At this point, dismissal should have been recommended.

Instead, the Magistrate Judge selectively quoted from *Shoemaker v. Taylor*, 730 F.3d 778 (9th Cir. 2013), to suggest that lawful speech outside one of those categories may be restricted.  *Id*. at 9.  The full quote from the Ninth Circuit contradicts his conclusion:

> the "appellate court has an obligation to make an independent examination of the whole record" to evaluate whether the speech is protected or whether it actually falls into a category of unprotected speech and thus may be lawfully restricted under the First Amendment.

730 F.3d at 787 quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984).  *Shoemaker* does not give a Court liberty to penalize unprotected speech outside one of the stated categories and no new category was recognized.

## 1.2    The Speech Cannot Otherwise be Regulated

Even were the Court to consider regulating Defendant's speech, directly or as vicariously liable for third party speech, despite not falling in one of the previously recognized categories of unprotected speech, it should not do so.

### 1.2.1    The Speech was a Matter of Public Concern

The Magistrate Judge found that the speech did not address matters of public concern.  Dkt. No. 85 at 12.  This conclusion is impossible to square with the allegations in the complaint.  "The inquiry into the protected status of speech is one of law, not fact."  *Connick v. Myers*, 461 U.S. 138, 148 n.7, 103 S. Ct. 1684, 1690 (1983).  "[The] First Amendment does not protect speech and assembly only to the extent it can be characterized as political.  'Great secular causes, with smaller ones,

are guarded.'"   *Mine Workers* v. *Illinois Bar Assn.*, 389 U.S. 217, 223 (1967),
quoting *Thomas* v. *Collins*, 323 U.S. 516, 531 (1945).

A matter of public concern is one "relating to any matter of political, social,
or other concern to the community." *Id*. at 146.  It is implausible to suggest that
"much of what Anglin wrote in his articles and many of the communications from
his readers had nothing to do with Gersh's involvement in a collective community
action against [Richard] Spencer." *Id*. at 11-12.

The allegations in the complaint clearly contradict the findings, and
acknowledge that this was, indeed, a controversy over a matter of public concern.

The controversy itself is rooted in the fact that Richard Spencer, a white
nationalist, catapulted to fame in November 2016 when a video of him went viral
doing the Nazi salute and stating "Hail Trump! Hail our people! Hail victory!" (Dkt.
No. 1 at ¶¶ 15 & 45).  This catapulted Spencer to the highest levels of public-
figurehood.  This speech disturbed many Americans, not the least of which are a
substantial composite of the population of Whitefish, Montana, because Spencer's
mother, Sherry Spencer, lives there.  And, whether Sherry Spencer likes it or not,
being the mother of America's most famous white nationalist can make one famous.
To the extent that Sherry Spencer is not globally famous, she certainly is "Whitefish
Montana famous."

It is undisputed that there are many Whitefish residents who wish that Mrs.
Spencer would leave town.  They object to white nationalism, and having the
Spencers in town is objectionable to them.  The instant dispute arose after "Whitefish

residents' discontent with the Spencer family…reached a fever pitch" after Spencer's "Hail Trump!" speech. Dkt. No. 1 at ¶¶ 15-16. Discontent with Spencer's white nationalism had been brewing for years, resulting in a City Council resolution promoting diversity. *Id*. at ¶¶ 51-54. Sherry Spencer was a public figure in Whitefish. *Id*. at ¶ 17. Community members approached Ms. Gersh, and she then voluntarily contacted Mrs. Spencer's tenants. *Id*. at ¶ 18 & 58. Ms. Gersh then agreed to accept a call from Mrs. Spencer and then agreed to act as her real estate agent, to try to mollify the community political protests. *Id*. at ¶¶ 19-22 & 59-61; Dkt. No. 32-3. Ms. Gersh then publicized her efforts on behalf of Mrs. Spencer. Dkt. No. 1 at ¶ 68; Dkt. No. 32-3. The relationship between them soured, resulting in Mrs. Spencer publishing an article about Ms. Gersh and her involvement in the public controversy. Dkt. No. 1 at ¶¶ 25, 70 & 74; Dkt. No. 32-1. Although Mr. Anglin and Ms. Gersh may differ as to the detail of Ms. Gersh's relationship with Sherry Spencer, there is no dispute that Ms. Gersh chose to speak with Mrs. Spencer about the planned public protest and potential building sale in response to Richard Spencer's public speech. Dkt. No. 1 at ¶¶ 61-65. The two women spoke on a matter of public concern. This was already a public controversy.

