**FILED**

NOV 1 4 2018

Clerk, U.S District Court
District Of Montana
Missoula

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| TANYA GERSH, | CV 17–50–M–DLC–JCL |
| Plaintiff, | |
| vs. | ORDER |
| ANDREW ANGLIN, publisher of the *Daily Stormer*, | |
| Defendant. | |

United States Magistrate Judge Jeremiah C. Lynch entered his Findings and

Recommendation in this case on May 3, 2018, recommending that Defendant

Andrew Anglin's Motion to Dismiss be denied to the extent it seeks dismissal

pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 85 at 30.) Anglin

filed his objections on May 13, 2018, and the Court deems his objections timely

filed. (Doc. 91.) Consequently, Anglin is entitled to de novo review of those

findings and recommendations to which he has specifically objected. 28 U.S.C.

§ 636(b)(1). Absent objection, this Court reviews findings and recommendations

for clear error. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.

2003) (en banc); *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Clear error exists if the

-1-

Court is left with a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (citations omitted).

Anglin objects to the recommendation that his motion to dismiss be denied, contending: (1) the First Amendment protects the speech at issue; (2) Anglin cannot be held liable for others' speech, even if that speech is not protected; and (3) Plaintiff Tanya Gersh failed to state a legally cognizable claim under any one of the various legal theories raised in her Complaint.

Reviewing de novo, the Court concludes that Judge Lynch correctly analyzed the sufficiency of Gersh's complaint. Accordingly, it adopts the Findings and Recommendation in full and denies Anglin's motion to dismiss except as to the constitutionality of the Anti-Intimidation Act, an issue that was not addressed in the Findings and Recommendation and accordingly is not reached in this Order.

## BACKGROUND[1]

Defendant Andrew Anglin publishes an alt-right website, the *Daily Stormer*, which derives its name from *Der Stürmer*, an unofficial pro-Nazi propaganda tabloid. On December 16, 2016, following a string of lead-up articles, Anglin wrote and published on his website an article calling his readers to action: "Let's

---

[1] Because the Findings and Recommendation include a more thorough factual background, and because the parties are familiar with the allegations of the Complaint, the Court presents only a brief background summary within this Order. For purposes of this Order, the allegations of the Complaint are presumed true.

-2-

Hit Em Up[.]  Are y'all ready for an old fashioned Troll Storm?  Because AYO—

it's that time, fam."  (Doc. 1 at 2.)  The so-called troll storm was targeted at

Plaintiff Tanya Gersh, and Anglin published Gersh's phone numbers, email

addresses, and social media profiles, as well as those of her husband, twelve-year-

old son, friends, and colleagues.  Anglin asked readers to "Tell them you are

sickened by their Jew agenda to attack and harm the mother of someone whom

they disagree with."  (Doc. 1 at 20.)

    The *Daily Stormer*'s articles centered on Gersh's interactions with Sherry

Spencer, Whitefish resident and mother of prominent neo-Nazi Richard Spencer.

At some point, Gersh, a realtor, discussed the potential sale of a business property

with Sherry Spencer, who owned the building and was facing boycotts related to

her son's notoriety.  In the articles, Anglin described Gersh's behavior as extortion,

and Anglin drew heavily on crude ethnic stereotypes, painting Gersh as acting in

furtherance of a perceived Jewish agenda and using Holocaust imagery and

rhetoric.  He called for "confrontation" and "action," (Doc. 1 at 18 & 41), but he

also told readers to avoid illegal activity, drawing a line between what Anglin

believed to be constitutionally protected speech—e.g., "photoshop[ping] pictures

of your face and that of your scamming spammer rat son onto Nazi propaganda

posters from the 1930s," (Doc. 1 at 41)—and speech for which he and his

-3-

followers might face liability—e.g., "threats of violence, suggestions of violence or acts of violence," (Doc. 1 at 43).

