John Morrison
Robert Farris-Olsen
MORRISON, SHERWOOD,
WILSON, & DEOLA, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
ph. (406) 442-3261
fax (406) 443-7294
john@mswdlaw.com
rfolsen@mswdlaw.com
*Attorneys for Plaintiff Tanya Gersh*

David C. Dinielli*
Jim Knoepp*
Elizabeth Littrell*
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
ph. (334) 956-8200
fax (334) 956-8481
david.dinielli@splcenter.org
jim.knoepp@splcenter.org
beth.littrell@splcenter.org
*Attorneys for Plaintiff Tanya Gersh*
*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## MISSOULA DIVISION

TANYA GERSH,

      Plaintiff,

      vs.

ANDREW ANGLIN, publisher of the
*Daily Stormer*,

      Defendant.

Case No.: 9:17-cv-00050-DLC-JCL

**BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT AND
REQUEST FOR EVIDENTIARY
HEARING**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................4

BACKGROUND ...............................................................................7

    I.     Undisputed Facts .................................................................7

          A.     Background on Anglin and the *Daily Stormer* .........................7

          B.     Anglin's Attack on Ms. Gersh ....................................8

          C.     Consequences of Anglin's Harassment Campaign..................10

    II.    Blatant Violations of Litigation Obligations......................................11

    III.   Entry of Default....................................................................12

LEGAL STANDARD..........................................................................13

ANALYSIS .....................................................................................14

    I.     This Court Properly Entered Default Against Defendant. .................14

          A.     Rule 55 ..............................................................14

          B.     Rule 37 ..............................................................14

    II.    Application of the Factors Identified in *Malone* and *Eitel* Support Default Judgment................................................15

          A.     *Malone* Factors (Rule 37) .......................................16

                1.     Risk of Prejudice to Plaintiff .........................17

                2.     Availability of Less Drastic Sanctions ...........................18

          B.     *Eitel* factors .........................................................19

                1.     Merits and Sufficiency of the Complaint .......................19

                2.     Sum of Money at Stake in the Action ...........................20

                3.     Possibility of Dispute Concerning Material Facts..........20

                4.     Whether Default Was Due to Excusable Neglect ..........21

    III.   The Amounts of Compensatory and Punitive Damages Requires Determination by Factfinder. ................................................21

          A.     Compensatory Damages .........................................22

                1.     Economic Damages .....................................22

                2.     Pain and Suffering to Date.............................23

       3.      Future Pain and Suffering and Loss of Enjoyment of Life ...............................................................25

       4.      Lost Earning Capacity ...................................................26

       5.      Similar compensatory damage awards range from $250,000 to $3 million....................................................28

   B.     Punitive Damages ...................................................................29

   C.     Injunctive Relief.......................................................................33

CONCLUSION .................................................................................................33

EXHIBIT INDEX ............................................................................................34

CERTIFICATE OF COMPLIANCE...................................................................35

CERTIFICATE OF SERVICE .........................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Adriana Int'l Corp. v. Lewis & Co.*,
　913 F.2d 1406 (9th Cir. 1990) ...........................................................................13

*Albinger v. Harris*,
　48 P.3d 711 (Mont. 2002) ..................................................................................23

*Allen v. Zonis*,
　2017 WL 4142046 (Wash. Super. March 31, 2017)..........................................28

*Au Bon Pain Corp. v. Artect, Inc.*,
　653 F.2d 61 (2d Cir. 1981).................................................................................14

*Avery v. Extradition Transp. of Am.*,
　No. CV 11-00153-M-DWM, 2012 WL 7017862 (D. Mont. Nov. 28, 2012),
　*report and recommendation adopted*, No. CV 11-153-M-DWM-JCL, 2013 WL
　486658 (D. Mont. Feb. 7, 2013) .........................................................................13

*Black & Decker, Inc. v. All Spares, Inc.*,
　2010 WL 3034887 (D. Ariz. Aug. 3, 2010)........................................................21

*Blue Ridge Homes, Inc. v. Thein*,
　191 P.3d 374 (Mont. 2008) .................................................................................32

*Cantu v. United States*,
　No. CV1400219MMMJCGX, 2015 WL 4720580 (C.D. Cal. Aug. 7, 2015) .....27

*Clark v. Hidden Valley Lake Association, Inc., JVR,* No. 1807100002 (N.D. Cal.
　February 8, 2018)................................................................................................29

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
　482 F.3d 1091 (9th Cir. 2007) ...........................................................................16

*Curtis v. Illumination Arts, Inc.*,
　33 F. Supp. 3d 88 (W.D. Wash. July 17, 2014)..................................... 15, 17, 20

*Czajkowski v. Meyers*,
　339 Mont. 503 (2007) .........................................................................................30

*Dreith v. Nu Image, Inc.*,
   CV 054146 SVW MANX, 2007 WL 9658786 (C.D. Cal. Mar. 2, 2007)...........15

*Dumpson v. Anglin*, 1:18-cv-01011-RMD (D.D.C.) ....................................... 30, 31

*Eitel v. McCool*,
   782 F.2d 1470 (9th Cir. 1986) ...........................................................13

*Geddes v. United Financial Group*,
   559 F.2d 557 (9th Cir. 1977)..............................................................13

*Hester v. Vision Airlines, Inc.*,
   687 F.3d 1162 (9th Cir. 2012) ...........................................................18

*Hoxworth v. Blinder, Robinson & Co.*,
   980 F.2d 912 (3d Cir. 1992)...............................................................14

*Hull ex rel. Senne v. Ability Ins. Co.*,
   No. CV-10-116-BLG-RFC, 2012 WL 6083614 (D. Mont. Dec. 6, 2012)..........31

*J & J Sports Prods., Inc. v. Becerra*,
   2015 WL 7771174 (D. Ariz. 2015).....................................................19