However, let us presume that it was not. The moment Ms. Spencer (a public figure herself) published her article criticizing Ms. Gersh, Ms. Gersh clearly then became a public figure.[3] *See Gertz v. Robert Welch, 418 U.S. 323, 351*, 94 S. Ct. 2997, 3013 (1974). There is no Allegation that Anglin had any part in the Spencer

---

[3]   While this event made Ms. Gersh's public figure status unquestionable, she was clearly involved in a matter of public concern well before that.

article.  In fact, only once Ms. Spencer wrote about Ms. Gersh did Mr. Anglin even hear of her or write about her.  Dkt. No. 1 at ¶ 80; Dkt. No. 32-2.

The Magistrate Judge conflated whether something is an issue of public concern with whether the speech was publicly or privately made.  *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414, 99 S. Ct. 693, 696 (1979) (one does not "forfeit[] his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly.")  The Magistrate Judge further improperly focused on whether Ms. Gersh is a private or public figure, which is not the inquiry – the inquiry is whether this is a *matter* of public concern.  The issue is the *public issue* not the players therein.

To that analysis, bigoted language does not remove it from the realm of public concern.   In *Connick,* the Supreme Court held that the "right to protest racial discrimination – a matter inherently of public concern – is not forfeited by [one's] choice of a private forum."   461 U.S. at 148 n.8.  Since such standard must be viewpoint neutral, the right to support racial, ethnic, or religious discrimination is also not forfeited by the choice of a private forum.  *See, e.g., Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 95, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972) ("Above all else, the First Amendment means that government has no power to restrict expression because of its message [or] its ideas.").

At oral argument, the undersigned reminded the Magistrate that the rule his order lays down would apply to civil rights activists as well as white nationalists.  *See* Transcript at 23:15-25.  Immediately, an example arose.  Just this week, social

justice activist Shaun King asked tens of thousands of his followers to "get in touch" with Aaron Schlossberg, a New York attorney caught in a viral video berating restaurant staff for speaking Spanish. *See* Tweet by @ShaunKing dated May 16, 2018.[4] Since then, Schlossberg has been deluged, at a minimum, by negative tweets, Yelp reviews, and camera crews.[5]  Under the First Amendment, King is not liable to Schlossberg, who made a statement in a public forum on a matter of public concern. And neither is Mr. Anglin liable to Ms. Gersh, who also spoke on a public forum about a matters public concern.  The mere fact that some portion of the allegedly offending third-party speech to Ms. Gersh was privately made does not alter the fact that (1) it was in support of Richard Spencer's speech in support of President Trump, and (2) it related to the growth of white nationalism in Whitefish, and the community's response thereto, all of which was a matter of public concern.

### 1.2.2    Plaintiff is a Limited Purpose Public Figure

As noted, the parties disagree as to how Ms. Gersh involved herself with Mrs. Spencer's affairs.  But the Magistrate Judge incorrectly minimized the situation

---

[4]    Available at: <https://twitter.com/ShaunKing/status/996776630520565760> last accessed May 17, 2018.

[5]    *See, e.g.,* Ari Levy "After New Yorker's racist rant goes viral, his law firm gets pummeled with 1-star Yelp reviews", CNBC (May 16, 2018) available at https://www.cnbc.com/2018/05/16/racist-viral-video-lawyer-aaron-schlossbergs-law-firm-yelp-bombed.html; Kevin Fasick & Natalie Musumeci, "Racist lawyer runs scared from cameras outside home", New York Post (May 17, 2018) available at  https://nypost.com/2018/05/17/racist-lawyer-runs-scared-from-cameras-outside-home/ ; Ari Feldman, "Latino Twitter Comes for Pro-Trump Lawyer Who Threatened Spanish-Speaking Workers", Forward (May 17, 2018) available at https://forward.com/fast-forward/401379/latino-twitter-comes-for-pro-trump-lawyer-who-threatened-spanish-speaking/ .

by finding that that Plaintiff "did not voluntarily inject herself into a public controversy simply by accepting a call from Sherry Spencer and having a private conversation with her."  Dkt. No. 85 at 15.  First of all, it matters not if she *voluntarily* interjected herself – public figures can be involuntarily so.  *See, e.g., Zupnik v. Associated Press, Inc.*, 31 F. Supp. 2d 70, 73 (D. Conn. 1998) (collecting cases).  Nevertheless, Ms. Gersh did more than "simply [] accepting a call."