The messages received by Gersh and her family, including her son, were filled with ethnic slurs and misogynistic rants. Many messages referenced the Holocaust, and some threatened violence. When Gersh filed her Complaint in the spring of 2017, she and her family had received more than 700 disparaging and/or threatening messages over phone calls, voicemails, text messages, emails, letters, social media comments, and Christmas cards.

## DISCUSSION

Withholding judgment on the constitutionality of Montana's Anti-Intimidation Act,[2] Judge Lynch recommended denying Anglin's motion to dismiss on every other theory raised. Anglin's objections fall along three lines: (1) the First Amendment broadly protects Anglin's own speech; (2) Anglin cannot be held liable for others' speech consistent with the First Amendment; and (3) Gersh failed to state a legally cognizable claim under each of the three legal theories raised in her complaint: invasion of privacy, intentional infliction of emotional distress, or violation of Montana's Anti-Intimidation Act.

---

[2] The constitutionality of the Anti-Intimidation Act is at issue in this litigation, but the issue was not fully briefed prior to the issuance of the Findings and Recommendation. Accordingly, it is not relevant to this Order.

-4-

## I.     First Amendment Protection

Judge Lynch recommended rejecting Anglin's argument that the challenged speech is protected by the First Amendment and accordingly immune from a state tort suit.  Anglin contends that his motion to dismiss should be granted because the speech giving rise to Gersh's claim enjoys First Amendment protection.  He argues that: (1) the speech does not fall within an unprotected category; and (2) the speech involved both a matter of public concern—neo-Nazi Richard Spencer's relationship with the town of Whitefish, Montana—and a public figure—Gersh.

The Court agrees that the speech does not fall into a de facto unprotected category.  And in fact Gersh does not contend that Anglin's speech falls within one of the few "historic and traditional categories of expression long familiar to the bar" for which content-based restrictions on speech are clearly permitted.  *United States v. Alvarez*, 567 U.S. 709, 717–18 (2012) (citations, alterations, and internal quotation marks omitted).   Indeed, "there is no categorical exception to the First Amendment for harassing or offensive speech." *United States v. Osinger*, 753 F.3d 939, 953 (9th Cir. 2014).

Further, the Court is unconvinced by Gersh's argument that, pursuant to *Shoemaker v. Taylor*, 730 F.3d 778, 787 (9th Cir. 2013), the Ninth Circuit generally demands a balancing approach to First Amendment issues.  The Ninth

Circuit's discussion in *Shoemaker* was limited by the Antiterrorism and Effective Death Penalty Act. The Court addressed only whether "the Supreme Court has . . . clearly established that images morphed to depict children engaged in sexual activity are protected by the First Amendment" when the Supreme Court had in fact expressly reserved the question of whether morphed images fell within a clearly established category of unprotected speech, child pornography. *Id.* at 787. However, *Shoemaker*'s inapplicability does not necessarily mean that Anglin is entitled to dismissal.

"The Free Speech Clause of the First Amendment—'Congress shall make no law . . . abridging the freedom of speech'—can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011).[3]  That said, "[t]he protections afforded by the First Amendment . . . are not absolute, and [courts] have long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358 (2003).

The First Amendment's protections are particularly strong when the speech at issue involves "matters of public concern." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (Powell, J., for the

---

[3] The Fourteenth Amendment extends the First Amendment's zone of protection to include state action. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

plurality) (quoting *First Nat'l Bank of Boston v. Belotti*, 435 U.S. 765, 776 (1978)).

"'[N]ot all speech is of equal First Amendment importance,' however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder*, 562 U.S. at 452 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)).  This is so because the regulation of "speech on matters of purely private concern" does not "threat[en] the free and robust debate of public issues" or "potential[ly] interfere[] with a meaningful dialogue of ideas." *Dun & Bradstreet*, 472 U.S. at 760.

Accordingly, in cases brought under state tort law, where the cause of action is not itself subject to a facial challenge, the first question is "whether [the] speech is of public or private concern, as determined by all the circumstances of the case." *Snyder*, 562 U.S. 443 (addressing claim for intentional infliction of emotional distress); *see also Hustler*, 485 U.S. 46 (libel, invasion of privacy, and intentional infliction of emotional distress); *Dun & Bradstreet*, 472 U.S. 749 (defamation).