*Johnson v. Lababedy*,
   No. 2:16-CV-0126 KJM AC, 2016 WL 4087061 (E.D. Cal. Aug. 2, 2016).......19

*Laera v. Fang*,
   No. 214CV00667JADNJK, 2016 WL 3410173 (D. Nev. June 14, 2016) ..........20

*Martinez v. Extra Space Storage, Inc.*,
   No. C 13-00319 WHA, 2013 WL 5732967 (N.D. Cal. Oct. 22, 2013)........ 14, 16

*Maurer v. Clausen Distrib. Co.*,
   912 P.2d 195 (Mont. 1996) ...............................................................32

*North Seattle Health Ctr. Corp. v. Allstate Fire & Cas. Ins. Co.*,
   No. C14-1680JLR, 2016 WL 4533055 (W.D. Wash. Jan. 27, 2016).................15

*Obeidallah v. Anglin*,
   2:17-CV-00720-EAS-EPD (S.D. Ohio)..............................................28

*PepsiCo v. Trinufo-Mex, Inc.*,
189 F.R.D. 431 (C.D. Cal. 1999) .........................................................................13

*Philip Morris USA, Inc. v. Castworld Prods.*, *Inc.*, 219 F.R.D. 494 (C.D. Cal. 2003)...........................................................................................................................13

*Ringgold Corp. v. Worrall*,
880 F.2d 1138, 1141 (9th Cir. 1989) ...................................................................14

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408, (2003) ............................................................................................31

*Trans World Airlines, Inc. v. Hughes*,
32 F.R.D. 604 (S.D.N.Y. 1963) ...........................................................................15

*United Specialty Ins. Co. v. Valdez*,
No. CV 16-164-BLG-TJC, 2018 WL 2121632 (D. Mont. Apr. 16, 2018), *report and recommendation adopted*, No. CV 16-164-BLG-SPW, 2018 WL 2120905 (D. Mont. May 8, 2018) ....................................................................................22

**Rules**

Fed. R. Civ. P. 37(d)(1)...........................................................................................15

Fed. R. Civ. P. 55 .......................................................................................... 12, 14

Mont. Code Ann. § 27-1-221(7)(b) (West).............................................................30

## BACKGROUND

Plaintiff Tanya Gersh filed this action on April 18, 2017, alleging that Defendant Andrew Anglin invaded her privacy, intended to and did inflict emotional distress on her, and violated the Montana Anti-Intimidation Act. Ms. Gersh's allegations arise out of a series of thirty blogs posted on Defendant's website, the *Daily Stormer*, targeting Ms. Gersh for a campaign of harassment, which he titled "Operation Whitefish."

## I. Undisputed Facts

### A. Background on Anglin and the *Daily Stormer*

The blog posts at issue in this case were written, ratified, and published by Anglin on his website, the *Daily Stormer*. The site is modeled after *Der Stürmer*, a virulently anti-Semitic Nazi-era weekly. Anglin clearly delineated his objectives and tactics in a manual for would-be posters (the "DS Style Guide"). (*See* Ex. A). Anglin explains that the *Daily Stormer* "is an outreach site, designed to spread the message of nationalism and anti-Semitism to the masses," and its "Prime Directive" is to "Always Blame the Jews for Everything." (Ex. A, at 10).

Anglin seeks to create terror in non-white people, whom he calls wildly profane and insulting epithets, a tactic he advises other bloggers on his site to use in order to likewise "dehumanize" them. (Ex. A, at 14). Anglin seeks through his site

"to normalize the acceptance of violence as an eventuality/inevitability." (Ex. A, at 15).

Anglin knows his tactics work. He boasts that his cohorts have "an army at our disposal, to use for whatever purposes we wish. They enjoy attacking people on the internet." (Ex. A, at 15). Anglin calls these attacks "troll storms" and acknowledges that "The Tanya Gersh incident was the most famous of these incidents, though we have done it consistently since I started the site." (Ex. A, at 16).

**B.  Anglin's Attack on Ms. Gersh**

Anglin's "Operation Whitefish" arose from a blog post containing false statements about Ms. Gersh on an open-source website called *Medium*, bearing the byline "Sherry Spencer." (Dkt. No. 32-1). In the *Medium* post, Richard Spencer, pretending to be his mother, falsely claimed that "she" had been "threatened" by Ms. Gersh in order to "force" the sale of her property—accusations proven to be false. (Ex. B, at 56:24–57:4). Deposition testimony by Ms. Spencer shows that she disagreed with the core claims about Ms. Gersh. (Ex. B, at 56:24–57:4).

On December 16, 2016, Anglin republished Spencer's false narrative, added the requisite anti-Semitic invective, and called for a "troll storm" against Tanya Gersh and her family. (Dkt. No. 1, at 20; Dkt. No. 32-2). Anglin urged, "This is very important. Calling these people up and/or sending them a quick message is very easy. It is very important that we make them feel the kind of pressure they are making

us feel." (Dkt. No. 1, at 20; Dkt. No. 32-2, at 12). Anglin published telephone numbers, physical addresses, social media handles and email addresses for Ms. Gersh, her husband, her then 12-year-old *child*, and her associates, and directed his readers to bombard his targets with harassing messages. (Dkt. No. 1, at 18–20).

In subsequent blog posts, totaling 30 before this lawsuit was filed, Anglin continued to target Ms. Gersh and continually urged his followers to "keep putting pressure on these Jews, Tanya Gersh in particular." (Dkt. No. 1, at 40; Dkt. No. 32-5, at 5). In another blog, Anglin encouraged followers to "Keep calling . . . Keep emailing," (Dkt. No. 1, at 40; Dkt. No. 32-4, at 10), after ominously warning Ms. Gersh via his blog:

> [Y]ou have to go back, Tanya. You simply are not welcome in this country. We've had enough, Tanya. This is the goylash. You remember the last goylash, don't you Tanya? Yeah. You're gonna wanna dip out before this thing really gets started. Because I'll tell you want [sic], Tanya. This fire is already rising. There's only one place this road ends.