She did far more than that.  In fact, she *alleges far more than that.*

- In the Week of November 13, 2016, she was in communication with people planning a boycott or protest of Mrs. Spencer's building (Dkt. No. 1 at ¶¶ 56-57);

- She then began monitoring Mrs. Spencer's building (*Id.*);

- She began warning multiple tenants of Mrs. Spencer of the planned protest (*Id.* at ¶ 58);

- She counseled a tenant (*Id.* at ¶ 59);

- She agreed to speak with Mrs. Spencer (*id.* at ¶¶ 59-61);

- Ms. Gersh questioned Mrs. Spencer why she "was keeping the building" (*id.* at ¶ 62);

- Ms. Gersh then told Mrs. Spencer, if it were her building, "she might sell her building, donate the profits, and make a public statement." (*Id.*);

- She accepted an access code and agreed to "look around, decide how to market [the building], and determine a proposed list price." (id. at ¶ 64);

- Ms. Gersh was involved with the drafting of a press release about the sale and Richard Spencer.  (Id. at ¶ 65);

- She agreed to act as Mrs. Spencer's real estate agent.  (id. at ¶ 67);

- She notified the tenants of the proposed resolution.  (Id. at ¶ 68);

- She publicized the proposed resolution through social media to "quell discussions of boycotts or protests."  (Id.)

Ms. Gersh does not dispute the authenticity of the emails or social media posts by Ms. Gersh at Dkt. No. 32-3 nor of the propriety of considering them on a motion to dismiss, yet the Magistrate Judge was silent as to them.  On November 22, 2016, Ms. Gersh wrote to Mrs. Spencer:

> "[I am] getting the listing agreement together" and asked her to "stay in close contact with me if you need anything or have questions at all about what is going on in the community.  I put out many fires today just by mentioning the possible sale.  All is very quiet right now waiting for your announcement.  I will have the public statement drafted shortly as well for you to review."  Dkt. No. 32-3 at 2.

This is far beyond "accepting a call"—it is agreeing to be her real estate agent, helping her to "put out many fires," **and drafting a public statement for her**. Ms. Gersh sent Mrs. Spencer a real estate listing agreement that same day.  *Id*. at 3. In furtherance of "putting out the fires," Ms. Gersh posed on Facebook the plan to sell the building, that the proceeds would be donated to Human Rights Networks, and **a public statement** would be made.  *Id*. at 4.  In fact, Ms. Gersh said she was "**spear heading" this effort and "[a]nyone who wants details, feel free to contact me**."  *Id*.  The finding that she did not voluntarily inject herself into the controversy,

even if she did not place the initial call to Mrs. Spencer, is untenable in light of what Ms. Gersh actually did.

At a minimum, Ms. Gersh is an involuntary public figure. *See Gertz v. Robert Welch*, 418 U.S. 323, 345 (1974). She "assumed the risk of publicity" and "has taken some action…in circumstances in which a reasonable person would understand that publicity would likely inhere." *Blaine Larsen Processing, Inc. v. Hapco Farms, Inc.*, No. 97-0212-E-BLW, 1999 U.S. Dist. LEXIS 23519, at *20 n.7 (D. Idaho Oct. 18, 1999) citing *Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999). Even if Ms. Gersh did not voluntarily inject herself into a public controversy and Mrs. Spencer dragged her into it, she remains at the center of a public controversy. At that point, it does not matter whether it was voluntary or involuntary – she was a public figure at least by the time Mrs. Spencer published her article, if not when she agreed to help Mrs. Spencer. This was no mere private transaction; it was a public, community-oriented matter dealing with what might be Whitefish's greatest public controversy. It might be different if Ms. Gersh simply agreed to accept a real estate listing, and woke up the next day shocked to find that her new client was a public figure of such notoriety. Instead, she ran toward the controversy – and did so presumably for what she believed to be noble reasons. Nevertheless, even if she ran into the controversy as a firefighter runs toward danger to save lives, the question is not how she came to be in the middle of the fire – it is whether she is in the fire or not. Ms. Gersh is a limited purpose public figure, this matter was one of public concern, and the Complaint should be dismissed for lack of a plausible claim of actual malice.