Whether speech is a matter of public concern depends on the "content, form, and context" of the speech, *Dun & Bradstreet*, 472 U.S. at 761, i.e., "what was said, where it was said, and how it was said," *Snyder*, 562 U.S. at 454.  "[T]he standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy

-7-

is present." *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curium). The

Court must determine whether the speech can "be fairly considered as relating to

any matter of political, social, or other concern to the community." *Connick v.

Myers*, 461 U.S. 138, 146 (1983). The standard is met when the speech centers on

"a subject of legitimate news interest; that is, a subject of general interest and of

value and concern to the public." *San Diego*, 543 U.S. at 83–84. However, in

determining the public value of the speech, the Court must be cautious to avoid

policing the speech's content, as the "inappropriate or controversial character of a

statement is irrelevant to the question whether it deals with a matter of public

concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

A few Supreme Court cases provide a sketchy outline of the public concern

test. *See San Diego*, 543 U.S. at 83 ("[T]he boundaries of the public concern test

are not well defined.") In *Snyder*, the Court considered a lawsuit brought by the

father of a soldier killed in Iraq in the line of duty against Fred Phelps, leader of

the Westboro Baptist Church. 562 U.S. at 448–49. Led by Phelps, members of the

church picketed the soldier's funeral, waving signs celebrating the death of

American soldiers and civilians as righteous vengeance wrought by sexual abuse in

the Catholic church and the government's tolerance of homosexuality. *Id.* at 448–

49, 454. The Court held that the speech was protected because the "content" of the

-8-

church's signs "plainly relate[d] to broad issues of interest to society at large,

rather than matters of 'purely private concern.'" *Id.* at 454 (quoting *Dun &*

*Bradstreet*, 472 U.S. at 759). The "context"—"where [the speech] was said"—was

something of a mixed bag, as the protest was tied to a soldier's funeral but also "on

public land next to a public street," "the archetype of a traditional public forum."

*Id.* at 454–56 (citation and internal quotation marks omitted). In the end, however

hurtful the protest was to the grieving family and friends of the fallen soldier, the

arguably private context could not transform speech about a matter of public

concern into speech about the Snyder family's loss. *Id.* at 455.

On the other end of the spectrum fall *San Diego* and *Connick*. In *San Diego*,

the Court held that a police officer's in-uniform amateur pornographic videos

constituted speech about a private matter, as the videos "did nothing to inform the

public about any aspect of the [San Diego Police Department's] functioning or

operations." 543 U.S. at 84. And in *Connick*, the Court determined that an

unhappy employee was speaking about a matter of private concern when she

circulated a questionnaire to her colleagues regarding "confidence and trust . . . in

various supervisors, the level of office morale, and the need for a grievance

committee" because the questions simply "reflect[ed] one employee's

dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celèbre." 461 U.S. at 148.

At minimum, Gersh has made a plausible claim that Anglin's speech involved a matter of strictly private concern. Unlike in *Snyder*, here there is a suggestion that "speech on public matters was intended to mask an attack . . . over a private matter." *Snyder*, 562 U.S. at 455. Indeed, Anglin's speech may ultimately be found to have been "contrived to insulate speech on a private matter from liability." *Id.* Regardless of how he packaged his posts about Gersh to his readers, Anglin's speech "did nothing to inform the public about any aspect" of a matter of public concern. *San Diego*, 543 U.S. at 84. Anglin instead broadcast information—not only about an alleged real estate dispute, but also contact information for Gersh and those with whom she was associated—on his website as "an attempt to turn" Anglin's personal hostilities into "a cause celèbre." *Connick*, 461 U.S. at 148.