(Dkt. No. 1, at 39; Dkt. No. 32-4, at 9–11).

Anglin continually stoked his followers' prejudice, calling Jewish people a "disease" and "disgusting," encouraging them to harass the "Jew Gersh," and falsely claiming that she was "running an extortion conspiracy targeting the mother of a perceived political opponent of international Jewry." (Dkt. No. 32-13, at 3). Anglin referred to Ms. Gersh and her family as "kikes" and "rats" and posted disturbing

pictures of them photoshopped onto Nazi propaganda posters. (Dkt. No. 1, at 8, 41–42). In order to create even more terror and chaos, Anglin claimed that he was organizing a "March on Whitefish" that would bring "two hundred skinhead Alt-Right Nazis marching with a guy from Hamas carrying machine guns through the center of their town!" (Dkt. No. 32-14, at 5).

## C.    Consequences of Anglin's Harassment Campaign

As of the filing of the Complaint, counsel for Ms. Gersh had counted more than 700 harassing, anti-Semitic messages sent after Anglin launched his trolls storm. (Dkt. No. 1, at 20). That number did not include hundreds of emails and phone messages deleted in the days before the FBI advised the Gershes to save all messages. Nor did it include the messages received since the filing of this lawsuit.

The disruption and chaos Ms. Gersh and her family experienced was multi-faceted. As a few examples: Ms. Gersh now suffers from Post-Traumatic Stress Disorder and major depression, developed panic attacks, and now needs medication to treat her symptoms, (Ex. C, at 3, 5–8; Ex. D, at 3-4); she was forced to give away all of her real estate listings and was unable to work for most of a year; she was forced to remove herself from all social media, despite the critical importance of an online presence to a real estate agent; and she was forced to delete her professional website, losing her life's work as a wedding planner. (Ex. E, at 8). The family had security cameras installed, altered their daily life for months on end, changed their

routine in the event they were being watched, closed their blinds, began carrying self-defense devices, such as a gun and mace, shopped at different stores in nearby towns, stopped using credit cards, avoided social events, and stopped inviting friends to their home for fear that their home address would become known to the hundreds of trolls and neo-Nazis threatening them. (Ex. E, at 9; Ex. F, at 5).

## II.    Blatant Violations of Litigation Obligations

Anglin has from the get go displayed a stunning disregard for the authority of this Court and has frustrated the progress of these proceedings. Anglin declined to permit his lawyer to accept service and repeatedly refused to disclose where he lives despite this Court's request that he do so. (Dkt. No. 45, at 10:5–12:5). Anglin refused to produce any non-public documents in response to Plaintiff's repeated requests for production, requiring her to file motions to compel. (Dkt. Nos. 112, 123). He has repeatedly ignored Court Orders and directives, among them a directive to supplement his interrogatory responses no later than February 18, 2019. (Dkt. No. 131, at 30). Anglin also has ignored *two* Court orders directing him to produce a financial statement. (Dkt. No. 131, at 30; Dkt. No. 160, at 2). And, he has breached agreements submitted to the Court as Joint Stipulations concerning his numerous discovery failures. (Dkt. No. 164). Simply put, Anglin has displayed a pattern of gamesmanship and disrespect, making it impossible to learn facts needed to get to the truth.

## III.    Entry of Default

On April 5, 2019, this Court issued an order denying Anglin's motion for a protective order that would have excused his appearance at an in-person deposition in the United States. (Dkt. No. 173). Plaintiff then noticed Anglin's deposition. (Dkt. No. 185-2). After a status conference on April 22, 2019, the Court advised Anglin's counsel in an Order that "[i]f Anglin fails to appear for his deposition . . . and in view of the Court's Order entered April 5, 2019, denying Anglin's motion for protective order relative to his deposition, the Court will enter Anglin's default in this matter." (Dkt. No. 182, at 2).

Less than 18 hours before the deposition, Anglin served objections, confirming that Anglin did not intend to appear for the deposition. (Dkt. No. 183-3, at 4). On April 30, 2019, at 9:00 a.m., counsel for all parties appeared for the noticed deposition, along with a court reporter and videographer. At 10:00 am, counsel went on the record and noted that Anglin had failed to appear. (Ex. G). Plaintiff filed a Notice of Defendant's Failure to Appear for Deposition, (Dkt. No. 185), and this Court issued an Order directing the Clerk to enter Anglin's default, (Dkt. No. 186). The Clerk entered default, pursuant to Rule 55(a), against Anglin. (Dkt. No. 188).

On April 30, 2019, Anglin's attorneys filed a motion to withdraw. (Dkt. No. 190). On May 14, 2019, Anglin's attorneys filed a supplement to the motion to withdraw. (Dkt. No. 195). Concurrent with this filing, Plaintiff filed a Motion for

Default Pursuant to Federal Rules of Civil Procedure 37 and 55. *See Adriana Int'l Corp. v. Lewis & Co.*, 913 F.2d 1406, 1410 (9th Cir. 1990) ("If a party . . . fails to obey an order to provide or permit discovery, . . . the court . . . may . . . render[] a judgment by default against the disobedient party.").

## LEGAL STANDARD

"Upon entry of default the factual allegations of the Complaint, except those relating to the amount of damages, are taken as true." *Avery v. Extradition Transp. of Am.*, No. CV 11-00153-M-DWM, 2012 WL 7017862, at *2 (D. Mont. Nov. 28, 2012), *report and recommendation adopted*, No. CV 11-153-M-DWM-JCL, 2013 WL 486658 (D. Mont. Feb. 7, 2013) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).