## 2.0    Defendant is Not Liable for the Speech of Third Parties

The third-parties in this case are the real parties-in-interest whose speech is at issue.  The complaint alleges more than 700 objectionable messages were sent to Ms. Gersh.  It does not specify how many positive messages were received, nor how Plaintiff came to categorize objectionable statements from others.  Nevertheless, even the worst of the worst do not rise to the level of a "true threat" or other kind of speech that lies outside the First Amendment's broad protections. Accordingly, the speech of the third-parties is not actionable, were they to have been named as defendants in this action.[6]  Defendant cannot be held vicariously liable for lawful (even if cruel) speech.  First, Mr. Anglin is not liable under the Montana state-law "Substantial Assistance" theory.  Second, the First Amendment does not tolerate the claim under *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

### 2.1    Defendant Did Not Provide "Substantial Assistance"

Mr. Anglin cannot be held liable for third-party speech under Montana state law.  At the outset, the parties agree that Defendant is not liable for his readers' speech under Montana agency law.  Dkt. No. 85 at 19; see also, Motion to Dismiss, Dkt. No. 32 at 33.   Instead, the Magistrate Judge relied upon the "substantial assistance" theory raised at oral argument.  Dkt. No. 85 at 19; *see Sloan v. Fauque*, 239 Mont. 383, 385, 784 P.2d 895, 896 (1989) (one may be liable for substantial

---

[6]   Defendant did not move to dismiss for failure to join them as indispensable parties under Rule 12(b)(7), but reserves the right to do so.  Fed. R. Civ. P. 12(h)(2). Such motion may be necessary depending on the nature of the relief to be sought, especially under Plaintiff's catch-all request for "Such other relief as the Court deems just."  Dkt. No. 1 at 62 ¶ H.

assistance where he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself").

In her Complaint, Plaintiff pleaded:

> Mr. Anglin gave his followers substantial assistance in harassing Ms. Gersh by continually posting stories about, and posting contact information for, Ms. Gersh, her family members, and her colleagues.

Dkt. No. 1 at 60, ¶ 214. This pleading is insufficient. In fact, if "continually posting" is "substantial assistance," then, as discussed below, this Court would countermand the standard in *Claiborne Hardware*. Further, it would chill advocacy and journalism alike. Imagine a company came to Missoula and began polluting the local water supply. Then, the *Missoulian* wrote daily editorials exhorting readers to write to the company, expressing displeasure. A certain percentage of those writers would engage in nasty speech. At what point would this Court tell the *Missoulian* it crossed the line? After writing about this matter of public concern twice? Ten times? Every day for one year? The First Amendment does not tolerate any ruling that a publisher must stop writing about a controversial subject once a court feels that it has been written about enough. Writing about a subject a lot does not create "substantial assistance."

The "substantial assistance" theory cannot apply here; in fact, it is not known to have been applied to anything other than a claim sounding in negligence. In fact, it would fly in the face of the existing theory of the complaint – that writing about a subject too many times and publicly calling for others to join in (with an exhortation to lawful activity) – is directly tortious. Beyond that, the "substantial assistance"

theory has not been extended in Montana to statutory claims, such as claims under the Anti-Intimidation Act, except where the courts have looked to it to interpret specific statutory language invoking such principles. *See, e.g., Hansen v. Bozeman Police Dep't*, 2015 MT 143, ¶ 22, 379 Mont. 284, 289, 350 P.3d 372, 376 (2015) (using Restatement to interpret MCA § 49-2-302's "aid, abet, incite, compel or coerce" language).

Moreover, Plaintiff fails to plead the requisite knowledge element. The Complaint is silent as to the relationship between Mr. Anglin and those who communicated with Plaintiff.  That Mr. Anglin may have requested advocacy through the hyperbolic phrase "troll storm" does not imply those people listened to him, as opposed to having been motivated by Mrs. Spencer's article or by their own Anti-Semitism.  There is no an allegation that Mr. Anglin definitively knew that what each and every third party did or was doing. *See Newman v. Lichfield*, 2012 MT 47, ¶ 45, 364 Mont. 243, 255, 272 P.3d 625, 634 (2012) (requiring such breach of duty to be "definitively" known).  And, no such allegation could be made with any plausibility.