The context of the case is, at first blush, public—a series of blog posts on an alt-right "news" blog, which often engages with political issues, albeit from an extremist viewpoint. However, under a liberal interpretation of the Complaint, the content of the speech may be seen as strictly private; Anglin launched a campaign of unrelated personal attacks on a Whitefish realtor, her husband, and their son

-10-

because of a perceived conflict between Gersh and the mother of Anglin's friend,

another white supremacist.  Although Anglin drew heavily on his readers' hatred

and fear of ethnic Jews, rousing their political sympathies, there is more than a

colorable claim that he did so strictly to further his campaign to harass Gersh.

Indeed, the facts here follow a pattern inverse from that presented in *Snyder*, as the

public context of the *Daily Stormer* posts cannot "transform the nature of

[Anglin's] speech."  *Snyder*, 562 U.S. at 454.

 The Court cannot find that Anglin's speech is unprotected on the basis that

it evinces a morally and factually indefensible worldview.  *See, e.g.*, *Police Dep't*

*of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("Above all else, the First

Amendment means that government has no power to restrict expression because of

its message, its ideas, its subject matter, or its content.")  That said, it hardly makes

sense to conclude—as Anglin contends—that Anglin's posts and sponsored troll

storm are entitled to additional protection because of their anti-Semitic content.   A

state may protect its residents from "repeated unwanted telephone calls that are

harassing due to their sheer number and frequency."  *Osinger*, 753 F.3d at 954

(citing with approval *Gormley v. Director, Connecticut State Dep't of Probation*,

632 F.2d 938, 941–42 (2d Cir. 1980), in which the Second Circuit upheld a

Connecticut statute regulating harassing telephone calls as "an unwarranted

-11-

invasion of privacy"). In this case, the fact that Gersh heard anti-Semitic slurs on the other end of the line does not tip the scales in Anglin's favor.

Anglin further argues that his speech involved a matter of public concern because it focused on Gersh, who was a public figure. Even otherwise regulatable speech may be entitled to special protections when its subject is a general public figure—one with "pervasive fame or notoriety"—or a limited purpose public figure—one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Here, there is no question that Gersh is not a general public figure; of the cast of characters in this matter, only Richard Spencer and Andrew Anglin have reached "pervasive fame or notoriety." Rather, Anglin argues that Gersh became a limited purpose public figure when Sherry Spencer published an article in an online forum criticizing Gersh. At this point, the argument becomes somewhat circular, as whether Gersh is a limited purpose public figure depends wholly on Gersh's participation in a matter of public concern.

Anglin contends that Gersh injected herself into a matter of public concern by discussing the sale of Sherry Spencer's building with Spencer. Anglin argues that his speech about Gersh was both "in support of Richard Spencer's speech in

-12-

support of President Trump" and "related to the growth of white nationalism in Whitefish, and the community's response thereto." (Doc. 91 at 8.) However, Gersh has plausibly alleged that she did not initiate conversations regarding the sale of Sherry Spencer's buildings; if, indeed, she was "dragged unwilling" into a public controversy, she is not automatically fair game for all manner of public criticism. *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 (1979).

Even if Anglin were correct, though, there is little to no connection between Anglin's troll storm and Gersh's involvement in an alleged real estate dispute, let alone with Richard Spencer's support of President Trump or the Whitefish community's disapproval of white nationalism. *See Gertz*, 418 U.S. at 351–52 (explaining that a limited purpose public figure enjoys fewer protections as to the "limited range of issues" to which she is relevant). "A court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the [state tort].'" *Wolston*, 443 U.S. at 167 (quoting *Gertz*, 418 U.S. at 352). Here, construing the facts in the light most favorable to Gersh, "[Gersh] played only a minor role in whatever public controversy there may have been concerning" Richard Spencer and the alt-right agenda. *Id.* Her involvement in the potential sale of Sherry Spencer's building is not enough to "render[] [her] a public

-13-

figure for purposes of comment" on Richard Spencer and the modern white nationalist movement. *Id.*