When assessing the propriety of default judgment after entry of default, courts in the Ninth Circuit consider factors set out in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986); *see also infra* at pp. 19-21. In applying the discretionary standard set out in *Eitel*, "default judgments are more often granted than denied." *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003) (quoting *PepsiCo v. Trinufo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999)).

The Ninth Circuit has also, and in parallel, identified five factors that a district court must consider before dismissing a case or declaring default as a terminating sanction. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987); *see also*

*infra* at pp. 16-19. "The five-part test announced in *Malone* is viewed as a balancing test." *Martinez v. Extra Space Storage, Inc.*, No. C 13-00319 WHA, 2013 WL 5732967, at *3 (N.D. Cal. Oct. 22, 2013).

## ANALYSIS

### I. This Court Properly Entered Default Against Defendant.

#### A. Rule 55

Default was properly entered against Defendant under Federal Rule of Civil Procedure 55. The Clerk's Entry of Default states that it had entered a default against Defendant "[p]ursuant to Rule 55(a) of the Federal Rules of Civil Procedure." (Dkt. No. 188). Rule 55 includes the failure to "otherwise defend." Fed. R. Civ. P. 55(a); *see also, e.g.*, *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141 (9th Cir. 1989) (affirming Rule 55 default judgment where party "fail[ed] to attend on the first day of a trial scheduled months before"); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (defendant failed to "otherwise defend" by among other things "failing to appear for a deposition").

#### B. Rule 37

Entry of default also is justified as a terminating sanction under Federal Rule of Civil Procedure 37. *See Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 917–19 (3d Cir. 1992) (although trial court "explicitly referred to Rule 55" as authority for entry of default for failure to comply with court orders, Rule 37

provided an alternate basis to support the district court's sanction order). Indeed, it is likely the more appropriate basis for the entry of default and possibly what this Court originally intended. (Dkt. No. 182, at 2 ("Thereafter, the Court would entertain a motion filed by Gersh under Fed. R. Civ. P. 37(d)(1) for the entry of default judgment against Anglin as provided in Rule 37(d)(3) .")). *See Trans World Airlines, Inc. v. Hughes*, 32 F.R.D. 604, 607 (S.D.N.Y. 1963), *aff'd in part, dismissed in part*, 332 F.2d 602 (2d Cir. 1964) (willful failure to appear at deposition "justifies the court in entering a default judgment" pursuant to Rule 37).

## II.     Application of the Factors Identified in *Malone* and *Eitel* Support Default Judgment.

Courts in this circuit have noted the confusion created by the separate multi-factor in *Malone* and *Eitel*. *See N. Seattle Health Ctr. Corp. v. Allstate Fire & Cas. Ins. Co.*, No. C14-1680JLR, 2016 WL 4533055, at *2 n.2 (W.D. Wash. Jan. 27, 2016). It appears that the *Eitel* factors are more appropriately applied in the context of default entered as a result of a defendant's failure to file a response whereas *Malone* is more appropriately applied when default is entered as a discovery sanction. *Id.*; *see also Dreith v. Nu Image, Inc.*, No. CV 054146 SVW MANX, 2007 WL 9658786, at *7 (C.D. Cal. Mar. 2, 2007). *But see Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 88, 1210–14 (W.D. Wash. July 17, 2014) (referring to both the

*Malone* and *Eitel* factors). Nonetheless, the *Malone* and *Eitel* tests both favor the granting a default judgment here.

### A. *Malone* Factors (Rule 37)

Before imposing a terminating sanction, courts must consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998) (citing *Malone*, 833 F.2d at 130). The *Malone* factors are not a set of conditions necessary for imposing a terminating sanction, but rather "a way to think about what to do." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). In a case involving a party's repeated discovery violations, the most critical factor is whether these violations "make it impossible for a court to be confident that the parties will ever have access to the true facts." *Id.* at 1097 (quoting *Valley Eng'rs Inc.*, 158 F.3d at 1058).

Further, when a court order is violated "the first two factors support sanctions and the fourth factor cuts against a default," "it is the third and fifth factors that are decisive." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990); *see Martinez v. Extra Space Storage, Inc.*, No. C 13-00319 WHA, 2013 WL 5732967, at *2 (N.D. Cal. Oct. 22, 2013) (analyzing third and fifth factors after the plaintiff's

"repeated failure . . . to appear at scheduled depositions" and "continuing refusal to comply with court orders").

### 1. Risk of Prejudice to Plaintiff

Anglin has engaged in a pattern of discovery abuse and failure to obey this Court's orders. *See supra* at pp. 9-10. Anglin's tactics to deny Ms. Gersh access to documents and information has been exhausting. Beyond the abuses listed, Anglin also lodged objections to discovery requests and filed motions to compel without sufficient bases. (Dkt. No. 164). Perhaps the most glaring example of Anglin's disrespect for discovery obligations is his response to an interrogatory requesting that he describe all efforts he had undertaken to respond to document requests. His response was, in essence "I cannot recall." (*See* Dkt. No. 128-1, at 5).

Anglin's conduct has impaired Ms. Gersh's ability to proceed with the litigation on the merits. In *Adriana*, the Ninth Circuit found that failing to appear for depositions and to comply with court orders constituted "an interference with the rightful decision of the case," and therefore established prejudice to the other party. 913 F.2d at 1412; *see also Curtis*, 33 F. Supp. 3d at 1211 (finding that the defendant's "history of unexcused delay" and "willful disregard of court orders and deadlines" made it "unlikely that Plaintiffs' claims can be resolved on the merits").

Similarly, here, Anglin has not complied with multiple court orders, refused to appear for his deposition, refused to engage in discovery, and further indicated

that he would not ever travel to the United States regardless of this Court's direction. Accordingly, this factor heavily weighs in favor of entry of default judgment.