Like the NAACP in the *Claiborne* case, Anglin put forth his views and called upon those hearing those views to propagate them.  However, unlike the *Claiborne* case, there was never actual violence, there was no true economic harm, and there was a particular request to stay within the bounds of the law.  Thus, there is not a proper claim pleaded under the "substantial assistance" theory for lack of definitive

knowledge. Defendant cannot be held liable for the third-party speech under the First Amendment or Montana law.

## 2.2    The First Amendment Precludes Third-Party Liability

Where liability for substantial assistance is predicated solely on speech, as it is here, the common-law doctrine of substantial assistance must be viewed through the lens of the First Amendment, and it is a strict standard.  *See* Motion to Dismiss, Dkt. No. 32 at 33-34. The substantial assistance and/or encouragement under the doctrine must be limited to one of the historically unprotected categories.  In *Hansen*, *supra*, "substantial assistance" is compared to "incite[ment]."  The Magistrate Judge, however, found that Plaintiff was not pursuing the incitement theory recognized in *NAACP v. Claiborne Hardware Co.*  Dkt. No. 85 at 21, citing 458 U.S. 886, 927, 102 S. Ct. 3409, 3433 (1982).

The parties seem to agree that this case is largely covered by *Claiborne Hardware*.  In that case, the plaintiffs sought to hold the NAACP and its field secretary, Charles Evers, liable for damages stemming from boycotts against businesses and *actual violence*.  The violence was alleged to be a foreseeable result of the fiery rhetoric in some speeches given in furtherance of the boycott.  However, since the speeches did not incite the violence or specifically authorize it, they could not be the basis of liability.  The standard for such liability is quite strict.  *See Pfizer Inc. v. Giles (In re Asbestos Sch. Litig.)*, 46 F.3d 1284, 1289-90 (3d Cir. 1994) (addressing *Claiborne, supra* at 920,'s strict requirement of a "specific intent to further…illegal aims").

Instead, Plaintiff is pursuing the liability theory under *Claiborne* arising when a defendant "authorized, directed, or ratified specific tortious activity."  Dkt. No. 85 at 21.   In *Claiborne,* the Supreme Court rejected liability where Charles Evers's speeches did not "authorize[], ratif[y], or directly threaten[]" unlawful activity.  458 U.S. at 929.   Neither the NAACP nor Evers was liable where "Evers told his audience that they would be watched and that blacks who traded with white merchants would be answerable to him. … Evers told the assembled black people that any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people."  458 U.S. at 900 n.28.  This did not meet the authorize, ratify, or directly threaten standard.   Moreover, the Supreme Court found Mr. Evers had **no duty to "repudiate"** unlawful activity.  *Id.* at 929.

The Magistrate Judge incorrectly found that "Anglin authorized, directed, or ratified the tortious conduct of his readers."  Dkt. No. 85 at 22.  First, the Magistrate Judge identified no actionable invasion of privacy, infliction of emotional distress, or statutory intimidation by any actual reader.  There was none:  it was all protected speech, and thus no tortious activity in the first place.  Second, the Magistrate Judge made no finding that Defendant had any authority over any reader or had the ability to direct any reader and the Complaint does not allege as much.  As to ratification, the third parties must have engaged in "conduct of which [Defendant] had knowledge and specifically ratified."  *Claiborne Hardware., supra* at 930.  The Complaint is devoid of allegation that Mr. Anglin knew what any particular reader would do or had done, and any such allegation would be implausible.

What the Magistrate Judge calls "directed" is a suggestion of what readers *might* do, not a mandatory order.  Dkt. No. 85 at 23.  What the Magistrate Judge calls "ratified" are requests to readers to communicate with Plaintiff and others, devoid of anything "specifically ratified."  *Id*. at 23-24.  The Magistrate Judge makes no attempt to set forth anything as having been "authorized," with the exception that he lumped it into the mere existence of providing a forum for followers to have discussions with each other.[7]  *Id*. at 24.  The Magistrate Judge essentially faults Mr. Anglin for not repudiating the third-party communications, a duty specifically deemed non-existent in *Claiborne*.  Thus, there is no basis to hold Defendant liable for the speech of third parties.