Anglin did not use his speech about Gersh to raise awareness for issues consonant with the alt-right agenda. *See Snyder*, 562 U.S. at 454. Rather, construing the allegations in the Complaint as true, Anglin exploited the prejudices widely held among his readers to specifically target one individual. Moreover, the Court concludes that, at this stage of the litigation, it cannot agree with Anglin that his speech was indisputably tethered to Gersh's conduct in engaging in a matter of public controversy. *See Wolston*, 443 U.S. at 167. Accordingly, the Court agrees with Judge Lynch's finding that "[w]hether the speech giving rise to Gersh's claims addressed public or private matters for First Amendment purposes is properly addressed on a fully developed factual record." (Doc. 85 at 12.)[4]

## II.    Liability for Third-Party Conduct

Judge Lynch found that, "[t]o the extent Gersh is seeking to hold Anglin accountable for the conduct of his readers," (Doc. 85 at 18), "Gersh has alleged sufficient facts to support a cognizable legal theory," (Doc. 85 at 24). Anglin argues that Judge Lynch erred in finding that Anglin may be held liable for the

---

[4] Because the Court agrees with Judge Lynch's determination that Gersh's Complaint survives a First Amendment challenge without consideration of the captive audience doctrine, it does not address that issue in this Order.

-14-

speech of participants in his troll storm who harassed and threatened Gersh and her family.  Anglin contends that: (1) Gersh's allegations cannot satisfy the "substantial assistance" test under Montana law; and (2) the First Amendment insulates Anglin from liability pursuant to *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

Anglin claims that even the worst of his readers' messages do not fall within a historically recognized category of unprotected speech.  Setting aside the question of whether, for example, a voicemail message consisting solely of the sound of gunshots constitutes a "true threat," Anglin misconstrues the issue.  Again, the relevant question is whether the speech regards a matter of public concern.  And, as discussed above, there is, at minimum, a plausible allegation that the speech does not.  If Anglin's speech in calling for a troll storm is not entitled to First Amendment protection, then it stands to reason he can be equally subject to tort liability under various theories.[5]

Anglin's argument to the contrary is based primarily in *Claiborne Hardware*, 458 U.S. 886.  However, as Judge Lynch found, *Claiborne Hardware*

---

[5] The Court notes that the Supreme Court cases addressing the public concern test do not depend on the specific state tort theory alleged. For example, in *Snyder*, the Court was not concerned with the precise elements required to state a claim for intentional infliction of emotional distress under Maryland law.  562 U.S. at 451–52.  Rather, because the Constitution is implicated only to the degree that Anglin's speech is entitled to protection, the Court need not, at least at this stage of the litigation, be overly concerned with *how* Anglin may be held liable under Montana law.

is specific to the issue of incitement, a theory that Gersh has not pursued in this litigation. (Doc. 85 at 21). Reviewing de novo, the Court agrees with Judge Lynch's analysis of this issue.

*Claiborne Hardware* involved a boycott of white merchants in Mississippi, instigated and organized in part by a local branch of the NAACP. 458 U.S. 886. The lower courts determined that an NAACP spokesperson could be held liable to the merchants for lost earnings because he had delivered speeches advocating— perhaps rhetorically, perhaps not—for the use of force against black citizens who continued to patronize the white merchants. *Id.* at 894–95. However, the Supreme Court disagreed, holding that the spokesperson was insulated from liability because he had not himself "authorized, ratified, or directly threatened" unlawful activity, i.e., violence. 458 U.S. at 929. The Court further concluded that the spokesperson did not have an affirmative duty to "repudiate" unlawful activity. *Id.*

*Claiborne Hardware* is inapposite for at least two reasons. First and most importantly, the case is legally distinguishable. Here, unlike the speaker in *Claiborne Hardware*, Anglin was not speaking on a matter of public concern. The First Amendment is considerably more concerned with a concerted action to address racial discrimination than it is with the ethnic background and contact information of a realtor who was arguably involved in a real estate dispute with the

-16-

mother of Richard Spencer. Thus, while the NAACP spokesperson's speech, absent a finding of incitement, falls within the core of the First Amendment, Anglin's speech does not. *See supra* pages 5–14. Second, *Claiborne Hardware* is factually distinguishable. To the degree that the NAACP spokesperson called on his supporters to engage in unlawful conduct, that conduct did not actually occur. *Claiborne Hardware*, 458 U.S. at 928. Here, on the other hand, the harm alleged by Gersh is precisely the type of harm not only anticipated but requested by Anglin in his *Daily Stormer* posts. *See id.* at 928 ("If [the] language had been followed by acts of violence, a substantial question would be presented whether [the spokesperson] could be held liable for the consequences of that unlawful conduct.").