### 2. Availability of Less Drastic Sanctions

An explicit discussion of alternative sanctions is not necessary for an entry of default. *Malone*, 833 F.2d at 132. In egregious circumstances, it is unnecessary for a district court to discuss why alternatives to dismissal are inappropriate. *Id.* Indeed, "warning a plaintiff that failure to obey a court order will result in dismissal can suffice to meet the 'consideration of alternatives' requirement." *Id.* "A plaintiff can hardly be surprised by a harsh sanction in response to willful violation of a pretrial order." *Id.* at 133; *see also Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1170 (9th Cir. 2012) (affirming default judgment where the court warned the party on the record about the possibility of a case-dispositive sanction).

Here, this Court warned Anglin about his evasive behavior and the threat of severe sanctions on more than one occasion. On December 14, 2017, during a preliminary conference, this Court instructed Anglin's attorney to "emphasize to Mr. Anglin there's not going to be any game-playing here" after Anglin had failed to disclose his location in order for this Court to make a jurisdictional determination. (Dkt. No. 45, at 12:3–4). In a Court Order from March 19, 2019, this Court warned that it "will impose sanctions" if Anglin did not comply with its previous order that he provide a financial statement. (Dkt. No. 160, at 2). In its most recent order, this

Court specifically cautioned Anglin that it would enter a default against him if he did not appear for deposition. (Dkt. No. 182, at 2).

## B. *Eitel* factors

The *Eitel* factors also support a default judgment. As discussed above, the possibility of prejudice to Ms. Gersh heavily weighs in favor of default judgment, while the policy favoring judgment on the merits, as always, weighs against default judgment. *See J & J Sports Prods., Inc. v. Becerra*, No. CV-15-803, 2015 WL 7771174, at *2 (D. Ariz. 2015) ("Although the policy favoring decisions on the merits counsels against default judgment, the mere existence of Rule 55(b) indicates this policy is not dispositive."). The remaining factors support entry of default judgment.

### 1. Merits and Sufficiency of the Complaint[1]

These two factors "amount to a requirement that the allegations in the complaint be sufficient to state a claim that supports the relief sought." *Johnson v. Lababedy*, No. 2:16-CV-0126 KJM AC, 2016 WL 4087061, at *3 (E.D. Cal. Aug. 2, 2016). Here, this Court has already determined that Plaintiff's allegations were

---

[1] "Given the close relationship between the merits of plaintiff's substantive claims and the sufficiency of the complaint, these factors can be discussed jointly." *Johnson v. Lababedy*, No. 2:16-CV-0126 KJM AC, 2016 WL 4087061, at *3 (E.D. Cal. Aug. 2, 2016).

sufficient to support its claims when it denied Defendant's 12(b)(6) Motion to Dismiss. (Dkt. No. 116).

### 2. Sum of Money at Stake in the Action

Courts "take into account the amount of money requested in relation to the seriousness of the defendant's conduct, whether large sums of money are involved, and whether 'the recovery sought is proportional to the harm caused by defendant's conduct.'" *Curtis*, 33 F. Supp. 3d at 1212 (quoting *Landstar Ranger, Inc. v. Parth Enter., Inc.*, 725 F. Supp. 2d 916, 921 (N.D. Cal. 2010)). Here, the amount being sought is substantial, but this factor alone does not shift the balance against default judgment. *Id.* at 1212–14 (finding that "*Eitel* factors overwhelmingly support default judgment" even when damages were substantial).

### 3. Possibility of Dispute Concerning Material Facts

On default, all material facts except those pertaining to damages are deemed admitted as a matter of law. *Laera v. Fang*, No. 214CV00667JADNJK, 2016 WL 3410173, at *2 (D. Nev. June 14, 2016). Here, after the entry of default, all material facts in the Complaint have been admitted as true. In any event, the core facts supporting liability—the fact that Anglin published 30 blog posts and that Ms. Gersh received hundreds of hateful messages and threats—cannot reasonably be disputed.

### 4. Whether Default Was Due to Excusable Neglect

Here, Anglin's conduct cannot be attributed to excusable neglect. Anglin has offered no explanation for his failure to appear for his deposition besides his unfounded fear of travelling to the United States, which this Court rejected, (Dkt. No. 173, at 5–6), or his repeated disregard for discovery obligations and court orders. In his objections to Plaintiff's Deposition Notice, Anglin stated that he had no intention of showing up for his deposition. (Dkt. No. 185-3, at 4).

## III. The Amounts of Compensatory and Punitive Damages Requires Determination by Factfinder.

Unliquidated and punitive damages require "proving up" at an evidentiary hearing or through other means. *See Black & Decker, Inc. v. All Spares, Inc.*, No. CV 09-2126, 2010 WL 3034887, *3 (D. Ariz. Aug. 3, 2010). "Plaintiff's burden in 'proving up' damages on a motion for default judgment is relatively lenient. If proximate cause is properly alleged in the complaint, it is admitted upon default. Injury is established and plaintiff need prove only that the compensation sought relates to the damages that naturally flow from the injuries pled." *Philip Morris USA, Inc. v. Castworld Prods., Inc.,* 219 F.R.D. 494, 498 (C.D. Cal. 2003) (citations omitted).

The Court may consider declarations or affidavits providing evidence, *United Specialty Ins. Co. v. Valdez*, No. CV 16-164-BLG-TJC, 2018 WL 2121632, at *2

(D. Mont. Apr. 16, 2018), *report and recommendation adopted*, No. CV 16-164-BLG-SPW, 2018 WL 2120905 (D. Mont. May 8, 2018), and may hold a hearing if necessary to determine or investigate the amount of damages. *See*, *e.g.*, *Brantley v. Boyd*, No. C 07-6139, 2013 WL 3766911, at *8 (N.D. Cal. July 16, 2013).

Here, Ms. Gersh provides declarations as a starting point for the appropriate amount of compensatory and punitive damages. Ms. Gersh requests an evidentiary hearing to provide testimony and additional evidence to assist the Court in ensuring just and reasonable amounts.