**3.0    The Claims are Otherwise Insufficient**

Although the claims should be dismissed because they unconstitutionally intrude upon Defendant's right to free speech, they should also be dismissed as insufficiently pled.

**3.1    Defendant Did Not Intrude on Plaintiff's Solitude**

In Count One of the Complaint, Plaintiff generically claims invasion of privacy by Defendant.  Dkt. No. 1 at 59.  She does not identify in the Complaint which type of invasion of privacy she claims.  In *Bd. of Dentistry v. Kandarian*, 268 Mont. 408, 413-14, 886 P.2d 954, 957 (1994), three types of invasion of privacy were identified: (1) intrusion upon solitude; (2) false light; and (3) public disclosure

---

[7]    In addition to First Amendment protections, Defendant cannot be held liable for merely providing an internet forum for people to "trade ideas and information." Dkt. No. 85 at 24.  Such is barred under Section 230 of the Communications Decency Act.  *See* 47 U.S.C. § 230(c).

of private facts.  The Complaint reads as though Plaintiff were claiming the third,[8] though Plaintiff subsequently claimed, and the Magistrate Judge agreed, that she was actually claiming intrusion upon solitude.

The Complaint does not even implicitly or properly allege intrusion upon solitude.[9]  Under *Kandarian*, invasion of privacy cannot be recognized without a "wrongful intrusion into one's private activities."  268 Mont. at 413 (internal citation omitted).   Defendant's alleged speech did not intrude upon Plaintiff's private activities.[10]  "To prevail on the tort of intrusion upon seclusion, a plaintiff must show: (a) an actual, subjective expectation of seclusion or solitude, and (b) that the expectation was objectively reasonable."  *Mortensen v. Bresnan Commun.*, 2010 U.S. Dist. LEXIS 131419, 2010 WL 5140454, *5 (D. Mont 2010) (citations omitted).   Plaintiff does not plead an actual, subjective expectation of seclusion.  Moreover, such would be unreasonable.   As seen at Dkt. No. 32-3, Plaintiff publicized her involvement with Mrs. Spencer and engaged the community to quell the planned protest.  *See also,* Dkt. No. 1 at ¶ 68.   If Ms. Gersh intended for her involvement with Mrs. Spencer to have been a private activity, she should have kept it so.  *See, e.g., Lurie v. Big Sky Publ'g Co.*, 2001 ML 3038, 21, 2001 Mont. Dist. LEXIS 2648, *21 (D. Mont. 2001) ("because an element of intrusion is 'private

---

[8]   There is no plausible allegation of false light invasion of privacy.  Neither, as explained in the motion, is public disclosure of private facts a viable claim.  See, Motion to Dismiss, Dkt. No. 32 at 34-36.

[9]   At no point in the Complaint do the words "intrusion," "solitude," or the related word "seclusion" appear.

[10]   It was also not wrongful, as it was constitutionally-protected speech.

activities' and this Court has already determined the activities at issue to be 'matters of public interest', Lurie's intrusion claim must fail").  To the extent she is upset that her correspondence with Mrs. Spencer was publicized, there is no allegation that he is the one who revealed it, nor could there be, as it was done by Mrs. Spencer herself. If she is upset at Mrs. Spencer for doing so, then let her sue Mrs. Spencer – but this is no tort for which Mr. Anglin should be called to answer for.

In *Lee v. Glickman*, the Ninth Circuit found there was no wrongful intrusion into private activities where the defendant distributed a third-party report.  1997 U.S. App. LEXIS 3660, at *5 (9th Cir. Feb. 25, 1997).  In essence, Mr. Anglin is alleged to have similarly distributed Mrs. Spencer's report, with editorial comment.  In *Lee*, the report did not concern the plaintiff's private activities—it "revealed no personal information … and she had previously contacted the news media about the same subjects." *Id*.  Ms. Gersh's communications with Mrs. Spencer revealed no personal information.  *See* Dkt. No. 32-3.  Ms. Gersh had previously published on Facebook, publicly, information about the same subjects.  *See id*.  Thus, as in *Lee*, there is no viable claim against Defendant.