Indeed, to the extent that *Claiborne Hardware* provides guidance, it advances Gersh's theory. The Court held that "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920. The standard is met when the individual "authorized, directed, or ratified specific tortious activity." *Id.* at 927. The test does not require, as Anglin ostensibly posits, that the "specific tortious activity" be physically violent.

-17-

The *Claiborne Hardware* standard finds a mirror in Montana's substantial assistance test.  Under Montana law, the substantial assistance test enables a plaintiff to seek damages from a defendant for the tortious conduct of another when the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Sloan v. Fauque*, 784 P.2d 895, 896 (Mont. 1989) (quoting Restatement (Second) of Torts § 876 (1979)).  In other words, liability may follow when an individual "authorized" or "directed" "specific tortious activity," *Claiborne Hardware*, 458 U.S. at 927—the "breach of duty" required to satisfy the substantial assistance test under Montana law, *Sloan*, 784 P.2d at 896.

Turning to the facts alleged in this case, Anglin contends that the substantial assistance test cannot be satisfied by Gersh's allegations because Gersh "fail[ed] to plead the requisite knowledge element." (Doc. 91 at 14.)  The Court disagrees. Gersh alleged that Anglin expressly summoned a troll storm, publishing personal and professional contact information for the Gersh family, and offering samples of the types of anti-Semitic and misogynistic messages his readers should leave.  He oversaw a discussion board on his website, in which he interacted with readers who posted comments about their trolling tactics.  It is not unreasonable to conclude from these facts that Anglin knew what his readers were doing.

-18-

"No first amendment defense need be permitted when words are more than

mere advocacy, so close in time and purpose to a substantive evil as to become part

of the [tort] itself"—"an integral and essential part of ongoing [tortious] activity."

*United States v. Mendelsohn*, 896 F.2d 1183, 1186 (9th Cir. 1990) (internal

quotation marks omitted).  Construing the Complaint in the light most favorable to

Gersh, Anglin's posts and his readers' messages are part of the same "ongoing

activity" with the same ultimate aim.  Thus, the Court agrees with Judge Lynch

that Gersh presented a cognizable theory by which the messages left by *Daily

Stormer* readers may form a basis for damages against Anglin.

### III.   The Sufficiency of Gersh's Allegations

Regarding Anglin's third challenge to this lawsuit's continued survival,

Judge Lynch concluded that "Gersh has adequately stated claims under Montana

law for invasion of privacy, intentional infliction of emotional distress, and

violations of the Anti-Intimidation Act." (Doc. 85 at 30).  Anglin challenges Judge

Lynch's Findings and Recommendation as to each cause of action.

First, under Montana law, a plaintiff may bring a claim for invasion of

privacy under the subtheory of intrusion upon seclusion—"a wrongful intrusion

into one's private activities in such a manner as to outrage or cause mental

suffering, shame, or humiliation to a person of ordinary sensibilities." *Mont. Bd. of*

-19-

*Dentistry v. Kandarian*, 886 P.2d 954, 957 (Mont. 1994). Judge Lynch found that the allegations of the Complaint, if true, could satisfy the applicable test because the series of harassing and threatening communications—sent first- and second-hand to Gersh via nearly every potential line of communication—could be seen as a "wrongful intrusion" into Gersh's private life.