### A. Compensatory Damages

In evaluating a claim for emotional distress under Montana law, the award should include reasonable compensation for any mental and emotional suffering and distress experienced by Ms. Gersh and reasonably probable to be experienced in the future. *Ammondson v. Nw. Corp.*, 220 P.3d 1, 17 (Mont. 2009). The law does not set a definite standard by which to calculate compensation for mental and emotional suffering and distress. *Id.* Instead, the factfinder must exercise reasonable judgment. *Id.* at 17–18.

### 1. Economic Damages

Ms. Gersh seeks compensation for her past medical expenses, including treatment and prescription medications caused by Anglin's actions, in the amount

of $15, 405. (Ex. F, at 8). She seeks $5, 275 to compensate for money expended as a result of the need to quickly flee their home to avoid an armed march Anglin announced with hundreds of armed neo-Nazis and anti-Semites to "protest" Ms. Gersh. (Ex. F, at 7).

Ms. Gersh seeks $440,885 for lost earnings from December 16, 2016, through December 15, 2018. (Ex. E, at 12).

### 2. Pain and Suffering to Date

Ms. Gersh experienced overwhelming trauma as a result of being the target of a brutal anti-Semitic campaign of harassment, magnified tenfold as a result of Anglin's targeting her child and the effect that his actions have had on her children, which has in turn intensified her own trauma. "In personal injury actions there is no measuring stick by which to determine the amount of damages to be awarded for pain and suffering other than the intelligence of a fair and impartial trier of fact governed by a sense of justice; each case must of necessity depend upon its own peculiar facts." *Albinger v. Harris*, 48 P.3d 711, 721 (Mont. 2002).

The Nazi images and references of concentration camps and gas chambers that Anglin used to provoke and direct his "army" into action were, in themselves, egregious and led Ms. Gersh to live in fear. From the first vicious attacks received hours after Anglin called upon his "troll army" to "hit 'em up"—profanity-laden missives, wishing her dead, calling her every anti-Semitic name imaginable, with

violent images and sounds, threats to "make every effort to get you fired from your job and run out of the United States," (Ex. I).—to the last one she received less than three weeks ago claiming to be "a former US Marine" and menacing her with the following; "I can only say GOD BLESS to any man in this world who kills a Jew," (Ex. J), Ms. Gersh suffered and suffers emotionally, physically and psychologically, as set out below.

The Court is called upon to compensate a victim for a life that has been torn apart and turned upside down. Ms. Gersh and her family lived in literal terror for months on end. (Ex. E, at 7). She received constant messages calling for her death, or the extermination of herself and her family as Jewish people, along with what she perceived to be threats and warnings of harm,[2] including calls with nothing but gun shots as the ominous warning message. (Ex. E, at 7). The family packed bags in the event they needed to flee, and, in fact, abruptly left their home when Anglin's armed "March on Whitefish" appeared to be imminent, plans hastily made less than 48 hours earlier. (Ex. E, at 8).

Anglin's terror campaign devastated Ms. Gersh's physical and mental health. Ms. Gersh has experienced serious and severe emotional and physical distress,

---

[2] Anglin incited his "army" of neo-Nazis with, among other images, pictures of Ms. Gersh *and her son* with gold stars on their foreheads—the image Nazis put on Jews destined for crematoriums. Understandably, Ms. Gersh perceived these messages as targeted her and her son for assassination, and every anti-Semitic message as threats of harm to her and her family.

including panic attacks, anxiety, hair loss, sleeplessness and physical pain in her shoulders and hips. (Ex. C, at 4–5; Ex. E, at 11–13). Ms. Gersh never took or needed to take prescription medication for anxiety or any mental health concern prior to Anglin's attack against her nor had she seen a therapist or a psychiatrist. (Ex. E, at 12–13). Now, she utilizes all three. Ms. Gersh was diagnosed and continues to struggle with Post-Traumatic Stress Disorder and Major Depression. (Ex. D, at 4–5). She needed treatment for stress-induced shoulder pain caused by Anglin's actions. (Ex. E, at 14). In order to be able to save her teeth from irreversible damage, she needed a dental device to mitigate the teeth grinding that she suffered as a result of Anglin's actions. (Ex. E, at 12). In order to treat her PTSD symptoms, she needs daily anti-depressant and other medication.

Perhaps the worst consequence is the impact on her children. Despite Ms. Gersh's conscious and consistent effort to shield her children from Anglin's campaign, she was not able to fully protect them from the consequences. Ms. Gersh's pain and suffering was magnified immeasurably by Anglin's targeting her then 12-year-old child, and by her children's suffered from the family trauma. The amount sought is just and reasonable.

### 3. Future Pain and Suffering and Loss of Enjoyment of Life

Ms. Gersh now suffers, and will continue to suffer, from mental health disorders and their manifestations as a result of Anglin's actions. She continues to

be retraumatized by events to this day. Ms. Gersh also suffers from distress, anxiety and grief as a result of her children's adverse and ongoing response to the trauma he witnessed his mother endure.

Ms. Gersh has had physical and neurological changes and is likely to suffer long-term impacts from the severe trauma she experienced. Studies have shown that trauma of the magnitude Ms. Gersh experienced creates chemical and physical changes in PTSD sufferers' brains. (Ex. D, at 7-8). In addition, studies have shown that trauma and PTSD impact cortisol, a primary stress hormone, where PTSD appears to hasten cortisol imbalance and has extensive consequences. (Ex. D, at 8). PTSD sufferers like Ms. Gersh are also highly susceptible to events that trigger her PTSD and are at a higher risk for a variety of physical illnesses. Finally, Ms. Gersh will continue to receive medical treatment for her injuries.

Currently, Ms. Gersh regularly sees her psychiatrist and has counseling sessions with her therapist. She takes prescription medications and likely will need to continue treatment and medications for the foreseeable future, perhaps a lifetime. (Ex. C, at 9).