Nor is there any actionable privacy interest in an e-mail message.  *See United States v. Mohamud*, 843 F.3d 420, 442 (9th Cir. 2016) ("case law contemplates a diminished expectation of privacy due to the risk that the recipient will reveal the communication"); *see also Tiberino v. Spokane Cty. Prosecutor*, 103 Wash. App. 680, 684, 13 P.3d 1104, 1106 (2000) (noting the well-established principle "not to

put anything on e-mail that they would not want on the front page of the newspaper").

Second, Defendant did not intrude.  Since he himself did not communicate with Ms. Gersh, he is again being held liable under the "substantial assistance" theory, which, as noted above, is inapplicable.  Moreover, "the tort of intrusion upon seclusion requires some form of concealment from the public."  *Prather v. Bank of Am., N.A.*, No. CV 15-163-M-DLC, 2017 U.S. Dist. LEXIS 70781, at *10 (D. Mont. May 9, 2017) (Christensen, U.S.D.J.).  Plaintiff does not claim she undertook to conceal her previously published contact information from the public.[11]  Just as "Montana has not recognized this common law tort to include intrusion upon land in public view," it should not be recognized to include intrusion upon telephone numbers, email addresses, webpages, and social media accounts also in public view.  *Id.* at *8.  And, in this case, Mr. Anglin provided no greater contact information for Ms. Gersh than she, herself, had already published to the world.  *See* Transcript at 20:9-24.  None of the examples of recognized intrusion on solitude in *Prather* remotely resemble such including merely communicating with a plaintiff, even if

---

[11]  Providing contact information is not actionable either.  *See, e.g., Kelly v. Opportunity Bank, Inc.*, No. CV 15-00109-H-DLC-JTJ, 2016 U.S. Dist. LEXIS 24068, at *6 (D. Mont. Jan. 12, 2016) ("Mr. Kelly has failed to show that the placement of an envelope with his name on it at the Bank was a 'wrongful intrusion' into his private activities, let alone that it would outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.")  Moreover, Ms. Gersh's contact information, including her e-mail address and telephone number, had already been publicized by Mrs. Spencer through her widespread *Medium* article. (Dkt. No. 32-3 at 2)

such communications are multitudinous or offensive.  Thus, the invasion of privacy claim must be dismissed.

### 3.2    Defendant is Not Liable for Intentional Infliction of Emotional Distress

The Magistrate Judge erroneously found that Ms. Gersh alleged sufficient facts to support a finding of foreseeability, a necessary element for the tort of intentional infliction of emotional distress.  *See* Dkt. No. 85 at 26-27, citing *Sacco v. High Country Independent Press*, 896 P.2d 411, 429 (Mont. 1995); see also, Motion to Dismiss, Dkt. No. 32 at 36-37 (explaining why foreseeability not met).  He found that she "alleges he assisted, encouraged, and ratified, a vicious campaign of anti-Semitic harassment against her and her family."  Dkt. No. 85 at 27.

First, as discussed above, the third parties were not his agents and he is not liable for their actions under the substantial assistance theory.   Second, the Magistrate Judge's finding is not a viewpoint neutral statement of law, but rather is dependent on the content of the third-party speech.  As discussed above, none of that speech falls within an unprotected category, and there is no basis to recognize a new category of unprotected speech.  *See also* Motion to Dismiss, Dkt. No. 32 at 30-33.  "A content-based restriction on speech will pass constitutional muster only if it employs the least restrictive means to further a compelling interest."  *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1156 (9th Cir. 2003) citing *Frisby v. Schultz*, 487 U.S. 474, 483, 101 L. Ed. 2d 420, 108 S. Ct. 2495 (1988).  "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive

alternative exists.   We are expected to protect our own sensibilities simply by averting our eyes." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813, 120 S. Ct. 1878, 1886 (2000) (internal citation and quotation marks omitted). Specifically, if the speech were all boisterous praises in support of her and her efforts on behalf of "Love Lives Here," tortious liability would not be foreseeable.   Under the First Amendment, the same holds true for the contrary viewpoint.   *See R. A. V. v. St. Paul*, 505 U.S. 377, 394, 112 S. Ct. 2538, 2549 (1992) (precluding content discrimination simply because of "listeners' reactions").   Foreseeability is not constitutionally cognizable, especially where she invited public commentary **about a matter of public concern**.