Anglin's objections as to this issue are inextricable from his First Amendment objections, and they fail for the same reasons. He contends that Gersh did not have a reasonable expectation of privacy because her discussions with Sherry Spencer should be read as welcoming public engagement. (Doc. 91 at 18-20.) However, as discussed above, Gersh's allegations do not give rise to such a finding. *See supra* pages 12–14; *see also San Diego*, 543 U.S. at 83 ("[T]he standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present." ). Anglin also argues that his conduct was not intrusive, even if his followers' conduct was. Again, the Court concludes that at least some of Anglin's followers' conduct can be considered as a basis for liability under the First Amendment. *See supra* pages 14–19. And, at this stage of litigation, Anglin cannot avoid liability on the grounds that he merely posted publicly available information, such as Gersh's social media accounts, as Gersh alleges that Anglin

-20-

posted this information in order to further his goal of "outrag[ing] or caus[ing]

mental suffering, shame, or humiliation" to Gersh. *Kandarian*, 886 P.2d at 957.

Second, a claim for intentional infliction of emotional distress "arise[s]

under circumstances where serious or severe emotional distress to the plaintiff was

the reasonably foreseeable consequence of the defendant's . . . intentional act."

*Sacco v. High Country Ind. Press*, 896 P.2d 411, 429 (Mont. 1995). Responding to

Anglin's argument that Gersh's damages were not "reasonably foreseeable" to

Anglin, Judge Lynch determined that Gersh presented a cognizable claim by

"alleg[ing] that Anglin assisted, encouraged, and ratified a vicious campaign of

anti-Semitic harassment against her and her family." (Doc. 85 at 27.) Anglin

objects, again, on First Amendment grounds, arguing that he cannot be held liable

for the conduct of his readers and that Judge Lynch's findings constitute

viewpoint-based discrimination. (Doc. 91 at 21–22.) However, Anglin presents no

authority for his position that the Court should conduct an additional layer of First

Amendment review in analyzing the elements of his claim. *See supra* n.5. The

Court has thoroughly considered his free speech arguments and finds that a

decision for Anglin at this stage would, at minimum, be premature. Accordingly,

the Court agrees with Judge Lynch as to the adequacy of this claim.

Third and finally, Montana's Anti-Intimidation Act creates a cause of action for "[a]n individual or organization who is attempting to exercise a legally protected right and who is injured, harassed, or aggrieved by a threat or intimidation . . . against the person engaging in the threatening or intimidating behavior." Mont. Code Ann. § 27-1-503(2). Setting aside the question of the constitutionality of the Act, *see supra* n.2, Judge Lynch determined that "Gersh has alleged facts showing that she was attempting to exercise her legally protected rights to privacy and to freely practice her religion at the time of Anglin's allegedly wrongful conduct." (Doc. 85 at 28.) Anglin argues that the Complaint does not give rise to such a determination, as Gersh alleged only that Anglin interfered with her speech rights, rather than her privacy and free exercise rights. However, the Court cannot take such a parsimonious approach to the pleadings; the Complaint includes allegations that Gersh practices Judaism[6] and, as discussed above, Gersh presented a cognizable claim for invasion of privacy. No magic words were needed in the Complaint when the allegations of the Complaint, as a whole, could support a finding that Anglin's conduct interfered with Gersh's privacy and ability

---

[6] Anglin further argues that he did not interfere with Gersh's free exercise rights because "[a]lthough the speech addressed Ms. Gersh's status as a Jew, it did so in the context of ethnic background, rather than any attention to the practice of her faith." (Doc. 91 at 24.) Anglin's argument is too clever by half. The focus is on whether Anglin's intimidating and harassing speech interfered with Gersh's free exercise rights. It is indifferent to the source of Anglin's hostility to Gersh.

to freely practice her religion.  The Court agrees with Judge Lynch that Gersh's claim may proceed.

Reviewing the remaining portions of Judge Lynch's Findings and Recommendation for clear error and finding none,

IT IS ORDERED that Judge Lynch's Findings and Recommendation (Doc. 85) are ADOPTED in full.

IT IS FURTHER ORDERED that Anglin's Motion to Dismiss is DENIED to the extent it seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

DATED this 14th day of November, 2018.

Dana L. Christensen, Chief Judge
United States District Court

–23–