### 4. Lost Earning Capacity

Ms. Gersh's business as a real estate agent have been adversely affected by Anglin's conduct. Ms. Gersh was forced to stop working for most of 2017. Because Ms. Gersh had started in the real estate field only two years earlier and had just begun

to build her reputation as a real estate agent, she is many years behind where she would have been with respect to her earning potential. In addition, her earning potential was reduced by 47% in the past year and is likely permanently depressed. (Ex. E, at 12). This is so because an internet search of her name—which most potential clients conduct prior to hiring an agent—brings up thousands of sites connecting her with a 'Jew vs. Nazi' controversy, along with false reviews and claims still active as a result of Anglin's actions, including the still active adultery claim on "She's a Homewrecker.com" initiated days after Anglin's call to action. (Ex. H, at 6). But for Anglin's actions, such a search would show her listings, reviews, and positive information, thus making her imminently more likely to get new clients.

If Ms. Gersh increases her earnings by 10% for the next three years, she will reach her maximum earning potential, which the Principal Broker at her real estate office opines is her maximum of 80%. (Ex. H, at 7). Ms. Gersh's future losses over the course of the next 10 years are estimated to be approximately $866,375. (Ex. E, at 13). "Damages for the loss of future earnings . . . are recoverable 'where the evidence makes reasonably certain their occurrence and extent.'" *Cantu v. United States*, No. CV1400219MMMJCGX, 2015 WL 4720580, at *35 (C.D. Cal. Aug. 7, 2015).

### 5. Similar compensatory damage awards range from $250,000 to $3 million.

This Court should consider jury awards in similar cases to identify the appropriate amount of compensatory and punitive damages. *Brantley v. Boyd*, No. C 07-6139 MMC, 2013 WL 3766911, at *8 (N.D. Cal. July 16, 2013) (district courts have "compare[d] damages sought in default judgment to jury awards in similar cases" when evaluating whether "the amount of damages claimed for emotional distress is reasonably proportional to the harm at the default judgment stage.")

In *Allen v. Zonis*, 2017 WL 4142046 (Wash. Super. Ct. Mar. 31, 2017), the jury awarded $2 million for intentional invasion of privacy, and $3 million for IIED where the defendant sent plaintiff "hundreds of text messages, called her frequently, sent sexually explicit videos of her to their family, friends and neighbors," engaged in other online maliciousness, including calling family and workplaces and leaving threatening messages, and engaged in additional actions directed at harming plaintiffs.

Even more similar, however, is the damage award issued by a federal court days ago against Anglin for similarly malicious and outrageous actions directed at comedian and journalist Dean Obeidallah. There, the court awarded a default judgment in the amount of $4.1 million, with $820,000 as compensatory damages. Judgment, *Obeidallah v. Anglin*, No. 2:17-CV-00720-EAS-EPD (S.D. Ohio) (Ex. J).

Because the actions here are uniquely malicious, comparators in the Ninth Circuit are rare. Consider, however, *Clark v. Hidden Valley Lake Association, Inc., JVR*, No. 1807100002 (N.D. Cal. Feb. 8, 2018). In *Clark*, a professional golfer claimed to suffer emotional distress and damage to his professional reputation after defendant made false statements about him regarding possession of child pornography, improper accounting practices, and making personal use of defendant's money. The defendant instructed members of his association to post similar allegations about the plaintiff on Facebook and their personal blogs. Plaintiff brought privacy, defamation and IIED claims; the jury awarded $2 million in compensation.

## B.    Punitive Damages

In addition to compensatory damages, Ms. Gersh seeks punitive damages, for the reasons set out below.

Under Montana law, the judge must consider:

> (i) the nature and reprehensibility of the defendant's wrongdoing; (ii) the extent of the defendant's wrongdoing; (iii) the intent of the defendant in committing the wrong; (iv) the profitability of the defendant's wrongdoing, if applicable; (v) the amount of actual damages awarded by the jury; (vi) the defendant's net worth; (vii) previous awards of punitive or exemplary damages against the defendant based upon the same wrongful act; (vii) potential or prior criminal sanctions against the defendant based upon the same wrongful act; and (ix) any other

> circumstances that may operate to increase or reduce,
> without wholly defeating, punitive damages.

Mont. Code Ann. § 27-1-221(7)(b);

As to the defendant's wrongdoing, the facts here support a large punitive award. Anglin has maliciously and knowingly directed a sustained campaign of harassment and terror against a private individual living an otherwise quiet and apolitical life. Perhaps most egregiously, in order to harm Ms. Gersh, Anglin targeted a 12-year-old *child*—posting his picture, identifying him by name, providing contact information, and calling him a "scamming little kike" and a "creepy little faggot." (Dkt. No. 1, at 4; Dkt. No. 32-2, at 8–10).

Undeterred by this lawsuit, or the knowledge that his actions have devastated other people, Anglin continues to publish and make available the thirty blog posts about Ms. Gersh and her family underlying this lawsuit. He boasts about and has continued his malicious "troll storms" both before and after the Whitefish events. *See Obeidallah*, No. 2:17-CV-00720-EAS-EPD (S.D. Ohio); *Dumpson v. Anglin*, No. 1:18-cv-01011-RMD (D.D.C.). A significant punitive award is necessary because Anglin has continued to employ his malicious, vile and vicious tactics, fully knowing that they result in sustained harassment and distress to his targets. *See Czajkowski v. Meyers*, 172 P.3d 94, 104 (2007) (finding the defendants conduct as "particularly egregious since this was not an isolated incident, as it appears they have a pattern and practice of tormenting their neighbors").