Similarly, the Magistrate Judge found that merely "calling for a troll storm" met the "extreme and outrageous" conduct requirement for an intentional infliction of emotional distress claim.   *See* Dkt. No. 85 at 26.   Speaking out on an issue of public concern is privileged and cannot be the basis for such a claim.   *See* Motion to Dismiss, Dkt. No. 32 at 37-38 citing *Judd v. Burlington N. & Santa Fe Ry.*, 2008 MT 181, ¶¶30-31, 343 Mont. 416, 423, 186 P.3d 214, 218 (2008) and *United States v. Cassel*, 408 F.3d 622, 626 (9th Cir. 2005) (requiring public figures to make a plausible claim of actual malice under the First Amendment).   Andrew Anglin has the same rights as those on the other side of the political spectrum, like Shaun King.[12] Thus, the second cause of action must be dismissed.

---

[12]   See *supra* at n.4.

### 3.3    Defendant Did Not Violate the Anti-Intimidation Act

Defendant expects the Montana Anti-Intimidation Act, Mont. Code Ann. § 27-1-503(2) will be found unconstitutional, facially and/or as-applied.  It is being used to punish speech that does not fit within any unprotected category.  To the extent the forthcoming brief of the Montana Attorney General may argue that the statute only addresses true threats and intimidation, the Magistrate Judge has already agreed that the speech at issue does not fit into either category.  Neither do the Magistrate Judge's findings identify any "threatening or intimidating behavior" required by the statute, no matter how it is interpreted.[13]  Dkt. No. 85 at 27-28.  Thus, even if the statute is constitutional, the claim must be dismissed for lack of a covered true threat or intimidation.  *See* Motion to Dismiss, Dkt. No. 32 at 38-40.

The statute requires an attempt to exercise a legally-protected right.  The only right asserted in the Complaint was freedom of speech.  Dkt. No. 1 at ¶ 226.  The Magistrate Judge incorrectly found Plaintiff was attempting to exercise her rights to privacy and to freely practice her religion, thus the right to free speech was not relevant.  Dkt. No. 85 at 28.  Plaintiff did not originally argue in her brief she was seeking to exercise those rights, first raising such issue at oral argument as "the practicing Judaism and simply the right to be let alone."  *Compare* Dkt. No. 50 at 43 with Transcript of April 3, 2018, hearing at 40:12-19.

---

[13] Although the Magistrate Judge earlier identified some third-party communications as "threatening" (Dkt. No. 85 at 20), there is no indication that such was a finding that Mr. Anglin himself engaged in "threatening behavior" for purposes of the Anti-Intimidation Act claim.

As discussed above, Defendant did not violate any right to privacy. He did not publish private facts. And, more important, he did not intrude upon her solitude. Neither did the alleged speech arise out of Plaintiff's practice of Judaism. Although the speech addressed Ms. Gersh's status as a Jew, it did so in the context of ethnic background, rather than any attention to her practice of her faith. *Compare Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18, 107 S. Ct. 2019, 2021-22 (1987) (recognizing Jews as an ethnic group for Section 1982 purposes); *Kaye v. Conklin*, No. SACV15-00018 JLS (AJW), 2016 U.S. Dist. LEXIS 109503, at *11-12 (C.D. Cal. June 17, 2016) (recognizing Jewish ethnicity for Section 1985 purposes). As a result, the third cause of action must be dismissed.

**4.0   Conclusion**

Defendant is not asking for the Court to approve of his speech, only to recognize that Plaintiff seeks to punish him for the exercise of his Constitutional right. The Magistrate Judge's Findings and Recommendation are fundamentally flawed in their First Amendment analysis and the Complaint otherwise fails to state a claim. The motion should be allowed and the matter should be dismissed with prejudice.

Dated: May 17, 2018.          Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza, *pro hac vice*
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, Nevada 89147

/s/ Jay M. Wolman

Jay M. Wolman, *pro hac vice*
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103

/s/ Mathew M. Stevenson

Mathew M. Stevenson
STEVENSON LAW OFFICE
1120 Kensington, Suite B
Missoula, MT 59801

*Attorneys for Defendant,*
*Andrew Anglin*

Case No. 9:17-cv-50-DLC-JCL

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 17, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Marc J. Randazza

Marc J. Randazza