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *See Hull ex rel. Senne v. Ability Ins. Co.*, No. CV-10-116-BLG-RFC, 2012 WL 6083614, at *3 (D. Mont. Dec. 6, 2012) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). Here, Anglin shared pictures of Ms. Gersh's family and superimposed her and her son's faces over the gates of Auschwitz. He introduced her to his horde of anti-Semites, riled them into a frenzy with false and inflammatory claims, and provided contact information and instructions for months. Anglin's troll storm was meant to inflict maximum harm on Ms. Gersh by targeting her, her profession, and her child. Anglin's wrongdoing was extensive—he posted on the *Daily Stormer* repeatedly, called on his followers to continue the trolling, threatened to bring an armed neo-Nazi March to her doorstep. Anglin is a serial wrongdoer, employing these troll storm tactics against numerous targets over the years, and has displayed no remorse for his actions.

In terms of previous awards against this Anglin, the court in *Obeidallah* recently awarded $3,280,000.00 in punitive damages, based on a multiplier of four, for Anglin's actions in falsely portraying an American Muslim comedian as a terrorist on the *Daily Stormer*. (Ex. K). Anglin is also awaiting default judgment for similar troll storm tactics in the *Dumpson v. Anglin* case where he targeted an African American college student.

As to the limitation based on a defendant's net worth, Anglin cannot avoid a large punitive damage award based on the lack of evidence of his net worth where his own refusal to comply with discovery and this Court's orders is the very reason that Ms. Gersh lacks such evidence. As set out by the Montana Supreme Court, the limitation on damage awards in excess of 3% of a defendant's net worth applies only "if the defendant first meets his burden of demonstrating an accurate calculation of his net worth." *Blue Ridge Homes, Inc. v. Thein*, 191 P.3d 374, 387 (Mont. 2008); *see also Maurer v. Clausen Distrib. Co.*, 912 P.2d 195, 199 (Mont. 1996) ("[A] plaintiff is not required to show proof that a defendant's net worth supports an award of punitive damages. If the defendant's net worth does not support an award of punitive damages, the defendant must produce evidence to that fact.").[3]

---

[3] Although Plaintiff bears no burden of proof with respect to Anglin's net worth to support a punitive damage award, evidence presented in the Southern District of Ohio in *Obeidellah v. Anglin*, and reports of same, show that Anglin raises between $20,000 and $80,000 in bitcoin donations per month and that, in Jan. 28, 2017, when Anglin received his first donation to the bitcoin wallet that he advertises on *the Daily Stormer*, he has taken in around $260,000 in bitcoin at that single address, according to witness John Bambenek, Vice President Of Security Research And Intelligence for cyber security firm ThreatSTOP data, and has other wallets and likely received even more money through bitcoin and other cryptocurrency). *See* Luke O'Brien, *Who Gave Neo-Nazi Publisher Andrew Anglin a Large Bitcoin Donation after Charlottesville?*, HuffPost (June 12, 2019), https://www.huffpost.com/entry/andrew-anglin-bitcoin-mysterious-donor_n_5d011cc6e4b0304a12087e0c.

Should the Court find that Plaintiff bears the burden of somehow showing Defendant's net worth, she would request leave to file an expert report from Mr. Bambenek.

Accordingly, this Court should award a large in punitive damages to both deter and punish Defendant for his wrongful conduct.

## C. Injunctive Relief

A permanent injunction is warranted as relief in this case ordering Anglin to remove from his website the blog posts encouraging his readers to contact Ms. Gersh, her family and, especially, her son, including all photographs and images of the family and comment boards associated therewith. Given that Anglin continues to publish these malicious blog posts and make them available to an international audience of neo-Nazis, encouraging harassment against a child and his parents, which harassment continues to this day. Such relief is encompassed in in Plaintiff's prayer seeking "such other relief as the Court deems just."[4] (Dkt. No. 1, at 62).

## CONCLUSION

For all the foregoing reasons, Plaintiff requests entry of a default judgment in an amount to be determined.

DATED June 22, 2019.

/s/ Elizabeth Littrell
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff

---

[4] If the Court requires a more specific request for relief, Plaintiff requests an opportunity to seek leave to file an Amended Complaint to conform to proof.

## EXHIBIT INDEX

| Ex. | Description |
|-----|-------------|
| A | Daily Stormer Style Guide |
| B | Sherry Spencer Deposition Transcript |
| C | Affidavit of Dr. John Douglas Muir |
| D | Affidavit of Melissa Hartman |
| E | Affidavit of Tanya Gersh |
| F | Affidavit of Judah Gersh |
| G | Andrew Anglin Deposition Transcript |
| H | Affidavit of Dale Crosby Newman |
| I | Harassing Message, December 16, 2016 |
| J | Harassing Message, June 4, 2019 |
| K | Order in *Obeidallah v. Anglin* |

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Local Rule 7.1(d)(2). It contains 6497 words, excluding the caption, certificates of service and compliance, tables of contents and authorities.

/s/ Elizabeth Littrell
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing document was sent by U.S. mail to Defendant at the following addresses identified by his former counsel in his Motion to Withdraw:

6827 N High Street, Suite 121,
Worthington, Ohio 43085

3827 N High Street, Suite 121,
Worthington, Ohio 43085

7407 Brandshire Ln. Apt. B,
Dublin, Ohio 43017

915 N High Street,
Columbus, Ohio 43201

I hereby certify that on this date the foregoing document was filed through the Court's CM/ECF filing system, and by virtue of this filing notice will be sent electronically to all counsel of record, including:

Jonathan W. Bennion
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
jonbennion@mt.gov
*Attorney for Intervenor State of Montana*

Matthew T. Cochenour
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
PO Box 201401
Helena, MT 59620-1401

mcochenour2@mt.gov
*Attorney for Intervenor State of Montana*

Hannah E. Tokerud
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
hannah.tokerud@mt.gov
*Attorney for Intervenor State of Montana*

on this 21st day of June, 2019.

/s/ Elizabeth Littrell
Attorney for Plaintiff Tanya Gersh
on behalf of all Attorneys for Plaintiff